**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOHN DOE, INC.<br><br>       Plaintiff,<br><br>       v.<br><br>ALBERTO R. GONZALES,<br>in his official capacity as<br>Attorney General of the United States, and<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20530,<br><br>KAREN P. TANDY, in her official<br>capacity as Administrator of the<br>United States Drug Enforcement<br>Administration, and<br><br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION<br>2401 Jefferson Davis Highway<br>Alexandria, VA  22301<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 1:06-CV-00966-CKK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR MANDATORY INJUNCTIVE RELIEF

John Doe, Inc. ("Plaintiff"), through its undersigned counsel, files the following

complaint seeking preliminary and permanent mandatory injunctive relief, and states as follows:

## Introduction

This is an action for mandatory injunctive relief to reverse a decision by the United States

Drug Enforcement Administration ("DEA") to deny a permit to Plaintiff to import certain

Schedule III controlled substances pursuant to a duly issued DEA registration.  The DEA action,

violative of the Administrative Procedure Act and Plaintiff's Constitutional 5th Amendment rights, is preventing Plaintiff from producing a low cost generic alternative to Marinol®, a medicine used by cancer and AIDS patients.  Plaintiff seeks to import a generic version of Marinol®, a Schedule III controlled substance, for the purpose of completing studies required by the Food and Drug Administration ("FDA") to obtain approval to market and sell its generic Marinol®.  DEA's position, that Plaintiff must first have FDA approval of its product before it may import under its Schedule III registration, puts Plaintiff is a classic "Catch 22" situation – it cannot obtain FDA approval without first importing the product and conducting the required testing, yet it cannot, according to DEA import the product to conduct the testing without first obtaining FDA approval.  Plaintiff has and will continue to suffer irreparable injury by DEA's action, as such action has brought to a standstill Plaintiff's effort to obtain the first FDA approval to market and sell its lower cost generic equivalent to Marinol®.

## Parties

1.      Plaintiff is a **[REDACTED]** corporation with its principal place of business located at **[REDACTED]**.

2.      Defendant, Alberto R. Gonzales is the Attorney General of the United States.  Pursuant to 21 U.S.C. § § 952 and 958, he is charged with enforcing federal law and regulations relating to the importation of controlled substances.  He is sued in his official capacity.

3.      Defendant, United States Department of Justice, through the United States Drug Enforcement Administration, is delegated the responsibility to regulate the importation of controlled substances in the United States.

4.      Defendant, Karen P. Tandy, is the Administrator of the Drug Enforcement Administration, and is delegated authority to administer a program of registration and permits relating to the importation of controlled substances.  She is sued in her official capacity.

5.    Defendant, United States Drug Enforcement Administration, part of the United States Department of Justice, is the federal agency primarily responsible for implementing regulations relating to the importation and distribution of controlled substances in the United States.

## Jurisdiction and Venue

6.    The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as the claims arise under 21 U.S.C. § § 952 and 958, 5 U.S.C. § § 701-706 and the Fifth Amendment of the United States Constitution.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1).

## Background

## Plaintiff's Business

8.    **[REDACTED]**.

9.    **[REDACTED]**.

10.    Plaintiff has expertise in the development, manufacture, sale, marketing and distribution of pharmaceutical products sold under generic chemical names including, DEA Schedules II-V products for human use.  These products include, among others, **[REDACTED]**.

11.    Plaintiff has knowledge, skill and experience in the development, manufacturing, and marketing of pharmaceutical drug products, including managing the development and production of pharmaceutical drug products from concept through approval by the United States Food and Drug Administration ("FDA") of an Abbreviated New Drug Application ("ANDA") for marketing approval.  In the course of its existence, Plaintiff has developed and brought to market over **[REDACTED]** generic drug products.

3

12.     Although Plaintiff is a **[REDACTED]** company, with **[REDACTED]**, Plaintiff competes with nearly every manufacturer and distributor of generic drugs.

13.     Currently, Plaintiff manufactures **[REDACTED]** generic drugs.

14.     In order to continue to offer lower-cost alternatives to brand-name pharmaceuticals, in some instances, Plaintiff pursues partnerships or collaborative relationships with other companies.

15.     Plaintiff expends considerable effort, time and expense identifying opportunities for generic drug development and manufacture, formulating strategies for the development, manufacture, marketing and sale of new generic drugs (from concept through FDA approval to commercialization), developing and maintaining relationships with vendors, suppliers, customers, and other pharmaceutical manufacturers, and manufacturing and marketing its products.

