## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, INC.,<br><br>   Plaintiff,<br><br>   v.<br><br>ALBERTO R. GONZALES,<br>in his official capacity as<br>Attorney General of the United States, and<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530,<br><br>KAREN P. TANDY, in her official<br>capacity as Administrator of the<br>United States Drug Enforcement<br>Administration, and<br><br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION<br>2401 Jefferson Davis Highway<br>Alexandria, VA 22301<br><br>   Defendants. | CIVIL ACTION NO. 1:06-CV-00966-CKK |

## PLAINTIFF'S MOTION FOR PRELIMINARY MANDATORY INJUNCTIVE RELIEF

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff respectfully moves

for entry of a preliminary injunction to prevent the Defendants from continuing to deny an

import permit for which Plaintiff applied on April 18, 2006.

As set forth more fully in the accompanying memorandum of points and authorities, and

affidavits attached thereto, Plaintiff, a manufacturer of generic pharmaceutical products that has

been in business since **[REDACTED]** and has developed over **[REDACTED]** generic drugs, is

seeking to develop a new generic drug that would provide a low-cost alternative for cancer and AIDS patients. However, the Drug Enforcement Administration, exceeding its authority and acting arbitrarily and capriciously, has refused to issue a permit to Plaintiff necessary to import the drug from its **[REDACTED]** manufacturing partner. Obtaining the product is critical to Plaintiff's ability to obtain approval from the Food and Drug Administration of the new generic drug. DEA has not disputed that Plaintiff is seeking to import the product for legitimate medical and scientific purposes, and, in fact, DEA in March 2006 granted Plaintiff a permit to import the very same product for initial FDA application procedures.

When Plaintiff applied for a second permit to import an additional batch of the product in order to complete required FDA approval procedures, DEA suddenly changed its position and denied the permit. This denial has blocked Plaintiff's ability to obtain FDA approval, endangering the public interest in having lower-cost drugs available for seriously ill patients. DEA's position that Plaintiff must first obtain FDA approval for its generic drug before DEA will grant the import permit places Plaintiff in a "Catch-22" position – unable to obtain FDA approval unless it can obtain the next batch of product from **[REDACTED]**, but unable to obtain the import permit until it obtains FDA approval.

As demonstrated in the attached memorandum and accompanying affidavits, any further delay in obtaining the import permit will cause irreparable harm to Plaintiff, as another generic manufacturer could get its product to market first and capture a significant market share, which the courts have recognized as irreparable injury in similar contexts. Further, there is no perceptible harm to DEA if required to grant the permit, much less harm comparable to that which Plaintiff is now facing. And the public interest is best served by making low-cost drugs

available for cancer and AIDS patients. The requirements for preliminary injunctive relief are certainly met in this case.

Pursuant to Local Rule 65.1, Plaintiff respectfully requests that a hearing be set promptly because, as the foregoing demonstrates, expedition is essential in order to prevent irreparable injury to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that its Motion for Preliminary Mandatory Injunctive Relief be granted. A proposed order is attached.

Respectfully submitted,


_____/s/_____
Terence J. Lynam (Bar No. 253872)
Joseph P. Esposito (Bar No. 375507)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4045

Samuel H. Israel
Patrick J. Egan
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103
(215) 299-2886

Attorneys for Plaintiff

Date: May 22, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>ALBERTO R. GONZALES,<br>in his official capacity as<br>Attorney General of the United states, and<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20530,<br><br>KAREN P. TANDY, in her official<br>capacity as Administrator of the<br>United States Drug Enforcement<br>Administration, and<br><br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION<br>2401 Jefferson Davis Highway<br>Alexandria, VA  22301<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 1:06-CV-00966-CKK |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR PRELIMINARY MANDATORY INJUNCTIVE RELIEF**

Plaintiff, by and through its undersigned attorneys, hereby submits this Memorandum of

Law in support of its Motion for Preliminary Mandatory Injunctive Relief.

I.    **INTRODUCTION**

Plaintiff is a manufacturer and marketer of generic pharmaceutical products.  The

company has been in business since **[REDACTED]** and has successfully developed over

**[REDACTED]** generic drugs.  Plaintiff is attempting to develop a new generic drug that would provide a low-cost alternative to a brand name drug currently being used by cancer and AIDS patients.  However, Plaintiff is being prevented from developing this important product by the Drug Enforcement Administration ("DEA"), which has refused to issue a permit for Plaintiff to import capsules of the drug from its **[REDACTED]** manufacturing partner.  Plaintiff needs the imports to complete its Abbreviated New Drug Application ("ANDA") and obtain approval from the Food and Drug Administration ("FDA") for its generic product.

