# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOE DOE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:06CV00966 |
| | ) | |
| ALBERTO R. GONZALEZ, | ) | |
| in his official capacity as | ) | |
| Attorney General of the United states, and | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE | ) | |
| 950 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C. 20530, | ) | |
| | ) | |
| KAREN P. TANDY, in her official | ) | |
| capacity as Administrator of the | ) | |
| United States Drug Enforcement | ) | |
| Administration, and | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| 2401 Jefferson Davis Highway | ) | |
| Alexandria, VA 22301 | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF [REDACTED]

I, **[REDACTED]**, making this declaration under penalty for perjury, hereby

declare and verify that the following facts are true:

1.    I am over eighteen years of age and make this Declaration on the basis of

personal knowledge.

2.    **[REDACTED]**

3.      I have been actively and continuously engaged in the pharmaceutical products industry since **[REDACTED]**.

4.      As a result of my experience in the pharmaceutical products industry, I am familiar with and have knowledge, skill and experience in the development, manufacturing, and marketing of pharmaceutical drug products, including managing the development and production of pharmaceutical drug products from concept through approval by the United States Food and Drug Administration ("FDA") of an Abbreviated New Drug Application ("ANDA") for marketing approval.

5.      **[REDACTED]**.

6.      **[REDACTED]**.

7.      **[REDACTED]** was created to address a need in the pharmaceutical industry for economically-priced drugs.

8.      **[REDACTED]** has expertise in the development, manufacture, sale, marketing and distribution of pharmaceutical products sold under generic chemical names, including drug products containing controlled substances on Schedules II through V. By way of example, **[REDACTED]** manufactures and distributes **[REDACTED]**, among others.

9.      **[REDACTED]** competes with nearly every manufacturer and distributor of generic drugs.

10.      Currently, **[REDACTED]**.

11.      In order to continue to offer lower-cost alternatives to brand-name pharmaceuticals, in some instances, **[REDACTED]** pursues partnerships or collaborative

2

relationships with other companies. Since its inception, **[REDACTED]** has brought to market over **[REDACTED]** lower cost generic drug products.

12.    Being the first to manufacture and sell a generic drug is essential in the generic pharmaceutical business. As soon as the first generic product is approved and marketed, it will, in my experience, be sold at a drastically reduced price and, in turn, the manufacturer will take a huge portion of the market. Thus, the timing and proper completion of all tasks in a project is critical. Any delay, including a failure to establish and follow proper protocols, may result in a substantial delay in getting the generic product to market.

13.    **[REDACTED]** expends considerable effort, time and expense identifying opportunities for generic drug development and manufacture, formulating strategies for the development, manufacture, marketing and sale of new generic drugs (from concept through FDA approval to commercialization), developing and maintaining relationships with vendors, suppliers, customers, and other pharmaceutical manufacturers, and manufacturing and marketing its products.

### [REDACTED] Identifies a Market for Generic Marinol®

14.    I am aware of and familiar with the brand-name pharmaceutical product known as Marinol®.

15.    The generic chemical formulation of Marinol® is Dronabinol in sesame oil encapsulated in a soft gelatin capsule.

16.    The Active Pharmaceutical Ingredient ("API") of Marinol® is synthetic delta-9-tetrahydrocannabinol or delta-9-THC.

17.    Since 1985, Marinol® has been FDA-approved to treat nausea and vomiting in cancer patients who have undergone chemotherapy but have not responded to traditional anti-emetics.  Since 1992, Marinol® has been FDA-approved to treat anorexia associated with severe weight loss in AIDS patients.

18.    Marinol® is available in soft gelatin capsules containing synthetic delta-9-THC in sesame oil in 2.5 mg, 5 mg and 10 mg dosages.

19.    There is currently no generic competition to Marinol® on the market.

20.    Based on my research, current annual sales of Marinol in the United States total $170 million.  The current selling price of Marinol® is $1,263.31 for a bottle of sixty capsules.

21.    Based on our analysis of the market, if **[REDACTED]** is the first to obtain approval and introduce a lower cost generic version of Marinol®, it will take approximately **[REDACTED]** of the Marinol® market.  **[REDACTED]** plans to sell its generic Marinol® product for a price of **[REDACTED]** of the brand price.  Accordingly, **[REDACTED's]** introduction of the first generic competitor of Marinol® stands to save the public approximately $**[REDACTED]** annually.

**[REDACTED] Seeks an Agreement with a Soft Gelatin Capsule Manufacturer**

22.    **[REDACTED]** does not currently possess the technology for manufacturing soft gelatin capsules.  Accordingly, **[REDACTED]** was required to partner with a company that possessed such technology in order to formulate a generic Marinol® product

23.    On behalf of **[REDACTED]**, I approached approximately four companies in the United States who possess soft gelatin technology, about the possibility of entering

4

into a collaboration agreement with **[REDACTED]** to formulate a generic version of Marinol®. Each of the domestic companies that I approached declined to enter into an agreement with **[REDACTED]** to formulate a generic Marinol® product.

24.     Through a third party, I was introduced to **[REDACTED]** a company located in **[REDACTED]**. **[REDACTED]** possesses considerable know-how in soft gelatin capsule ("softgel") technology and is engaged in the business of developing, producing and packaging solid dosage forms for pharmaceutical use.