## Plaintiff Identifies a Market for a Generic Marinol® Product

16.     Marinol® is the brand name of a pharmaceutical drug product that was approved by the FDA to treat nausea and vomiting associated with cancer chemotherapy on May 31, 1985.

17.     Marinol® has also been approved by the FDA to treat anorexia associated with weight loss in patients with acquired immunodeficiency syndrome (AIDS) since December 22, 1992.

18.     The generic chemical name of Marinol® is Dronabinol.

19.     The Active Pharmaceutical Ingredient (or Active Drug Substance) in Marinol® (Dronabinol) is a synthetic version of a naturally-occurring compound known as delta-9-tetrahydrocannabinol or delta-9-THC.

20.    Marinol® is available in 2.5 mg, 5 mg, and 10 mg soft gelatin capsules containing synthetic delta-9-THC in sesame oil.

21.    Currently, there are no generic competitors to Marinol® on the market. Accordingly, Plaintiff stands to offer a lower cost alternative to the market when it obtains FDA approval of a generic Marinol® product.

22.    Current annual sales of Marinol® in the United States are $170 million.  The current selling price of Marinol is $1,263.31 for a bottle of sixty capsules.

23.    If Plaintiff is the first to obtain FDA approval of an ANDA for its generic Marinol® product, it anticipates capturing approximately **[REDACTED]** of the market. Furthermore, if Plaintiff is the first to receive FDA approval of its ANDA for generic Marinol®, it plans to sell its product for **[REDACTED]** of the price of brand-name Marinol.  Accordingly, Plaintiff's introduction of the first competitor to Marinol® would provide a savings to the public of **[REDACTED]** annually.

### Plaintiff Enters Into A Product Development Agreement With [REDACTED]

24.    **[REDACTED]**.

25.    Plaintiff approached at least four companies in the United States that it believed possessed **[REDACTED]** but did not reach an agreement with them.

26.    Through a third party, Plaintiff was introduced to **[REDACTED]**, that is engaged in the business of developing, producing and packaging solid dosage forms for pharmaceutical use.

27.    On March 23, 2005, Plaintiff executed an agreement with **[REDACTED]** (the "Manufacturing Agreement") to develop a custom process for the development of the generic equivalent of Marinol®.

28.    The secrecy and timing of the generic Marinol® project is critical.  With no generic competition for Marinol® currently on the market, Plaintiff stands to obtain a significant portion of the market if it is first to receive approval of its ANDA.

29.    Pursuant to the Manufacturing Agreement, Plaintiff and its collaborators prepared a schedule for obtaining FDA approval of the ANDA for the generic equivalent of Marinol®.

30.    In order to meet their target for the submission of the ANDA to the FDA, Plaintiff and its collaborators established target dates, referred to as milestones, for the work that needed to be completed before submission of the ANDA.  The milestone schedule provides for **[REDACTED]** to formulate initial batches of its generic Marinol® product, export those batches to Plaintiff in the United States pursuant to Plaintiff's Schedule III DEA registration, for packaging, stability testing and bioequivalence studies.[1]  Once these studies are completed, Plaintiff will submit all of the data in its ANDA to the FDA.

31.    Plaintiff and its collaborators have been diligently working to meet the ANDA milestones that they have set out.

### DEA Regulation of Importation of Marinol®

32.    Pursuant to the Controlled Substances Act of 1970 ("CSA"), 21 U.S.C. §801 et seq., and regulations promulgated in 21 C.F.R. § 1308, the Drug Enforcement Administration has identified five "Schedules" of controlled substances.

33.    To be listed on Schedule III, it must be found that:  (A) the drug has a potential for abuse less than drugs in schedules I and II; (B) the drug has a currently accepted medical use

---

[1] As part of its ANDA, Plaintiff must show, among other things, that its Dronabinol product is "bioequivalent" to Marinol®.  In order to develop the data for establishing bioequivalence, Plaintiff is required to import the three batches, package them and conduct patient testing.

in treatment in the United States; and (C) abuse of the drug may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3).

34.    Pursuant to the Federal Register Notice of July 2, 1999, "Marinol" was added to Schedule III. 64 Fed. Reg 35928-01. In doing so, the term "Marinol" was used throughout the Notice "to refer to Marinol and any other products, which may be approved by FDA in the future, that have the same formulation as Marinol." In referring to the product being added to Schedule III as encompassing both the then-existing Marinol and any other products having the same formulation as Marinol, which may be approved by the FDA in the future, the DEA recognized the possibility of such future generic products not yet approved by the FDA and added those products to Schedule III as well.