The DEA does not dispute that Plaintiff is seeking to import the capsules for legitimate medical and scientific purposes.  Indeed, the DEA previously granted a permit on March 22, 2006 to Plaintiff, permitting it to import 1,200 capsules of the drug, which were needed for initial ANDA procedures.  However, when Plaintiff applied for a second permit for a second importation needed to complete the ANDA process, the DEA suddenly changed course, denying the permit and claiming that the earlier permit was issued in error.  As a result, Plaintiff's development process has been stopped dead in its tracks and the public is being denied any opportunity to obtain this lower-cost generic drug.

The DEA's action in denying the import permit was in excess of its statutory authority under 21 U.S.C. § 952(b), which governs the importation of nonnarcotic controlled substances, and the regulations promulgated thereunder.  The DEA's actions are also arbitrary, capricious and contrary to law because the DEA has stated that Plaintiff must first obtain FDA approval for its generic drug before an import permit may be issued.  This is a classic "Catch-22" - - as the company cannot obtain the FDA approval without first obtaining the next batch of capsules from its **[REDACTED]** partner and completing the FDA approval process.

As demonstrated herein, Plaintiff satisfies all the requirements for obtaining a preliminary injunction. Furthermore, Plaintiff should not be required to first pursue an administrative appeal within the DEA. The DEA's administrative appeal procedures provide no set time period by which an appeal will be heard or decided. Furthermore, the statute at issue does not mandate that an administrative appeal be taken as a prerequisite to seeking judicial review. Because Plaintiff will suffer irreparable harm by any delay in obtaining FDA approval, and because of the possibility that another generic manufacturer may get its generic product to market first, and thus capture a significant market share, judicial review and the issuance of a preliminary injunction is necessary at this time.

## II.    FACTUAL BACKGROUND

### A.    John Doe, Inc.

Founded in **[REDACTED]**, Plaintiff is **[REDACTED]**.  See Affidavit of [Plaintiff's CEO] attached hereto as Exhibit "A", at ¶ 6. The company was created **[REDACTED]**.  Id. at ¶ 7.  Although it is a **[REDACTED]** company with **[REDACTED]**, Plaintiff vies in a highly competitive market with nearly every manufacturer and distributor of generic drugs, both foreign and domestic. Id. at ¶ 9.

Product development is a key component of Plaintiff's success and Plaintiff invests substantial time, effort and expense identifying opportunities for generic drug development and manufacture. Id. at ¶¶ 12, 13. For more than one year, Plaintiff has dedicated a substantial amount of time, effort and financial resources to develop a generic equivalent of Marinol®, a product that is already approved by the FDA to treat (1) nausea and vomiting associated with cancer chemotherapy in patients who have failed to respond adequately to other treatments; and (2) appetite loss associated with weight loss in people with acquired immunodeficiency

syndrome (AIDS). Id. at ¶¶ 17, 25-29. There are presently no generic competitors to Marinol®
on the market in the United States. Id. at ¶ 19. Plaintiff's research has indicated that it will
obtain a considerable share of the generic Marinol® market (which currently has annual sales of
$170 million (Id. at ¶ 21)) provided it is first to obtain FDA approval of its generic version of
Marinol®, and will be able to sell its product at **[REDACTED]** of the price charged for
Marinol®, thereby saving the public tens of millions of dollars annually.[1] Id.

     The generic chemical name of Marinol® is Dronabinol and the product is encapsulated in
a soft gelatin capsule in sesame oil. Id. at ¶ 15. The active pharmaceutical ingredient is a
synthetic version of a naturally-occurring compound known as delta-9-tetrahydrocannabinol or
delta-9-THC. Id. at ¶ 16. Plaintiff has identified a market for generic Marinol® and, because
**[REDACTED]**, Plaintiff was required to partner with a firm that could formulate the product.
Id. at ¶¶ 21, 22.

     Initially, Plaintiff approached several companies **[REDACTED]** that possessed the
requisite technology but was unable to reach an agreement with them to formulate the product
for Plaintiff. Id. at ¶ 23. Ultimately, Plaintiff was introduced to a company in **[REDACTED]**,
**[REDACTED]**, that had the requisite expertise to formulate a generic Marinol® product. Id. at
¶ 24. Plaintiff thereafter executed a manufacturing agreement with **[REDACTED]**. Id. at ¶ 25.

### B.    The FDA Approval Process

#### 1.    The Abbreviated New Drug Application (ANDA)

     In order to bring its generic Marinol® to the market, Plaintiff must first obtain FDA
approval of the product. The procedure for obtaining FDA approval of generic drugs was
simplified when, in 1984, Congress enacted the Drug Price Competition and Patent Term

---

[1] The cost of 60 capsules of Marinol® is $1,263.81. Id. at ¶ 20.