25.     In 2005, **[REDACTED]**, among others, entered into a Product Development and Manufacturing Agreement (the "Manufacturing Agreement") with respect to development, manufacture and commercialization of a generic formulation of Marinol®.

26.     I executed the Manufacturing Agreement on behalf of **[REDACTED]** and am familiar with its terms.

27.     Through the Manufacturing Agreement, **[REDACTED]** contracted with **[REDACTED]** to develop a custom process for the production and manufacture of Dronabinol in sesame oil encapsulated in a soft gelatin capsule. **[REDACTED]** also contracted with third parties for the raw material supplies, analytical laboratory services and packaging with the goal of obtaining an ANDA.

28.     The ultimate goal of the collaboration with **[REDACTED]** is to submit an Abbreviated New Drug Application ("ANDA") to the FDA for approval as soon as possible and to receive FDA approval for the sale and marketing of a lower cost alternative generic to Marinol® in the United States.

29.     In order to obtain FDA approval of its ANDA, **[REDACTED]** is required to formulate various batches Dronabinol in sesame oil encapsulated in a soft gelatin capsule, bottle the product, run stability studies on the product and conduct various patient studies for the purpose of gathering information to support its ANDA submission to FDA.  Pursuant to the schedule of milestones established in the Manufacturing Agreement, **[REDACTED]** was required to formulate an initial small batch for export to **[REDACTED]** in the United States, pursuant to **[REDACTED's]** Schedule III DEA registration.  Following the receipt of the small batch, **[REDACTED]** was required to formulate three "submission" batches for export to **[REDACTED]** in the United States pursuant to **[REDACTED's]** Schedule III DEA registration.  **[REDACTED]** was then required to bottle the product and send it out for the laboratory and patient testing. **[REDACTED]** believes that it will be able to establish that its generic product is bioequivalent to Marinol®.

### [REDACTED] Obtains a DEA Registration to Import
### Schedule III Controlled Substances and a Permit to
### Import its First Batch of Generic Marinol® to the United States

30.     It is my understanding that in order to import controlled substances on Schedule IIIN, DEA regulations require a duly issued DEA registration.  Accordingly, on June 25, 2005, **[REDACTED]** submitted an application to DEA for a registration to import controlled substance listed in Schedule IIIN and IV.  In order to obtain this registration, **[REDACTED]** was required to establish to DEA's satisfaction that it has adequate security and handling procedures in place to ensure that the controlled substances are not illegally diverted.  **[REDACTED]** must also submit to periodic DEA inspections, which it has consistently passed.

6

31.    On December 22, 2005, DEA issued a registration (DEA Registration

Number **[REDACTED]**) to **[REDACTED]** to import controlled substances listed on

Schedule IIIN (i.e., Dronabinol in sesame oil encapsulated in a soft gelatin capsule).

32.    **[REDACTED]** submitted its Protocol for *In Vivo* Bioequivalence study of

Dronabinol in Healthy Human Volunteers under Fasting Conditions to **[REDACTED]**

and an expert and consultant in such studies.  On April 26, 2006, **[REDACTED]**

received **[REDACTED's]** comments on **[REDACTED's]** protocol, in which he

concluded that **[REDACTED]**.

33.    On February 28, 2006, **[REDACTED]** submitted an application (DEA

Form 357) to import 400 capsules of Dronabinol 2.5 mg, 400 capsules of Dronabinol 5

mg and 400 capsules of Dronabinol 10 mg.  Thereafter, on March 22, 2006, DEA issued

Permit No. **[REDACTED]** to **[REDACTED]** to import its generic Marinol® product in

the quantities and dosage strengths identified in the February 28, 2006 Form 357.  The

DEA permit indicated that "[t]he consignment proposed to be imported is required for

legitimate purposes."

34.    On April 18, 2006, **[REDACTED]** filed an application for a permit (Form

357) to import three "submission batches" of its generic Marinol® product.

**[REDACTED]** certified on the application that the controlled substances "are imported

exclusively for scientific purposes" which was described as "Biostudy/Submission

Batches for ANDA Approval."  These batches were manufactured by **[REDACTED]**,

paid for by **[REDACTED]** and are stored at **[REDACTED's]** facility in **[REDACTED]**

pending DEA's issuance of a permit to **[REDACTED]** to import them to the United

States.

7

**The DEA Denies [REDACTED's] Form 357 Application and Refuses To
Issue a Permit to Import a Second Batch of its Generic Marinol®**

35.    I am advised that on May 5, 2006, representatives of DEA contacted
**[REDACTED]**, **[REDACTED's]** Manager of Controlled Substances and Security.  I am
further advised that the DEA representatives informed **[REDACTED]** that DEA would
not approve **[REDACTED's]** Form 357 and issue a permit to import the three batches of
its generic Marinol®.  The DEA representatives advised **[REDACTED]** that its Form
357 permit was being cancelled.  I am informed that DEA advised **[REDACTED]** that in
order for **[REDACTED]** to import its generic Marinol® product under its registration for
Schedule IIIN controlled substances, the product had to already be FDA approved.  When
**[REDACTED]** pointed out that DEA has already issued a permit to import an earlier
batch under its DEA import registration, the DEA representatives claimed that it had been
a mistake for DEA to issue that permit.