35.    Pursuant to 21 U.S.C. § 952(b), [i]t shall be unlawful to import ... into the United States from any place outside thereof, any nonnarcotic controlled substance in schedule III, unless such nonnarcotic controlled substance (1) is imported for medical, scientific, or other legitimate uses and (2) is imported pursuant to such notification, or declaration, or in the case of any nonnarcotic controlled substance in schedule III, such import permit, notification, or declaration, as the Attorney General may by regulation prescribe ..."

36.    DEA regulates the importation of nonnarcotic controlled substances in Schedule III through the issuance of registrations and permits. 21 C.F.R. § 1312.

37.    Pursuant to 21 C.F.R. § 1312.11, "[n]o person shall import or cause to import a controlled substance ... unless and until such person is properly registered under the [CSA] (or exempt from registration) and the Administrator has issued him a permit to do so pursuant to § 1312.13."

38.    Pursuant to 21 C.F.R. § 1312.13, an application for a permit to import controlled substances must be made on DEA Form 357.

39.    The DEA is authorized to approve the importation of Schedule III nonnarcotic controlled substances if it is found that the substance is being imported for medical, scientific or other legitimate uses.  21 C.F.R. § 1312.13(b).

## Plaintiff Seeks Approval to Import Dronabinol
## For Scientific Testing in Support of its ANDA

40.    On June 25, 2005, Plaintiff filed an application for registration to import controlled substances listed in Schedules IIIN and IV.  Included in the application was the drug code number 7369 (Dronabinol in sesame oil encapsulated in a soft gelatin capsule).  Thereafter, on or about December 22, 2005, DEA issued a registration (DEA Registration Number **[REDACTED]**) to import controlled substances listed on Schedule IIIN, which registration is valid and effective.  A true and correct copy of Plaintiff's registration is attached hereto as Exhibit "A."

41.    In the Fall of 2005, Plaintiff submitted to the FDA its Protocol for *In Vivo* Bioequivalence study of Dronabinol in Healthy Human Volunteers under Fasting Conditions.  On April 26, 2006, FDA submitted comments on Plaintiff's protocol, concluding that "… the protocol is well thought out, and it includes measures to protect the safety of subjects.  The pilot study based on the protocol will be an excellent source of information on Dronabinol to conduct a bioequivalence study."  A true and correct copy of a Memorandum from **[REDACTED]** to Plaintiff is attached as Exhibit "B."

42.    On February 28, 2006, Plaintiff submitted an application to the DEA (DEA Form 357) for a permit to import 400 capsules of Dronabinol 2.5 mg, 400 capsules of Dronabinol 5 mg and 400 capsules of Dronabinol 10 mg.  A true and correct copy of the Form 357 submitted by

Plaintiff on February 28, 2006 is attached hereto as Exhibit "C." Plaintiff certified on the application that the substances "are imported exclusively for scientific purposes" which was described as "Internal Analytical Method Development and Validation."

43.    Thereafter, on March 22, 2006, DEA issued Permit No. **[REDACTED]** to Plaintiff to import its generic Marinol® product in the quantities and dosage strengths identified in the February 28, 2006 permit application. A true and correct copy of DEA Permit No. **[REDACTED]** is attached hereto as Exhibit "D." Significantly, the DEA permit indicated that "[t]he consignment proposed to be imported is required for legitimate purposes."

44.    On April 18, 2006, Plaintiff submitted an application to the DEA (DEA Form 357) for a permit to import three "submission batches" of its generic Marinol® product. A true and correct copy of Form 357 submitted by Plaintiff on April 18, 2006 is attached hereto as Exhibit "E." Plaintiff again certified on the application that the substances "are imported exclusively for scientific purposes" which was described as "Biostudy/Submission Batches For ANDA Approval." These batches were manufactured by **[REDACTED]**, paid for by Plaintiff and are stored at **[REDACTED]** facility in **[REDACTED]** pending DEA's issuance of a permit to Plaintiff to import them to the United States. Once imported, these batches are to be packaged and used in "pilot" and "pivotal" bioequivalence studies as set forth in the protocol approved by FDA on April 26, 2006. Accordingly, the three batches fell within the July 2, 1999 Federal Register Notice whereby Marinol and products having the same formulation as Marinol which "may be approved by FDA in the future" were placed under Schedule III.