Restoration Act, Pub.L. No. 98-417, 98 Stat. 1585 (1984), also known as the Hatch-Waxman Amendments. In contrast to new drugs which are approved by the FDA following an extensive investigation into their safety and efficacy, including submission of a New Drug Application ("NDA"), generic manufacturers, such as Plaintiff, may file an Abbreviated New Drug Application ("ANDA"), relying on the testing conducted by the original manufacturer. The generic manufacturer must only establish that the generic drug is the "bioequivalent" of the brand name drug. 21 U.S.C. §§ 355(j)(2)(A),(j)(8); see also Collagenex Pharmaceuticals, inc. v. Thompson, 2003 WL 21697344 (D.D.C. Aug. 26, 2003) (explaining the same).

Thus, Plaintiff's generic Marinol® must be bioequivalent to Marinol® in order to be approved. Plaintiff believes it will be able to show that the generic Marinol® that Plaintiff seeks to import is bioequivalent to Marinol® and thus substantially identical. See [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 29.

### 2. **Plaintiff's ANDA Submission**

On March 23, 2005, Plaintiff entered into a **[REDACTED]** with, among others, **[REDACTED]** to develop a custom process for the development of the generic equivalent of Marinol® (the "Manufacturing Agreement"). Id. at ¶ 25. Plaintiff also began contracting with approved third parties for raw material supplies, analytical laboratory work, and packaging, with the goal of obtaining FDA approval of its ANDA. Id. at ¶ 27.

Plaintiff and its business partners set a schedule for obtaining approval from the FDA of the ANDA for a generic equivalent of Marinol as soon as possible in order to obtain the first ANDA approval in the market. Id. at ¶ 29.

In furtherance of these goals, **[REDACTED]** is required to manufacture various "batches" of the product, and ship them to Plaintiff in the United States. Id. Plaintiff will then

package the product and conduct various laboratory and clinical testing to substantiate that the generic product it is submitting for FDA approval is the "bioequivalent" of Marinol®. Id. Thus, importation of the batches of finished product is crucial and absent importation, Plaintiff will be unable to complete its research and obtain FDA approval.

### C.    Regulation and Importation of Generic Marinol Under the Controlled Substances Act

The DEA regulates controlled substances through the Controlled Substances Act of 1970 ("CSA"), 21 U.S.C. § 801 et seq., as well as DEA regulations promulgated thereunder. All controlled substances are listed in Schedules I through V. See 21 U.S.C. § 812; 21 C.F.R. § 1308. To be classified on Schedule III, a substance must have a lower potential for abuse than the substances in Schedules I and II; a currently accepted medical use in treatment in the United States; and abuse of the drug may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3); see also 21 C.F.R. § 1308.13(g) (classifying Marinol® as a Schedule III drug).

The importation of controlled substances into the United States is governed by statute, which explicitly recognizes importation for medical and scientific uses and, in the case of Schedule III nonnarcartotic controlled substances, grants the Attorney General the authority to issue permits for such importation. The statute provides: " [i]t shall be unlawful to import … into the United States from any place outside thereof, any nonnarcotic controlled substance in schedule III, unless such nonnarcotic controlled substance (1) is imported for medical, scientific, or other legitimate uses and (2) is imported pursuant to such notification, or declaration, or in the case of any nonnarcotic controlled substance in schedule III, such import permit, notification, or declaration, as the Attorney General may by regulation prescribe …" 21 U.S.C. § 952(b).

Through delegation from the Attorney General, the DEA regulates the importation of

nonnarcotic controlled substances in Schedule III through the issuance of registrations and permits and is authorized to approve the importation of these substances if it is found that the substance is being imported for medical, scientific or other legitimate uses.  21 C.F.R. § 1312.13(b); see also 21 C.F.R. § 1312 (providing that, "[n]o person shall import or cause to import a controlled substance ... unless and until such person is properly registered under the [CSA] (or exempt from registration) and the Administrator has issued him a permit to do so pursuant to § 1312.13").[2]