36.    The DEA's decision not to issue an import permit has caused and
continues to cause **[REDACTED]** substantial injury that cannot be adequately
quantified.  **[REDACTED]** cannot obtain FDA approval of its generic Marinol® until
after it imports the three batches and runs the required testing, yet DEA will not allow
**[REDACTED]** to import the product under its Schedule IIIN registration until after it
receives FDA approval.  Each day that passes with the product stored in bulk awaiting
importation increases the risk that FDA will question the results of any testing run on the
batches, thereby delaying FDA's approval of **[REDACTED's]** ANDA.  Moreover,
**[REDACTED's]** project to obtain the first ANDA approval to bring a lower cost
alternative to Marinol® to the market has come to a stop.

8

37.     I attest that the foregoing facts are true and correct to the best of my

knowledge, information and belief.  I am aware that if any of the foregoing is willfully

false I am subject to punishment.


Date:  _____                    _____/s/_____
                                                                  **[REDACTED]**

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:06CV00966 |
| | ) | |
| ALBERTO R. GONZALEZ, | ) | |
| in his official capacity as | ) | |
| Attorney General of the United states, and | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE | ) | |
| 950 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C.  20530, | ) | |
| | ) | |
| KAREN P. TANDY, in her official | ) | |
| capacity as Administrator of the | ) | |
| United States Drug Enforcement | ) | |
| Administration, and | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| 2401 Jefferson Davis Highway | ) | |
| Alexandria, VA  22301 | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AFFIDAVIT OF [REDACTED]</u>

I, **[REDACTED]**, being duly sworn according to law, hereby depose and verify that the following facts are true:

1.      I am over eighteen years of age and make this Affidavit on the basis of personal knowledge.

2.      I am currently employed at **[REDACTED]** as the Manager of Controlled Substances and Security.  My job duties include, among other things, filling out the proper paper

work for submission to the Drug Enforcement Administration ("DEA") for licenses and permits
to import and export controlled substances listed on Schedules I through V.

3.      In 2005, I was instructed to prepare and submit an application on behalf of
**[REDACTED]** for a registration to import controlled substances listed on Schedule IIIN.
Accordingly, on June 25, 2005, I sent to the DEA on behalf of **[REDACTED]** an application for
a registration to import Schedule IIIN controlled substances.  In order to obtain a registration to
import controlled substances, **[REDACTED]** is required to demonstrate to the DEA that it has
sufficient security and handling procedures in place to ensure that the controlled substances are
not illegally diverted.  **[REDACTED]** must also submit to and pass periodic DEA inspections.
**[REDACTED]** has demonstrated to DEA's satisfaction that it has such security and handling
procedures in place and has consistently passed its DEA inspections, including an inspection that
occurred very recently.

4.      On or about December 22, 2005, DEA issued Registration No. **[REDACTED]** to
**[REDACTED]** to import controlled substances on Schedule III(N).

5.      In February 28, 2006, I prepared and submitted on behalf of **[REDACTED]** on
DEA's Form 357 an application for a permit to import a small batch of **[REDACTED's]** generic
version of Marinol® from **[REDACTED]**.  On March 22, 2006, DEA issued Permit No.
**[REDACTED]** to import a small batch of its generic Marinol® from **[REDACTED]**.

6.      On April 18, 2006, I prepared and submitted on behalf of **[REDACTED]** a second
application on DEA's Form 357 to a permit to import three additional "submission batches" of
**[REDACTED's]** generic Marinol® product from **[REDACTED]**.  I certified on the application
that the controlled substances "are imported exclusively for scientific purposes" which I
described as "Biostudy/Submission Batches for ANDA Approval."

2

7.      On May 5, 2006, I received a telephone call from Stephen Via, Matt Straight and Michael Morley, of the DEA.  These DEA representatives advised me that DEA would not approve **[REDACTED's]** second Form 357 and issue a permit to import the three batches of its generic Marinol®.  The DEA representatives advised me that **[REDACTED's]** Form 357 permit application was being cancelled because **[REDACTED]** can only import its generic Marinol® under its Schedule IIIN registration after it is approved by FDA.  I advised the DEA representatives the purpose of the importation was to develop the data necessary to obtain FDA approval and that DEA had previously issued a permit to **[REDACTED]** to import its generic Marinol® product under its Schedule IIIN registration.  The DEA representatives claimed that it had been a mistake for DEA to issue that permit.

8.      I attest that the foregoing facts are true and correct to the best of my knowledge, information and belief.  I am aware that if any of the foregoing is willfully false I am subject to punishment.


Date:  _____            _____/s/_____
                                           **[REDACTED]**



SWORN TO AND SUBSCRIBED
BEFORE ME THIS _____ DAY
OF _____, 2005



_____
NOTARY PUBLIC

PH1 848293v1 06/23/06

# EXHIBIT C

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
| --- | --- | --- |
| | 03-31-2007 | PAID |

**CONTROLLED SUBSTANCE REGISTRATION CERTIFICATE**
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
WASHINGTON, D.C. 20537

| SCHEDULES | BUSINESS ACTIVITY | ISSUE DATE |
| --- | --- | --- |
| 3N,4 | IMPORTER | 03-15-2006 |

Sections 304 and 1008 (21 U.S.C. 824 and 958) of the Controlled Substances Act of 1970, as amended, provide that the Attorney General may revoke or suspend a registration to manufacture, distribute, dispense, import or export a controlled substance.