### The DEA Denies Plaintiff's Form 357 Application to Import Generic Marinol®

45.    On May 5, 2006, representatives of DEA contacted a Plaintiff representative to inform him that the application for a permit to import the three batches of Dronabinol in sesame

9

oil encapsulated in a soft gelatin capsule had been denied. Despite the fact that DEA had already issued a permit to Plaintiff to import the previous smaller batch, DEA now erroneously concluded that in order for Plaintiff to import the generic Marinol® product under its Schedule IIIN registration, the product had to already be FDA approved. When Plaintiff's representative pointed out that DEA has already issued a permit to import a previous smaller batch under its DEA import registration, the DEA representatives claimed that it had been a mistake for DEA to issue that permit.

46.    Plaintiff requested that DEA reconsider its position and grant the permit to import the three batches of its generic Marinol® product. However, DEA has refused to change its position.

47.    Plaintiff will suffer severe, substantial irreparable injury if it must first seek an administrative hearing on DEA's denial of its permit request before obtaining judicial review. DEA regulations provide no timeframe for an administrative hearing or decision by the DEA administrator. Furthermore, each day that passes renders the three batches stale and unusable. In addition, Plaintiff's project to obtain the first ANDA approval to bring a lower cost alternative to Marinol® to the market has come to a stop. The damage to Plaintiff, while substantial, is incalculable.

48.    Immediate injunctive relief is required to prevent severe irreparable injury to Plaintiff.

49.    It is in the public interest to issue mandatory injunctive relief.

### Count I – Agency Action in Excess of Statutory Authority

50.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 49 as though the same were set forth herein in full.

51.    Pursuant to 5 U.S.C. § 706(2)(C), the District Court has authority to "hold unlawful and set aside agency action … found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

52.    Plaintiff is duly registered to import Schedule III controlled substances. The generic product that Plaintiff seeks to import is for medical and scientific purposes, specifically for the purpose of obtaining FDA approval, and has the same formulation as Marinol®, and thus falls within Schedule III as described in the July 2, 1999 Federal Register Notice. Accordingly, Plaintiff satisfies the requirements for importation stated in 21 U.S.C. § 952(b). Defendants' refusal to grant a permit to Plaintiff for the importation of its generic Marinol® product pursuant to its duly authorized registration for scientific purposes is contrary to law and in excess of their statutory authority.

### Count II – Agency Action Arbitrary, Capricious and Contrary to Law

53.    Plaintiff incorporates the allegations in paragraphs 1 through 52 as though the same were set forth herein in full.

54.    Pursuant to 5 U.S.C. § 706(2)(A), a District Court may "hold unlawful and set aside agency action found to be arbitrary, capricious … or otherwise not in accordance with law."

55.    Defendants' position that Plaintiff's generic Marinol® may not be imported unless it is already an FDA-approved product is arbitrary, capricious and not otherwise in accordance with law because it prevents importation of the very product for which FDA approval is sought and because it is contrary to the statement in the Federal Register Notice of July 2, 1999, that recognized that other products having the same formulation as Marinol® may be approved by the FDA in the future when it assigned those products to Schedule III.

## Count III – Agency Action in Violation of 5th Amendment

56.     Plaintiff incorporates the allegations in paragraphs 1 through 55 as though the same were set forth herein in full.

57.     Plaintiff is authorized to import Schedule IIIN controlled substances.  As a result, Plaintiff has a 5th Amendment property interest in its ability to import Dronabinol in sesame oil encapsulated in a soft gelatin capsule for scientific testing necessary to obtain FDA approval of an ANDA.

58.     DEA's refusal to permit Plaintiff to import its generic Marinol® product for scientific testing necessary to obtain FDA approval of an ANDA implicates a protected a 5th Amendment liberty interest.

59.     Additionally, Defendants have deprived Plaintiff of liberty and property without due process of law, in violation of the 5th Amendment of the Constitution.

## Prayer for Relief

Wherefore, Plaintiff requests judgment in its favor as follows:

(a)     granting preliminary and permanent mandatory injunctive relief pursuant to Fed. R. Civ. P. 65 compelling Defendants to issue a permit to Plaintiff to import Dronabinol in sesame oil encapsulated in a soft gelatin capsule in the dosage strengths and quantities set forth in Plaintiff's Form 357 submitted on April 18, 2006;

(b)     awarding Plaintiff its fees and costs; and

(c)     awarding such other relief as deemed just and appropriate.

Respectfully submitted,

_____
Terence J. Lynam (Bar No. 253872)
Joseph P. Esposito (Bar No. 375507)

12

AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4045

Samuel H. Israel
Patrick J. Egan
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103
(215) 299-2886

Attorneys for Plaintiff

Date:  May 24, 2006