### 1.    Plaintiff Is Duly Registered With DEA

Pursuant to 21 C.F.R. § 1312.13, Plaintiff submitted an application to the DEA on or about June 25, 2005, for registration for a permit to import certain controlled substances listed in Schedules IIIN and IV.[3]  See Affidavit of **[REDACTED]** attached hereto as Exhibit "B", at ¶ 3. In order to obtain an import registration, Plaintiff was required to show that it has in place sufficient security controls and handling procedures to ensure that controlled substances are not illegally diverted and, moreover, Plaintiff must submit to and pass periodic DEA inspections.  Id. at ¶ 3.  Plaintiff has previously and continues to demonstrate to the DEA that is has the proper security and handling procedures and has consistently passed all DEA inspections, including one which occurred recently.  Id.  Therefore, on December 22, 2005, the DEA granted Plaintiff's application and issued Registration Certificate No. **[REDACTED]**, to import controlled substances listed on Schedules IIIN and IV.  Id. at ¶ 4.  A true and correct copy of DEA

---

[2] In order to obtain permission to import Schedule III controlled substances, Plaintiff must obtain an DEA registration covering Schedule III.  Each time Plaintiff seeks to import under that registration, it must submit an application for and obtain a DEA permit.

[3] Schedule III contains both narcotic and nonnarcotic controlled substances.  The designation "IIIN" on Plaintiff's registration refers to nonnarcotic controlled substances.  Currently, the only nonnarcotic controlled substance listed on Schedule IIIN is Dronabinol in sesame oil encapsulated in a soft gelatin capsule. 21 C.F.R. § 1308.13(g).

Registration No. **[REDACTED]** is attached hereto as Exhibit "C".

### 2.    Plaintiff's First Import Permit Is Granted

On February 28, 2006, Plaintiff submitted an application with the DEA (Form 357) to import 400 2.5 mg capsules of its generic Marinol®, 400 5 mg capsules of its generic Marinol®, and 400 10 mg capsules of its generic Marinol®, pursuant to its DEA Schedule IIIN registration. See **[REDACTED]** Aff., Ex. "B" at ¶ 5. A true and correct copy of the completed DEA Form 357 is attached hereto as Exhibit "D". Plaintiff certified on the application that the substances "are imported exclusively for scientific purposes." which was described as "Internal Analytical Method Development and Validation." See Ex. "D". The DEA granted Plaintiff's application, issuing Permit No. **[REDACTED]** to Plaintiff on March 22, 2006. A true and correct copy of DEA Import Permit No. **[REDACTED]** is attached hereto as Exhibit "E". Pursuant to 21 C.F.R. § 1312.13(e), the permit stated that "the Administrator [of the DEA] was satisfied that the consignment proposed to be imported is required for legitimate purposes." Id. The batches were imported and received by Plaintiff on April, 24, 2006. See [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 33.

### 3.    Plaintiff's Second Import Permit Is Denied

Because "[n]ot more than one shipment shall be made on a single import permit," 21 C.F.R. § 1213(e), Plaintiff filed a second application (Form 357) with the DEA for a permit on April 18, 2006 for the purposes of importing three larger batches of generic Marinol® for its laboratory and biostudies, pursuant to its DEA registration. See **[REDACTED]** Aff., Ex. "B" at ¶ 6. A true and correct copy of the second completed DEA Form 357 is attached hereto as Exhibit "F". Plaintiff again certified on the application that the substances "are imported exclusively for scientific purposes" which was described as "Biostudy/Submission Batches For

ANDA Approval." <u>See</u> Ex. "F". These batches were manufactured by **[REDACTED]**, paid for by Plaintiff and are stored at **[REDACTED]** facility in **[REDACTED]** pending DEA's issuance of a permit to Plaintiff to import them to the United States. <u>See</u> [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 34. Once imported, these batches are to be packaged and used in "pilot" and "pivotal" bioequivalence studies as set forth in the protocol approved by FDA on April 26, 2006. <u>Id.</u>

On May 5, 2006, representatives of DEA contacted Plaintiff by telephone to inform it that the second permit application had been denied. <u>See</u> **[REDACTED]** Aff., Ex. "B" at ¶ 7. The DEA explained that, to import generic Marinol® product under its Schedule IIIN registration, the product had to already be FDA-approved. <u>Id.</u>

Plaintiff explained to the DEA that the purpose of importing the generic Marinol® was to obtain FDA approval of the product it was developing, which it could not do without the products it sought to import. <u>Id.</u> Plaintiff further reminded the DEA that it had already approved one importation permit allowing Plaintiff to import its generic Marinol® product under its Schedule IIIN registration. <u>Id.</u> The DEA responded by indicating that it had been a mistake for it to have issued the first permit. <u>Id.</u>