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION. OR BUSINESS ACTIVITY, AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

---

**CONTROLLED SUBSTANCE REGISTRATION CERTIFICATE**
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
WASHINGTON, D.C. 20537

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
| --- | --- | --- |
| | 03-31-2007 | PAID |

| SCHEDULES | BUSINESS ACTIVITY | ISSUE DATE |
| --- | --- | --- |
| 3N,4 | IMPORTER | 03-15-20 |

Sections 304 and 1008 (21 U.S.C. 824 and 958) of the Controlled Substances Act of 1970, as amended, provide that the Attorney General may revoke or suspend a registration to manufacture, distribute, dispense, import or export a controlled substance.

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY, AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

Form DEA-223 (7/05)



# EXHIBIT D

U.S. Department of Justice / Drug Enforcement Administration
## APPLICATION FOR PERMIT TO IMPORT CONTROLLED SUBSTANCES
### FOR DOMESTIC AND/OR SCIENTIFIC PURPOSES
PURSUANT TO SECTION 1002, TITLE III, P.L.91-513
( Read instructions on reverse before completing)

OMB APPROVAL
No. 1117 - 0013

See reverse for Privacy Act

TO: **DRUG ENFORCEMENT ADMINISTRATION
INTERNATIONAL DRUG UNIT (ODOI)
WASHINGTON, D.C. 20537**

DATE
Feb 28, 2006

Application is hereby made pursuant to the provisions of the Controlled Substances Import and Export
Act and the regulations prescribed thereunder for a permit to import as follows:

| 1. NAME OF FOREIGN EXPORTER | 2. ADDRESS OF FOREIGN EXPORTER |
|---|---|
| | |

| 3. FOREIGN PORT OF EXPORTATION | 4. PORT OF ENTRY (U.S. Customs port where shipment will clear) | 5. LATEST DATE SHIPMENT WILL LEAVE FOREIGN PORT |
|---|---|---|
| | NEW YORK/JFK | Mar 16, 2006 |

| 6a. NAME AND QUANTITY OF DRUG PREPARATION TO BE IMPORTED (Enter names as shown on labels; numbers and sizes of packages; strength, CSA Drug Code, and NDC Number) | 6b. CONTROLLED SUBSTANCE CONTENT OF DRUG OR PREPARATION TO BE IMPORTED expressed as acid, base or alkaloid (Enter name of controlled substance contained in the drug; compound, or preparation) | 6c. DATE IMPORTED AND ACTUAL QUANTITY (Completed by registrant at time of import) DEA PERMIT No.: |
|---|---|---|
| Dronabinol 2.5mg Capsules in Sesame Oil 2 Bags X 200 Caps CSA Drug Code: 7369 NDC# 0527-1450-01 | 2 X 200Caps = 400Caps X .0025gm/1 Cap X 1 = 1 gm/base | |
| Dronabinol 5mg Capsules in Sesame Oil 2 Bags X 200 Caps CSA Drug Code: 7369 NDC# 0527-1451-01 | 2 X 200Caps = 400Caps X .0050gm/1 Cap X 1 = 2 gm/base | |
| Dronabinol 10mg Capsules in Sesame Oil 2 Bags X 200 Caps CSA Drug Code: 7369 NDC# 0527-1452-01 | 2 X 200Caps = 400Caps X .010gm/1 Cap x 1 = 4 gm/base  Total= 7 gm/base | |

| 7a. ASSIGNED QUOTA FOR THIS YEAR | 7b. TOTAL KG. AUTHORIZED ON PERMITS THIS YEAR | 7c. KG OF 7b. IMPORTED TO DATE | 7d. STOCK ON HAND & DATE |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

8. IF SUBSTANCE(S) WILL BE IMPORTED FOR SCIENTIFIC PURPOSES ONLY, PLEASE COMPLETE:

I hereby certify the above controlled substances are imported exclusively for scientific purposes, pursuant to 21 CFR 1312.13(a)(4) (see reverse), as follows:

Internal Analytical Method Development and
Validation

Signature of Certifying Individual

| NAME OF IMPORTER | ADDRESS OF IMPORTER |
|---|---|
| | |

| IMPORTER'S TELEPHONE NO. | DEA REGISTRATION NO. | SIGNATURE AND TITLE OF PERSON MAKING APPLICATION |
|---|---|---|
| | | |

**NOTICE : Controlled Substances may not be imported by mail or parcel post.**

| DEA USE ONLY | APPROVED IMPORT PERMIT NUMBER | DATE IMPORT PERMIT NUMBER ISSUED |
|---|---|---|
| | | |

# EXHIBIT E





**U.S. Department of Justice**
Drug Enforcement Administration

# PERMIT TO IMPORT

The Administrator of the Drug Enforcement Administration, being the official charged with the administration of the laws relating to the importation of the dangerous drugs to which the Controlled Substances Import and Export Act and the several international treaties apply, authorizes and permits the following importation of controlled substances into the United States.

| DATE OF ISSUE | EXPIRATION DATE |
|---|---|
| MARCH 22, 2006 | SEPTEMBER 22, 2006 |

**IMPORTER**

**EXPORTER**

| PORT OF IMPORT | FOREIGN PORT OF EXPORT |
|---|---|
| JAMAICA, NEW YORK | |

Importer is hereby permitted under the provisions of the Controlled Substance Import and Export Act to import items below.