## III.    <u>LEGAL ARGUMENT</u>

### A.    <u>Standard for Granting Injunctive Relief</u>

The prerequisites for the entry of a preliminary injunction are well settled. In deciding whether to grant such injunctive relief, the Court must consider: (1) whether there is a substantial likelihood that the plaintiff will succeed on the merits of the case; (2) whether the plaintiff will suffer irreparable injury absent an injunction; (3) the harm to the defendant or other interested parties; and (4) whether an injunction would be in the public interest or at least not adverse to the public interest. <u>Mova Pharms. Corp. v. Shalala</u>, 140 F.3d 1060, 1066 (D.C.Cir. 1998). The court

balances these four factors such that a particularly strong showing on one or more can outweigh a weaker showing on another. CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). In other words,

> ... the factors must be viewed as a continuum, with more of one
> factor compensating for less of another. ... An injunction may be
> justified 'where there is a particularly strong likelihood of success
> on the merits even if there is a relatively slight showing of
> irreparable injury.' Conversely, when the other three factors
> strongly favor interim relief, a court may grant injunctive relief
> when the moving party has merely made out a 'substantial' case on
> the merits. The necessary level or degree of likelihood of success
> that must be shown will vary according to the Court's assessment
> of the other factors.

Bracco Diagnostics, Inc. v. Shalala, 963 F.Supp. 20. 27 (D.C. 1997). For reasons more fully set forth below, Plaintiff's motion meets each of these standards.

**B.      Plaintiff Has A Substantial Likelihood Of Success
          On The Merits Of Its Claims Against The Defendants**

The DEA's primary reason for denying Plaintiff's importation permit is that the generic Marinol® that Plaintiff seeks to import is not yet an FDA-approved product. According to DEA, the only Marinol® product that is in Schedule III is the product that is already approved by FDA. DEA's position is at odds with its own statement in the Federal Register Notice issued at the time DEA moved Marinol® from Schedule II to Schedule III. 64 Fed.Reg 35928-01 (July 2, 1999) (see copy attached hereto as Exhibit G). In that Federal Register Notice, DEA stated that the term "Marinol" was used throughout the Notice "to refer to Marinol and any other products, which may be approved by FDA in the future, that have the same formulation as Marinol." Id., at 2 (emphasis added). If the interpretation that DEA is now using to deny Plaintiff's permit application is correct, then the DEA would have defined the term "Marinol" in the Federal Register to include Marinol® and any other products that have been approved by FDA, that have

10

the same formulation as Marinol®. The DEA's Federal Register statement, however, clearly recognized that Schedule III would include both the existing FDA-approved Marinol® and the generic equivalent product that had not yet received FDA approval.

DEA's denial of a permit to Plaintiff to import its generic Marinol® on the ground that it is not yet approved by the FDA is in excess of the statutory authority set forth in 21 U.S.C. § 952(b), which explicitly recognized importation of nonnarcotic Schedule III substances for medical and scientific uses and set up the permit system for that very purpose. The pertinent regulation promulgated thereunder simply states that "The Administrator may authorize the importation of such substances if he finds that the substance is being imported for medical, scientific, or other legitimate uses." 21 C.F.R. § 1312.13 (b). The DEA does not dispute that Plaintiff's importation is for that purpose, but has instead imposed an additional requirement that the product must already be approved by the FDA for that purpose. In imposing this additional requirement, the DEA has exceeded its statutory and regulatory authority. Accordingly, the defendants have violated the Administrative Procedure Act.

The DEA's position is also arbitrary, capricious, and not in accordance with the law. The DEA is prohibiting importation of the product because it lacks FDA approval when the importation is for the very purpose of obtaining that approval. This is a classic "Catch 22" and is arbitrary and capricious.

Under the APA, the Court may set aside agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A); see also Nat'l Ass'n of Food Chains, Inc. v. Interstate Commerce Comm'n, 535 F.2d 1308, 1314 (D.C. Cir. 1976) (explaining the same). Under this standard, a court must uphold agency action if a rational basis exists for the decision. Nat'l Ass'n of Food Chains, Inc.

11

v. Interstate Commerce Comm'n, 535 F.2d at 1314. A court should decline to do so, however, where an agency's decision was "arbitrary and capricious" in that the agency "relied on facts which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The DEA's explanation for denying Plaintiff's importation permit is implausible. It is also counter to its own statement in the Federal register notice of July 2, 1999, in which it indicated that the "Marinol" being moved to Schedule III was "Marinol *and any other products, which may be approved by FDA in the future, that have the same formulation as Marinol*." 64 Fed Reg 35928-01(emphasis added), Ex G, at 2. This future approval of its generic Marinol® product is precisely what Plaintiff is seeking to obtain.[4]

The DEA is charged with notice of and bound by its own interpretation of the CSA and related regulations as published in the Federal Register. It is well settled that, "publication in the Federal Register effects constructive notice of the contents of a federal regulation to a person subject to or affected by those contents. 44 U.S.C. § 1507; Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947). "Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." Hawpe Constr., Inc. v. U.S., 46 Fed. Cl. 571, 579 (2000). Courts will, accordingly, use commentary in the Federal Register in interpreting federal regulations and/or statutes. Roberto v. Dep't of the Navy, 440 F.3d 1341

---

[4] The product that is actually listed in Schedule III is described not as Marinol but by its generic name "Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product." 21 C.F.R. § 1308.13(g).