| Item No. | Number and Size of Packages | Name of Substance or Preparation | Controlled Substance Content |
|---|---|---|---|
| 1 | 2 BAGS<br>200 CAPSULES/BAG<br>2.5MG/CAPSULE | DRONABINOL<br>(MARINOL) | 1GM DELTA-9-THC BASE |
| 2 | 2 BAGS<br>200 CAPSULES/BAG<br>5MG/CAPSULE | DRONABINOL<br>(MARINOL) | 2GM DELTA-9-THC BASE |
| 3 | 2 BAGS<br>200 CAPSULES/BAG<br>10MG/CAPSULE | DRONABINOL<br>(MARINOL) | 4GM DELTA-9-THC BASE |
| | NOTHING FOLLOWS | | |

Total Number of Item  THREE

**The consignment proposed to be imported is required for legitimate purposes.**

NOTES:  THE ORIGINAL PERMIT IS REQUIRED TO ACCOMPANY THE SHIPMENT.

**Endorsement by U.S. Customs** This is to certify that the controlled substance merchandise described herein was imported into this port. If
(Original)                     quantity is different than permitted, please indicate in Notes section above.

_____     _____     _____
(Port)                              (Signature/Title)                        (Date)

For the Administrator:
**Stephen M. Via**                    _____      Address   Drug Enforcement Administration
**Acting Chief, ODEI**                    (Signature)                                Import/Export Unit (ODEI)
                                                                                     Washington, DC 20537
DEA Form 35 (10/02)

QUINTUPLICATE — FOR THE IMPORTER

                                                                              TOTAL P.04

# EXHIBIT F

U.S. Department of Justice / Drug Enforcement Administration

# APPLICATION FOR PERMIT TO IMPORT CONTROLLED SUBSTANCES
## FOR DOMESTIC AND/OR SCIENTIFIC PURPOSES
### PURSUANT TO SECTION 1002, TITLE III, P.L.91-513
( Read Instructions on reverse before completing )

**OMB APPROVAL**
No. 1117 - 0013

See reverse for Privacy Act

TO:  **DRUG ENFORCEMENT ADMINISTRATION**
**INTERNATIONAL DRUG UNIT (ODOI)**
**WASHINGTON, D.C. 20537**

DATE
Apr 18, 2006

Application is hereby made pursuant to the provisions of the Controlled Substances Import and Export Act and the regulations prescribed thereunder for a permit to import as follows:

1. NAME OF FOREIGN EXPORTER

2. ADDRESS OF FOREIGN EXPORTER

3. FOREIGN PORT OF EXPORTATION

4. PORT OF ENTRY (U.S. Customs port where shipment will clear)
NEW YORK/JFK

5. LATEST DATE SHIPMENT WILL LEAVE FOREIGN PORT
May 8, 2006

| 6a. NAME AND QUANTITY OF DRUG PREPARATION TO BE IMPORTED (Enter names as shown on labels; numbers and sizes of packages; strength, CSA Drug Code, and NDC Number) | 6b. CONTROLLED SUBSTANCE CONTENT OF DRUG OR PREPARATION TO BE IMPORTED expressed as acid, base or alkaloid (Enter name of controlled substance contained in the drug; compound, or preparation) | 6c. DATE IMPORTED AND ACTUAL QUANTITY (Completed by registrant at time of import) DEA PERMIT No.: |
|---|---|---|
| DRONABINOL 2.5MG CAPSULES IN SESAME OIL<br>1 X 175,000 CAPS<br>CSA DRUG CODE: 7369<br>NDC# 0527-1450-01 | 1 X 175,000 CAPS = 175,000 CAPS X .0025GM/1 CAP X 1 = 437.5 GM/BASE | |
| DRONABINOL 5MG CAPSULES IN SESAME OIL<br>1 x 175,000 CAPS<br>CSA DRUG CODE: 7369<br>NDC# 0527-1451-01 | 1 X 175,000 CAPS = 175,000 CAPS X .0050GM/1 CAP X 1 = 875 GM/BASE | |
| DRONABINOL 10MG CAPSULES IN SESAME OIL<br>1 X 175,000 CAPS<br>CSA DRUG CODE: 7369<br>NDC# 0527-1452-01 | 1 X 175,000 CAPS = 175,000 CAPS X .010GM/1 CAP X 1 = 1750 GM/BASE<br><br>TOTAL = 3,062.5 GM/BASE | |

| 7a. ASSIGNED QUOTA FOR THIS YEAR | 7b. TOTAL KG. AUTHORIZED ON PERMITS THIS YEAR | 7c. KG OF 7b. IMPORTED TO DATE | 7d. STOCK ON HAND & DATE |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

8. IF SUBSTANCE(S) WILL BE IMPORTED FOR SCIENTIFIC PURPOSES ONLY, PLEASE COMPLETE:

I hereby certify the above controlled substances are imported exclusively for scientific purposes, pursuant to 21 CFR 1312.13(a)(4) (see reverse), as follows:

BIOSTUDY/SUBMISSION BATCHES FOR ANDA APPROVAL

NAME OF IMPORTER

Signature of Certifying Individual

ADDRESS OF IMPORTER

IMPORTER'S TELEPHONE NO.

DEA REGISTRATION NO.

SIGNATURE AND TITLE OF PERSON MAKING APPLICATION

**NOTICE : Controlled Substances may not be imported by mail or parcel post.**

| DEA USE ONLY | APPROVED IMPORT PERMIT NUMBER | | DATE IMPORT PERMIT NUMBER ISSUED |
|---|---|---|---|

DEA Form

# EXHIBIT G

Westlaw.