(Fed. Cir. 2006), citing, Meyer v. Holley, 537 U.S. 280, 288 (2003) (using commentary in the Federal Register in interpreting the FHA and related regulations).

Here, the generic Marinol® that Plaintiff seeks to import has the same formulation as the brand name Marinol® (i.e., in sesame oil and encapsulated in soft gelatin capsules) and may be (indeed, is likely to be) approved by the FDA in the future. This product, therefore, clearly falls within the DEA's definition of "Marinol" as stated in the Federal Register Notice, despite DEA's present position to the contrary.

In compliance with the above regulations, Plaintiff completed and filed two permit applications to import its generic Marinol®, i.e., Dronabinol in sesame oil and encapsulated in soft gelatin capsules. See **[REDACTED]** Aff., Ex. "B" at ¶¶ 5, 6. This product contains the same formulation as Marinol®, the product that has been approved by the FDA. Plaintiff merely had to indicate as much on its application. Plaintiff thereby complied with the regulations, even noting that the purpose of importation was to perform scientific laboratory testing on the manufactured product in support of its ANDA submission. See Plaintiff's Form 357 dated April 18, 2006, Ex. "F". As a further example of DEA's arbitrary conduct, it approved Plaintiff's first permit application but denied the second, and then claimed that the first approval was in error. See **[REDACTED]** Aff., Ex. "B" at ¶ 7.

Additionally, the DEA's interpretation of its regulation does not further the purposes of the CSA. As explained by the United States Supreme Court, the CSA was enacted in 1970 "with the main objectives of combating drug abuse and controlling legitimate and illegitimate traffic in controlled substances" and "criminalize[ing], inter alia, the unauthorized distribution and dispensation of substances classified in any of its five schedules." Gonzales v. Oregon, 126 S. Ct. 904, 907 (2006).

In the instant matter, the DEA does not argue that Plaintiff's importation of its generic Marinol® product is for an illegitimate or any purpose other than the legitimate scientific purpose stated in its application. Rather, the DEA merely imposes the requirement that, even if used for a legitimate scientific purpose, the generic Marinol® that Plaintiff seeks to import must first be approved by FDA. But Plaintiff cannot yet obtain FDA approval until it imports the product and conducts the required testing. See [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 29. Plaintiff's product is in the same form and/or unit as Marinol® (i.e. in sesame oil and encapsulated in soft gelatin capsules) and DEA has found no other reason to deny a permit other than that it is not yet FDA approved. Such reasoning is arbitrary and capricious.

In light of the foregoing, Plaintiff is substantially likely to prevail on the merits of its case against the defendants. DEA clearly "relied on facts which Congress has not intended it to consider" and "offer[s] an explanation for its decision that ... is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Plaintiff is therefore entitled to the remedy it seeks.

### C.    Plaintiff Will Suffer Irreparable Harm If Injunctive Relief Is Denied, While The DEA Will Not Be Harmed If The Court Overturns DEA's Decision To Deny Plaintiff The Right To Import Generic Marinol®

For the purposes of deciding a motion for injunctive relief, "irreparable harm" has been defined as "harm that cannot be adequately compensated by an award of damages." Bracco Diagnostics, Inc. v. Shalala, 963 F.Supp. at 28. If the injunctive relief is not granted, Plaintiff will suffer serious harm that is difficult to quantify. Only injunctive relief can provide Plaintiff with an adequate remedy.

Everyday which passes without the ability to import its generic Marinol® to the United

States to complete the bioequivalence and other laboratory studies compromises Plaintiff's prospects of timely submitting its ANDA and being the first on the market to obtain approval of its ANDA. See [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 36. Courts have repeatedly recognized that this type of damage constitutes "irreparable harm" for purposes of granting injunctive relief. See Mova Pharms. Corp. v. Shalala, 140 F.3d at 1067, n.6 (explaining that giving a pharmaceutical company's competitor an "officially sanctioned head start" for a discrete pharmaceutical product will cause irreparable injury to the company that is left behind); Bracco Diagnostics, Inc. v. Shalala, 963 F.Supp. at 29 (noting that, "there is a significant economic advantage to receiving first approval and being the first company to enter the market, an advantage that can never be fully recouped through money damages or by 'playing catchup'").