64 FR 35928-01                                                    Page 1
64 FR 35928-01, 1999 WL 445863 (F.R.)
(Cite as: 64 FR 35928)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Drug Enforcement Administration

21 CFR Parts 1308, 1312

[DEA-180F]

Schedules of Controlled Substances: Rescheduling of the Food and Drug
Administration Approved Product Containing Synthetic Dronabinol [(-)-D $^9$-
(trans)-Tetrahydrocannabinol] in Sesame Oil and Encapsulated in Soft Gelatin
Capsules From Schedule II to Schedule III

Friday, July 2, 1999

*35928  AGENCY: Drug Enforcement Administration, Department of Justice.

ACTION: Final rule.

SUMMARY: This is a **final rule** of the Deputy Administrator of the Drug Enforcement
Administration (DEA) transferring a drug between schedules of the Controlled
Substances Act (CSA) pursuant to 21 U.S.C. 811.  With the issuance of this **final
rule**, the Deputy Administrator transfers from schedule II to schedule III of the
CSA the drug containing synthetic **dronabinol [(-)-D $^9$-(trans)-tetrahydrocannabinol]**
in sesame oil and encapsulated in soft gelatin capsules in a product approved by
the Food and Drug Administration (FDA).  This rule also designates this drug as a
schedule III non-narcotic substance requiring an import/export permit.  As a result
of this rule, the regulatory controls and criminal sanctions of schedule III will
be applicable to the manufacture, distribution, importation and exportation of this
drug.

EFFECTIVE DATE: July 2, 1999.

FOR FURTHER INFORMATION CONTACT: Frank Sapienza, Chief, Drug and Chemical
Evaluation Section, Drug Enforcement Administration, Washington, DC 20537, 202-
307-7183.

SUPPLEMENTARY INFORMATION:

Background

 **Dronabinol** is the United States Adopted Name (USAN) for the (-)-isomer of D $^9$-
(trans)-tetrahydrocannabinol [(-)-D $^9$-(trans)-THC], which is believed to be the
major psychoactive component of Cannibas sativa L. (marijuana).  On May 31, 1985,
FDA approved for marketing the product Marinol--which contains synthetic **dronabinol**
in sesame oil and encapsulated in soft gelatin capsules-- for the treatment of
nausea and vomiting associated with cancer chemotherapy. Following this FDA
approval, DEA issued a **final rule** on May 13, 1986, transferring FDA-approved
products of the same formulation as Marinol from schedule I to schedule II of the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 FR 35928-01                                                                                  Page 2
64 FR 35928-01, 1999 WL 445863 (F.R.)
**(Cite as: 64 FR 35928)**

CSA in accordance with 21 U.S.C. 811(a). (For simplicity within this document, the term "Marinol" will be used hereafter to refer to Marinol and any other products, which may by approved by FDA in the future, that have the same formulation as Marinol.) The 1986 rescheduling of Marinol was based on a medical and scientific evaluation and scheduling recommendation from the Assistant Secretary for Health in accordance with 21 U.S.C. 811(b).  The transfer of Marinol to schedule II did not affect the CSA classification of pure **dronabinol**, which--as a tetrahydrocannabinol with no currently accepted medical use in treatment in the United States--remains a schedule I controlled substance.  On December 22, 1992, FDA expanded Marinol's indications to include the treatment of anorexia associated with weight loss in patients with AIDS.

The Petition To Reschedule Marinol[R]

 On February 3, 1995, UNIMED Pharmaceuticals, Inc. petitioned the Administrator of DEA to transfer Marinol[R] from schedule II to schedule III.  In response to this petition, and in view of supplemental information that UNIMED provided to DEA on December 11, 1996, DEA had to determine whether this proposed rescheduling of Marinol[R] would comport with United States obligations under the Convention on Psychotropic Substances, 1971 (Psychotropic Convention).  See 21 U.S.C. 811(d). Under the Psychotropic Convention, dronabinol and all dronabinol-containing products, such as Marinol[R], are listed in schedule II. As a result, the United States is obligated under the Psychotropic Convention to impose certain restrictions on the export and import of Marinol[R].  DEA has concluded that, in order for the United States to continue to meet its obligations under the Psychotropic Convention, DEA will continue to require import and export permits for international transactions involving Marinol[R], even though Marinol[R] will be transferred to schedule III of the CSA.  (As set forth below, to accomplish this, DEA is hereby amending 21 CFR 1312.30 to require import and export permits for international transactions involving Marinol[R].)

 After determining that Marinol[R] could be transferred to schedule III while maintaining the controls required by the Psychotropic Convention, and after gathering the necessary data, on August 7, 1997, DEA requested from the Acting Assistant Secretary for Health, Department of Health and Human Services (DHHS), a scientific and medical evaluation, and recommendation, as to whether Marinol[R] should be rescheduled, in accordance with 21 U.S.C. 811(b).

 On September 11, 1998, the Acting Assistant Secretary for Health sent to DEA a letter recommending that Marinol[R] be transferred from schedule II to schedule III of the CSA.  Enclosed with the September 11, 1998, letter was a document prepared by the FDA entitled "Basis for the Recommendation for Rescheduling Marinol[R] Capsules from schedule II to schedule III of the Controlled Substances Act (CSA)." In this document, the FDA defines the Marinol[R] product as "an FDA-approved drug product containing synthetically produced dronabinol dissolved in sesame oil and encapsulated in soft *35929 gelatin capsules (2.5 mg, 5 mg, and 10 mg per dosage unit)." The document contained a review of the factors which the CSA requires the Secretary to consider, which are set forth in 21 U.S.C. 811(c).