If injunctive relief is denied here, Plaintiff will continue to be harmed in a way that cannot be adequately remedied by the payment of money. Plaintiff will have to forfeit all of the time, money and effort it has invested over the past year to timely submit its ANDA. The longer the bulk product sits in **[REDACTED]**, the higher the risk that FDA will question the results of any testing on the product and delay approval of Plaintiff's ANDA. See [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 36. Moreover, Plaintiff's position in the Marinol® market will be compromised if another competitor is able to submit its ANDA in advance of Plaintiff. Id. These circumstances inflict damage which is difficult to quantify.

DEA, on the other hand, will not be harmed by the issuance of an injunction. Just as DEA was not harmed by granting the first permit, it will not be harmed by issuing the second. There is no dispute that the products are being imported for medical and scientific purposes, which causes no harm to DEA. Any possible concern that DEA might have with diversion of the products has been satisfied by Plaintiff's obtaining of the DEA registration to import

Schedule III substances. DEA makes no claim that it even has such concerns. Accordingly, Plaintiff has satisfied this requirement for a preliminary injunction.

### D.    Granting Plaintiff The Right To Import Generic Marinol® Is In The Public Interest

The relief that Plaintiff seeks furthers the public interest. If Plaintiff is able to import the generic Marinol® it needs to perform testing to obtain FDA approval of its generic Marinol® product, the public interest will served by ready access to a less-expensive generic drug. See Collagenex Pharmaceuticals, Inc. v. Ivax Corp., 375 F.Supp.2d 120, 141 (E.D. N.Y. 2005) (recognizing that "the public has a strong interest in obtaining generic drugs at the reduced rates that they are offered); Boehringer Ingelheim corp. v. Shalala, 993 F.Supp.1, 3 (D.D.C. 1997) (recognizing a "public interest in receiving generic competition to brand-name drugs as soon as is possible"). "This strong public interest has been recognized in the enactment of the Hatch-Waxman Amendments, whose principal purpose was 'to increase competition in the drug industry by facilitating the approval of generic copies of drugs.'" Collagenex Pharmaceuticals, Inc. v. Ivax Corp., 375 F.Supp.2d at 141. See also citing H.R.REP. No. 98-857, pt. 1, at 14 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647 (noting, in connection with the proposed enactment of the Hatch-Waxman Amendments that "the purpose of ... the bill is to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962" and that enactment would beneficially "increase drug price competition").

The public interest is a weighty factor when considering the high cost of prescription drugs. This is even more significant in the instant matter where the cost of Marinol® is so high and the individuals who require the drug face the catastrophe and trauma of cancer and AIDS.

Plaintiff believes that it will be able to sell its generic product for **[REDACTED]** of the

16

cost of Marinol® and obtain **[REDACTED]** of the market if it is the first to obtain ANDA approval.  See [Plaintiff's CEO's] Aff., Ex. "A" at ¶ 21.  With annual Marinol® sales of $170 million (Id.), the public stands to save **[REDACTED]** annually.  Clearly, the issuance of a mandatory preliminary injunction is in the public interest.

Moreover, courts have recognized that there is a substantial public interest in ensuring that administrative agencies act within the limits of their authority.  See, e.g., Clarke v. Office of Fed. Hous. Enter. Oversight, 355 F.Supp.2d 56, 66 (D.D.C. 2004) (finding that there is a substantial public interest in ensuring that OFHEO acts within the limits of its authority); Pearson v. Shalala, 130 F.Supp.2d 105, 121 (D.D.C. 2001) (discussing that, "it is clearly in the public interest to ensure that governmental agencies, such as the FDA, fully comply with the law" governing them); Nat'l Treasury Employees v. U.S. Dep't of Treasury, 838 F.Supp. 631, 640 (D.D.C. 1993) (recognizing the same in explaining that, "[t]he preservation of ... the legality of the process by which government agencies function certainly weighs heavily in the public interest).  The DEA acts outside of the limits of its authority when it creates and imposes requirements upon applicants for importation permits that are no where to be found in the statutes and regulations the DEA is administering.  Consequently, the public interest is certainly furthered by compelling the DEA to step back within its statutory and regulatory bounds and grant an importation permit that complies with established authority.

     **E.**    **Plaintiff Should Not Be Required To Pursue An Administrative Appeal Before Obtaining Relief Because Such An Appeal Is Not Required Under The Circumstances**

Plaintiff anticipates that the DEA will argue that Plaintiff must first pursue an administrative appeal within DEA before seeking judicial review.  However, under the facts and circumstances of this case, such a step is not required.