The Proposed Rule

 On November 7, 1998, the then-Acting Deputy Administrator of DEA published a notice of proposed rule making in the Federal Register (63 FR 59751), proposing to transfer Marinol[R] from schedule II to schedule III of the CSA.  The proposed rule was based on the DHHS scientific and medical evaluation and scheduling recommendation and DEA's independent evaluation.  Also under the proposed rule, 21

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 FR 35928-01                                                    Page 3
64 FR 35928-01, 1999 WL 445863 (F.R.)
(Cite as: 64 FR 35928)

CFR 1312.30 would be amended to include Marinol[R] as a schedule III non-narcotic controlled substance specifically designated as requiring import and export permits pursuant to 21 U.S.C. 952(b)(2) and 953(e)(3). As discussed above, this proposed amendment to 21 CFR 1312.30 is necessary for the United States to continue to meet its obligations under the Psychotropic Convention. The notice of proposed rule provided an opportunity for all interested persons to submit their comments, objections, or requests for hearing in writing to DEA on or before December 7, 1998.

Comments From the Public

DEA received comments regarding the proposed rule from ten persons. Nine of the commenters supported the proposed rule. One commenter objected to the proposed rule and requested a hearing thereon. The comments are briefly summarized below.

The nine commenters who supported the proposed rule included organizations, physicians, and one individual. Eight of the nine commenters who supported the proposed rule expressed the opinion that Marinol[R] is a safe and effective alternative to smoking marijuana for treatment of nausea and loss of appetite and has low abuse potential.

One commenter who supported the proposed rule expressed the view that the rescheduling of Marinol[R] should not serve as a substitute for making marijuana legally available for medical use. This commenter stated that it supported the use of marijuana for medical purposes and, therefore, wished to emphasize that the proposed rule affected the CSA status of Marinol[R]--not that of marijuana, which remains a schedule I controlled substance.

The one commenter who objected to the proposed rule, and requested a hearing thereon, asserted that Marinol[R] should not be transferred to schedule III unless and until marijuana and all other THC-containing drugs are simultaneously and likewise rescheduled. This commenter asserted that Marinol[R] has the same potential for abuse as marijuana and all other THC-containing drugs. This commenter agreed with the proposed rule that Marinol[R]'s potential for abuse is less than the "high potential for abuse" commensurate with schedules I and II of the CSA. Accordingly, this commenter agreed that Marinol[R] should be transferred to a less restrictive schedule than schedule II. However, this commenter disagreed with what would be the resultant status of Marinol[R] vis-a1-vis marijuana and THC if the NPRM becomes final: Marinol[R] would be in schedule III while marijuana and THC would remain in schedule I. This commenter asserted that the CSA prohibited transferring Marinol[R] to a less restrictive schedule unless marijuana and all THC-containing drugs are simultaneously transferred to the same schedule. DEA has determined that this commenter's objections are based on a misinterpretation of the CSA, which can be addressed, as a matter of law, without conducting a fact-finding hearing. Accordingly, as this commenter presented no material issues of fact, DEA denied this commenter's request for a hearing.

Findings

Relying on the scientific and medical evaluation and scheduling recommendations of the Assistant Secretary for Health, and based on DEA's independent review thereof, the Deputy Administrator of the DEA, pursuant to 21 U.S.C. 811(a) and 811(b), finds that:

(1) Based on information now available, Marinol[R] has a potential for abuse less than the drugs or other substances in schedules I and II.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 FR 35928-01
64 FR 35928-01, 1999 WL 445863 (F.R.)
(Cite as: 64 FR 35928)

(2) Marinol[R] is a FDA-approved drug product and has a currently accepted medical use in treatment in the United States; and

(3) Abuse of Marinol[R] may lead to moderate of low physical dependence or high psychological dependence.

Rescheduling Action

Based on the above findings, the Deputy Administrator of the DEA concludes that Marinol[R] should be transferred from schedule II to schedule III. Schedule III regulations will, among other things, allow five prescription refills in six months and lessen record keeping requirements and distribution restrictions. The schedule III control of Marinol[R] will become effective July 2, 1999, except that certain regulatory provisions governing registrants who handle Marinol will take effect as indicated below. In the event that the regulations impose special hardships on the registrants, the DEA will entertain any justified request for an extension of time to comply with the schedule III regulations regarding Marinol[R]. The applicable regulations are as follows.

1. Registration. Any person who manufactures, distributes, dispenses, imports or exports Marinol[R] or who engages in research or conducts instructional activities with Marinol[R], or who proposes to engage in such activities, must be registered to conduct such activities in accordance with part 1301 of Title 21 of the Code of Federal Regulations.

2. Security. Marinol[R] must be manufactured, distributed and stored in accordance with § § 1301.71, 1301.72(b), (c), and (d), 1301.73, 1301.74, 1301.75(b) and (c) and 1301.76 of Title 21 of the Code of Federal Regulations.