"Of 'paramount importance' to any exhaustion inquiry is congressional intent."

McCarthy v. Madigan, 503 U.S. 140, 144 (1992).  In determining whether to require exhaustion

of administrative remedies, a court must first look to congressional intent as expressed in the

applicable statute.  Id.  A statute creates a duty to exhaust where it contains "'sweeping and

direct' statutory language indicating that there is no federal jurisdiction prior to exhaustion, or

the exhaustion requirement is treated as an element of the underlying claim."  Weiberger v. Salfi,

422 U.S. 749, 757 (1975).  "Where Congress specifically mandates, exhaustion is required.  But

where Congress has not clearly required exhaustion, sound judicial discretion governs."

McCarthy v. Madigan, 503 U.S. at 144; see also Elk v. U.S., 2006 WL 1030279 (Fed. Cir.

Apr. 20, 2006) (holding that the "Bad Men" Clause of Sioux Treaty does not require exhaustion

of administrative remedies before bringing an action in the Court of Federal Claims because the

Clause does not explicitly require exhaustion).  Here, there is nothing in the applicable

provisions of the Controlled Substances Act ( 21 U.S.C. § 952) that requires exhaustion of

administrative remedies before obtaining judicial review.

Where a statute does not mandate exhaustion, however, the courts must evaluate whether

the interests of the individual weigh heavily against the institutional interests the doctrine exists

to serve.  Maggitt v. West, 202 F.3d 1370, 1377 (Fed. Cir. 2000).  There exist at least three broad

sets of circumstances in which courts may legitimately decline to require exhaustion.  McCarthy

v. Madigan.  503 U.S. at 146.  The first is where exhaustion will result in undue prejudice to the

individual, such as "from an unreasonable or indefinite timeframe for administrative action."  Id.

at 146-47.  This is because the plaintiff "may suffer irreparable harm if unable to secure

immediate judicial consideration of [its] claim."  Id. at 147.  Exhaustion is also inappropriate

where there is "doubt as to whether the agency was empowered to grant effective relief."  Id. at

18

147. Finally, exhaustion should not be required where "the administrative body is shown to be biased or has otherwise predetermined the issue before it." Id. at 148.

Here, the first of these exhaustion exceptions, regarding irreparable harm and an indefinite timeframe for administrative action, is applicable. If Plaintiff were to await the conclusion of the administrative process, it could likely lose its position as the first market entrant with a generic product equivalent to Marinol®. As explained earlier, this market advantage can never be fully recouped through money damages or by "playing catch-up."

Further, and significantly, the federal regulations governing the appeal of a denial of an import permit do not establish any fixed time within which the DEA must grant an administrative hearing or issue a decision on such an appeal. See 21 C.F.R. §§ 1312.41-1312.47. Rather, the regulations merely provide that the DEA Administrator's Order shall be issued "as soon as practicable after the presiding officer has certified the record to the Administrator." See 21 C.F.R. 1312.47.[5]

If Plaintiff is forced to await the administrative appeals process, its generic Marinol project will come to a stop for an indefinite period of time, irreparably harming its business and the individuals it employs in this regard. This indefinite period of time, and irreparable harm that will result to Plaintiff, makes exhaustion of an administrative appeal inappropriate. See Coit Indep. Joint Venture, 489 U.S. 561, 587 (1989) (holding that "[b]ecause the Bank Board's regulations do not place a reasonable time limit on FSLIC's consideration of claims, Coit cannot be required to exhaust those procedures"); Smith v. Ill. Bell Tel. Co., 270 U.S. 587, 591-92, (1926) (explaining that a claimant "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief"); Elk v. U.S., 2006 WL

---

[5] This is in contrast to the appeals process for denial of importation of List I chemicals, which requires a hearing within forty five days. 21 U.S.C. § 971(c); 21 C.F.R. § 1313.52.

1030279 (Fed. Cir. Apr. 20, 2006) (holding that claimant need not exhaust administrative remedies before bringing suit in Court of Federal Claims where, inter alia, the Department of Interior did not adopt time limits on consideration of the claims at issue).

## IV.    **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that this Honorable Court grant its Motion for Preliminary Mandatory Injunctive Relief, in accordance with the attached proposed Order.

Respectfully submitted,


/s/
Terence J. Lynam (Bar No. 253872)
Joseph P. Esposito (Bar No. 375507)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4045

Samuel H. Israel
Patrick J. Egan
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103
(215) 299-2886

Attorneys for Plaintiff

Date:  May 22, 2006