3. Labeling and Packaging. All commercial containers of Marinol[R], which are packaged on or after January 3, 2000 must have the appropriate Schedule III labeling as required by § § 1302.03-1302.07 of Title 21 of the Code of Federal Regulations. Commercial containers of Marinol[R] packaged before January 3, 2000. After April 3, 2000, all commercial containers of Marinol must bear the CIII labels as specified in § § 1302.03-1302.07 of Title 21 of the Code of Federal Regulations.

4. Inventory. Registrants possessing Marinol[R] are required to take inventories pursuant to § § 1304.03, 1304.04 and 1304.11 of Title 21 of the Code of Federal Regulations.

5. Records. All registrants must keep records pursuant to § § 1304.03, 1304.04 and 1304.21-1304.23 of Title 21 of the Code of Federal Regulations.

6. Prescriptions. All prescriptions for Marinol[R] are to be issued pursuant to § § 1306.03-1306.06 and 1306.21-1306.26 of Title 21 of the Code of Federal Regulations. All prescriptions for Marinol[R] issued on or after July 2, 1999, if authorized for refilling, shall as of that date be limited to five refills and shall not be refilled after January 2, 2000.

7. Importation and Exportation. Due to its international control status, import and export permits for Marinol[R] will be required in accordance with 21 CFR 1312.30. All importation and exportation of Marinol[R] shall be in compliance with part 1312 of Title 21 of the CFR.

8. Criminal Liability. Any activity with Marinol[R] not authorized by, or in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 FR 35928-01                                                              Page 5
64 FR 35928-01, 1999 WL 445863 (F.R.)
(Cite as: 64 FR 35928)

violation of, the CSA or the Controlled *35930 Substances Import and Export Act shall continue to be unlawful.

   In accordance with the provisions of the CSA (21 U.S.C. 811(a)), this action is a formal rule making "on the record after opportunity for a hearing." Such proceedings are conducted pursuant to the provisions of 5 U.S.C. 556 and 557 and, as such, are exempt from review by the Office of Management and Budget pursuant to Executive Order (E.O.) 12866, section 3(d)(1). The Deputy Administrator, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this final rule and by approving it certifies that it will not have a significant economic impact on a substantial number of small entities. Marinol[R] is a prescription drug used to treat nausea due to cancer chemotherapy and AIDS wasting. Handlers of Marinol[R] are likely to handle other controlled substances used to treat cancer or AIDS which are already subject to the regulatory requirements of the CSA. Further, placement of Marinol[R] in schedule III of the CSA will mean a significant decrease in the regulatory requirements for persons handling Marinol[R].

   This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under provisions of the Unfunded Mandates Reform Act of 1995.

   This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

   This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with E.O. 12612, it is determined that this rule, if finalized, will not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

List of Subjects

*21 CFR Part 1308*

   Administrative practice and procedure, Drug traffic control, Narcotics, Prescription drugs.

*21 CFR Part 1312*

   Administrative practice and procedure, Drug traffic control, Exports, Imports, Narcotics, Reporting requirements.

   Under the authority vested in the Attorney General by section 201(a) of the CSA (21 U.S.C. 811(a)), and delegated to the Administrator of the DEA by the Department of Justice regulations (28 CFR 0.100) and redelegated to the Deputy Administrator pursuant to 28 CFR 0.104, the Deputy Administrator hereby amends 21 CFR parts 1308 and 1312 as follows:

PART 1308--[AMENDED]

            ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 FR 35928-01                                                              Page 6
64 FR 35928-01, 1999 WL 445863 (F.R.)
(Cite as: 64 FR 35928)

1.   The authority citation for 21 CFR part 1308 continues to read as follows:

Authority: 21 U.S.C. 811, 812, 871(b) unless otherwise noted.

### 21 CFR § 1308.12

§ 1308.12 [Amended]

### 21 CFR § 1308.12

2.   Section 1308.12 is amended by removing paragraph (f)(1) and redesignating the existing paragraph (f)(2) as (f)(1).

### 21 CFR § 1308.13

3.   Section 1308.13 is amended by adding a new paragraph (g) to read as follows:

### 21 CFR § 1308.13

§ 1308.13 Schedule III.

* * * * *
(g) Hallucinogenic substances.

(1) Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product--7369.

[Some other names for dronabinol: (6aR-trans)-6a,7,8,10a-tetrahydro-6,6,9-trimethyl-3-pentyl-6H-dibenzo [b,d]pyran-1-ol) or (-)-delta-9-(trans)-tetrahydrocannabinol]

(2) [Reserved]

PART 1312--[AMENDED]

1.   The authority citation for part 1312 continues to read as follows:

Authority: 21 U.S.C. 952, 953, 954, 957, 958.

### 21 CFR § 1312.30

2.   Section 1312.30 is amended by adding a new paragraph (a) and reserving paragraph (b) to read as follows:

### 21 CFR § 1312.30

§ 1312.30 Schedule III, IV and V non-narcotic controlled substances requiring an import and export permit.

* * * * *
(a) Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product.

(b) [Reserved]

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 FR 35928-01
64 FR 35928-01, 1999 WL 445863 (F.R.)
**(Cite as: 64 FR 35928)**

Dated: June 28, 1999.

Donnie R. Marshall,

Deputy Administrator, Drug Enforcement Administration.

[FR Doc. 99-16833 Filed 7-1-99; 8:45 am]

BILLING CODE 4410-09-M

64 FR 35928-01, 1999 WL 445863 (F.R.)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.