UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:06-CV-00966-CKK |
| ) | |
| ALBERTO R. GONZALES, ) | |
| in his official capacity as ) | |
| Attorney General of the United states, and ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| JUSTICE ) | |
| 950 Pennsylvania Avenue, N.W. ) | |
| Washington, DC  20530, ) | |
| ) | |
| KAREN P. TANDY, in her official ) | |
| capacity as Administrator of the ) | |
| United States Drug Enforcement ) | |
| Administration, and ) | |
| ) | |
| UNITED STATES DRUG ) | |
| ENFORCEMENT ADMINISTRATION ) | |
| 2401 Jefferson Davis Highway ) | |
| Alexandria, VA  22301 ) | |
| ) | |
| Defendants. ) | |
| ) | |

REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY MANDATORY INJUNCTIVE RELIEF

I.    **INTRODUCTION**

DEA's[1] opposition to Plaintiff's motion for preliminary mandatory injunctive relief is

based on the flawed premise that Plaintiff seeks to import a Schedule I controlled substance

under its Schedule III registration.  This premise is incorrect for the simple reason that the

---

[1] For simplicity sake, the defendants are collectively referred to herein as the "DEA."

product Plaintiff seeks to import -- dronabinol in sesame oil, encapsulated in a soft gelatin capsule, is not a Schedule I controlled substance. It is a Schedule IIIN controlled substance.

Therefore, DEA's suggestion that Plaintiff has not suffered irreparable injury because it can simply apply for a Schedule I registration and import the product pursuant to that registration, is incorrect. The product that Plaintiff seeks to import is not on Schedule I, so Plaintiff is not required to engage in the futile act of applying under that Schedule. Plaintiff is seeking to import a finished product, i.e., dronabinol in sesame oil encapsulated in a soft gelatin capsule, and this product is on Schedule III. It is this product which the FDA has recognized as having an accepted medical use, which is why it was placed on Schedule III on July 2, 1999. At that time, there was only one form of this drug, which was the brand name product Marinol. Since then, Plaintiff has developed a generic version of the same drug, with the same formulation. Indeed, Plaintiff's product is identical to the brand name product.[2] Therefore, Plaintiff's product is the same as the product that is on Schedule III. Accordingly, Plaintiff should not be required to file an import application under a different Schedule that does not describe its product.

Furthermore, the Schedule I process is simply not a viable option for Plaintiff. DEA's Opposition attempts to create the erroneous impression that the application for a Schedule I registration is a simple, quick process. Indeed, DEA's counsel readily conceded during the telephonic status conference on June 6, 2006 that the requirements for obtaining a Schedule I registration are substantially more stringent than a Schedule III registration and Plaintiff may never even be granted such a registration. In fact, as more fully set forth below, the process for

---

[2] The Federal Register notice of July 2, 1999 transferring this form of dronabinol to Schedule III specified that what remained on Schedule I was "pure dronabinol, which – as a tetrahydrocannabinol [has] no currently accepted medical use in treatment in the United States." See Exhibit G to Plaintiff's Motion, at 2.

obtaining a Schedule I registration could literally take years. Thus, it is very telling that the DEA

cannot identify a single other company that has received a Schedule I registration to import

dronabinol in sesame oil, encapsulated in a soft gelatin capsule.[3]

In fact, the case law in this Circuit is on point and controls here – the availability of an

alternative procedure that involves a longer, more onerous regulatory process (and one that is not

required in the first instance) does not abate the irreparable injury suffered as a result of the loss

of the advantage of receiving the first ANDA approval and being the first company to enter the

market. Indeed, such an advantage can never be fully recouped through money damages.

Plaintiff simply has no adequate remedy at law, and each day that goes by increases the risk that

Plaintiff will lose the ability to get its generic product to market first.

In addition, Plaintiff is likely to succeed on the merits, as DEA all but conceded in its

Opposition Memorandum. That is, while DEA readily acknowledges that "Schedule I

[controlled] substances have the most stringent requirements because they have 'no currently

accepted medical use in treatment in the United States'" (Opposition, at 3), it does not dispute

that the product that Plaintiff seeks to import -- Dronabinol in sesame oil and encapsulated in soft

gelatin capsules – has accepted medical uses for treating nausea and vomiting associated with

cancer chemotherapy in patients who have failed to respond adequately to other treatments, and

appetite loss associated with weight loss in patients with acquired immunodeficiency syndrome

(AIDS). Accordingly, this acknowledgement of the medical use of this product underscores why

importation under a Schedule I registration is not appropriate.

---

[3] DEA indicates in its opposition papers that it has counseled certain of Plaintiff's competitors regarding the need to obtain a Schedule I registration to import dronabinol in sesame oil encapsulated in a soft gelatin capsule. The Court asked counsel during the on the record telephone conference on June 6, 2006 whether any Schedule I registrations had been issued to Plaintiff's competitors and counsel could not represent that any had been issued.

Moreover, DEA does not dispute that the formulation of the product that Plaintiff seeks to import is the <u>identical</u> product that is described on Schedule IIIN.[4] It is Dronabinol in sesame oil and encapsulated in soft gelatin capsules. Defendants' Opposition, instead, appears to hinge entirely on the fact that Plaintiff's ANDA has not yet been approved. DEA seizes on the words "in an FDA approved product" that follows the description of the product formulation in Schedule IIIN, claiming that the words of the regulation are clear and unambiguous. However, there is nothing in the enabling statute that in any way links the scheduling of controlled substances to FDA approval. To the extent that DEA attempts to do so here to deny Plaintiff's import permit, it exceeds its authority. The language "in an FDA approved product" appears to be merely descriptive of the particular item that was being scheduled at that time, Marinol®, since it was the only product of its kind then on the market.

Any other interpretation of the language "in an FDA approved product" is, at a minimum, ambiguous, as it is unclear what the phrase means in the context presented here. Specifically, it is unclear whether the phrase refers to final ANDA approval or, for example, FDA-approved for use in bioequivalency studies in support of an ANDA application. In light of such ambiguity, resort to the Federal Register is appropriate and, in fact, readily clears up the ambiguity -- the Schedule IIIN product – dronabinol in sesame oil, encapsulated in a soft gelatin capsule, includes both Marinol® (the FDA approved product), as well as any other products, "which <u>may</u> be approved by FDA in the future, that have the same formulation as Marinol." Ex. G to Motion, at 2 (emphasis added).

---

[4] The Court questioned defendants' counsel during the telephone conference call as to whether there is any dispute that Plaintiff's product formulation is the same as the product on Schedule IIIN. While counsel was unclear in her response, the opposition papers do not dispute that the formulation of the product that Plaintiff seeks to import is identical to the product identified on Schedule IIIN.

Finally, while DEA half-heartedly suggests that Plaintiff has failed to exhaust its administrative remedies, it acknowledges that the Court has jurisdiction to hear this case. In light of the substantial prejudice that Plaintiff will incur if required to exhaust administrative remedies, the Court should hear this case at this time.

Accordingly, as more fully set forth below and in Plaintiff's opening memorandum, Plaintiff has demonstrated that it meets each of the requirements for the issuance of preliminary mandatory injunctive relief.

## II.    FACTUAL BACKGROUND

Plaintiff has set forth at length in its opening memorandum the factual background, which will not be repeated herein. However, Plaintiff is compelled to address certain misstatements in the affidavits attached to DEA's opposition papers.

The DEA acknowledges that on June 25, 2005, Plaintiff filed an application to register as an importer of Schedule IIIN controlled substances. See Declaration of Cheryl Brown at ¶ 13. On July 5, 2005, Plaintiff representatives met with representatives of the DEA to discuss its desire to obtain a registration to import finished dosage product in connection with its development of an ANDA for a generic form of Marinol®. Id. at ¶¶ 4-12. Indeed, Ms. Brown further acknowledges that when Plaintiff submitted its application for a Schedule IIIN registration, it indicated that the purpose of the imports was product development. Id. at 16. Subsequently, DEA issued a Schedule IIIN registration to Plaintiff and granted its first import permit for the Schedule IIIN product. Thus, if any one was misled about what was required to import a generic version of Marinol®, it was Plaintiff, which received these two DEA approvals under Schedule IIIN and advanced its development program in reliance thereof.

As noted in Plaintiff's opening brief, on February 22, 2006, Plaintiff filed an application on Form 357 for a permit to import 1,200 capsules of dronabinol in sesame oil, encapsulated in soft gelatin capsules. <u>See</u> Plaintiff's Motion for Preliminary Injunctive Relief, Exhibit "D". Once again, DEA attempts to suggest that Plaintiff misled DEA in its application but that is not the case. According to Matthew Strait of the DEA, the first permit application, unlike the second one, was for bulk dronabinol, as opposed to finished dosage capsules. Opposition, at 8; Declaration of Matthew Strait attached as Ex. B to Opposition. Mr. Strait is incorrect, based on the plain language of Plaintiff's first permit application. This application, Ex. D to Plaintiff's Motion, clearly states that Plaintiff is importing "capsules" of dronabinol in sesame oil. There is no reference to "bulk" dronabinol in the application. This first permit application was granted by the DEA. The second application, which was denied, contains the same description of dronabinol "capsules".

DEA's suggestion that Plaintiff refused to submit a detailed letter explaining its exact plans is likewise erroneous. After DEA advised Plaintiff of its position, Plaintiff CEO **[REDACTED]** wrote a lengthy and detailed letter to DEA counsel explaining Plaintiff's plans. The letter, dated May 9, 2006, is attached as Ex. 1 to the Strait Declaration (Ex. B to the Opposition). In that letter, Plaintiff clearly states its exact plans for use of the imported substance in testing to support its ANDA.[5]

## III.    ARGUMENT

### A.    Plaintiff Will Suffer Irreparable Harm If Injunctive Relief Is Denied

In its moving papers, Plaintiff established that DEA's denial of an import permit has substantially imperiled Plaintiff's ability to become the first generic entrant in the Marinol®

---

[5] Based on the statements of defendants' counsel during the June 6, 2006 telephone conference, there is no dispute that the denial of Plaintiff's import permit is final agency action.

market. This Circuit deems such harm irreparable. See Mova Pharms. Corp. v. Shalala, 140

F.3d 1060, 1066 (D.C.Cir. 1998); Bracco Diagnostics, Inc. v. Shalala, 963 F.Supp. 20. 27

(D.D.C. 1997). Indeed, even the availability of an alternative procedure for obtaining the permit

does not rectify the irreparable harm suffered by Plaintiff resulting from DEA's denial of the

import permit under its Schedule IIIN registration. See Bracco, 963 F. Supp. At 28-29

(availability of more onerous procedures to obtain approval of product as "new drug" does not

abate irreparable harm caused by loss of significant economic advantage of receiving first

approval resulting from FDA's failure to treat product under the less onerous "new device"

regulations).

Indeed, DEA acknowledges in its opposition papers that "some courts have held that a

pharmaceutical company's loss of its statutory entitlement to generic market exclusivity

attendant with being the first company to receive FDA approval for a generic drug [constitutes

irreparable harm]." See Opposition at p. 21. In fact, it is not just "some court" that has so held,

but the Court of Appeals for the District of Columbia Circuit, whose rulings control here. DEA

claims nevertheless that the holdings in Mova and Bracco are inapposite, yet DEA makes no

effort to distinguish them. It makes no such effort because it cannot distinguish them; they are

squarely on point.

DEA's reliance on Apotex, Inc. v. Food & Drug Admin., 2006 WL 1030151 (D.D.C.

2006) is equally unavailing. In that matter the court found that because Apotex had not

established a likelihood of success on the merits, its showing of irreparable harm must be very

strong. The court further found that Apotex's concerns about a lost market share fell well short

of the serious, irreparable damage to its business required to warrant a preliminary injunction,

because the actual relevant period for assessing the harm was probably only a few months.

Neither of those concerns are present here. Plaintiff has shown a substantial likelihood that it will prevail on the merits and its loss of market share will be ongoing.

In <u>Mova</u>, a small generic pharmaceutical manufacturer brought suit against the FDA to compel it to delay the effective date of an approval of a competitor's ANDA until six months after plaintiff prevailed on its patent infringement suit. 140 F.3d at 1062-63. Plaintiff alleged that FDA based its approval of the competitor's ANDA on a regulation that was contrary to the plain language of the Hatch Waxman Amendments. <u>Id.</u> In opposing a motion for a preliminary injunction, the FDA argued precisely what the DEA argues here – that "the mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact." <u>Id.</u> at 1067, n. 6. The district court held that plaintiff had established irreparable injury and the Court of Appeals affirmed, noting "the district court found that Mova would be harmed by the loss of its 'officially sanctioned head start,' and that Mova's small size put it at a particular disadvantage. This suffices to show a severe economic impact to Mova." <u>Id.</u>

In <u>Bracco</u>, plaintiff filed suit for injunctive relief against the FDA claiming that it was treating plaintiff's product as a "drug" while it was treating a virtually identical product of a competitor as a "device." 963 F.Supp. at 23-25. This court found that plaintiff had demonstrated irreparable harm, stating "[w]hile injury to plaintiffs is 'admittedly economic,' there is 'no adequate compensatory or other corrective relief' that can be provided at a later date." <u>Id.</u> at 29. More significantly, the court also found other irreparable harm, stating "there is a significant economic advantage to receiving first approval and being the first company to enter the market, an advantage that can never be fully recouped through monetary damages or by 'playing catch up.'" <u>Id.</u>

The arguments advanced by the DEA here – that irreparable harm is not shown because Plaintiff's harm is speculative and that Plaintiff may seek a Schedule I registration to import its product -- are virtually identical to the arguments made and rejected by the D.C. Circuit and this court in Mova and Bracco.  DEA has not disputed that Plaintiff stands to take a substantial portion of the Marinol® market if it is first to market a generic version.  Plaintiff will never be able to recoup such losses if a competitor obtains an ANDA approval first.  This is precisely the type of irreparable harm recognized by this court and the D.C. Circuit .[6]

Furthermore, DEA attempts to create the impression that there will be little harm to Plaintiff because all it has to do is apply for a permit to import its product under a Schedule I registration.  As explained in the Introduction to this Reply, Plaintiff's product is not tetrahydrocannabinol, or even Dronabinol in bulk form, but rather a finished product of Dronabinol in sesame oil and encapsulated in soft gelatin capsules, and thus is properly classified under Schedule III, not  Schedule I.  In addition, there are several other flaws in the defendants' position.

Most significantly, there is no certainty that Plaintiff will receive approval of its application to register to import its product under Schedule I.  Indeed, DEA's counsel conceded as much during the recent telephone status hearing.  In fact, the registration process for Schedule I is much more restrictive and time consuming.  The submission of an application requires publication in the Federal Register, and the opportunity by all previous registrants to comment, request a hearing and object to the registration. 21 C.F.R. § 1301.34.  To obtain a Schedule I

---

[6] The DEA suggests that there are competitors of Plaintiff that approached the DEA in 2003 about developing a generic version of Marinol® and, therefore, it is speculative to suggest that Plaintiff will be the first to obtain FDA approval of its ANDA.  However, DEA does not explain whether these other companies had developed dronabinol in sesame oil in a soft gel capsule with the same formulation as Marinol, as Plaintiff has. It is very telling that as of 2006, three years after these companies allegedly approached DEA, none has obtained approval of an ANDA.

registration, Plaintiff must show, among other things, that the substance is necessary to provide

for the medical, scientific, or other legitimate needs of the United States, that the competition

among the domestic manufacturers of a controlled substance is inadequate and that it can and

will maintain effective controls against diversion.  21 U.S.C. § 912(a); 21 C.F.R. § 1301.34.[7]

Clearly, these stringent requirements make the registration not a simple matter of applying and

receiving a registration, but rather a long, drawn out proceeding with no real guarantee that a

registration will be granted.

 Even if  Plaintiff were to ultimately go through the process and obtain a registration to

import under Schedule I, the time delay alone would cause Plaintiff irreparable injury.  Just as

plaintiff's available use of alternative, more stringent "new drug" regulations in Bracco did not

abate the irreparable harm suffered by the plaintiff in that case, the possibility of Plaintiff

obtaining a Schedule I registration (which is far from certain) does not abate the irreparable harm

to Plaintiff here.  Thus, the alleged "adequate remedy" that DEA alludes to is really no remedy at

all.  As this Court has plainly stated, "there is a significant economic advantage to receiving first

approval and being the first company to enter the market, an advantage that can never be fully

recouped through money damages." Bracco, 963 F. Supp. at 29; see also Mova, 140 F.3d at

1066 ( "an officially sanctioned head start in the market" for a discrete pharmaceutical product

will cause irreparable injury to the company that is left behind.)

---

 [7] Not surprisingly, competitors holding DEA registrations often provide comments and request hearings to oppose applications from new registrants claiming that there is sufficient competition, thereby drawing out the registration process.

**B.    Plaintiff Is Likely To Succeed On The Merits, As The Dronabinol In Sesame Oil And Encapsulated In Soft Gelatin Capsules Is Properly Classified As A Schedule IIIN Controlled Substance**

There is no factual dispute regarding the formulation of the product that Plaintiff seeks to import. It is Dronabinol in sesame oil and encapsulated in soft gelatin capsules. This is identical to the Marinol® product that is currently classified under Schedule IIIN. DEA insists, however, that it can only be so classified if the specific product is an FDA-approved ANDA. This requirement is improper not only because it misinterprets the Schedule IIIN regulation itself, but also because it ascribes a basis for scheduling controlled substances that is inconsistent with the enabling legislation.

The Controlled Substances Act ("CSA") provides the following basis for classification as a Schedule III substance:

> (A) The drug or other substance has a potential for abuse less than the drugs or other substances in schedules I and II.
>
> (B) The drug or other substance has a currently accepted medical use in treatment in the United States.
>
> (C) Abuse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence.

21 U.S.C. § 812(b)(1).

There can be no dispute that dronabinol in sesame oil, encapsulated in soft gelatin capsules has a currently accepted medical use in treatment in the United States. It has been accepted for the medical uses of treating nausea and vomiting associated with cancer chemotherapy in patients who have failed to respond adequately to other treatments; and appetite loss associated with weight loss in patients suffering acquired immunodeficiency syndrome (AIDS). The DEA made that determination when it moved Dronabinol, under the name "Marinol", from Schedule II to Schedule III. Exhibit "G" to Motion, 64 Fed. Reg 35928.

There is no authority in the enabling statute or in the schedules of controlled substances for the proposition that two identical substances should be scheduled differently based on whether one is already FDA-approved and the other is in the process of receiving FDA approval. The statute is very clear -- if the substance has a currently acceptable medical use, and meets the other criteria, it belongs on Schedule III.

Conversely, dronabinol in sesame oil, encapsulated in soft gelatin capsules cannot fall within Schedule I. The basis for classification as a Schedule I substance is:

> (A) The drug or other substance has a high potential for abuse.
>
> (B) The drug or other substance has no currently accepted medical use in treatment in the United States.
>
> (C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b)(3). Plaintiff's formulation of Dronabinol has a currently accepted medical use in the United States and thus does not fit within this classification.

While DEA does not dispute this medical use, it attempts here, in the context of denying Plaintiff's import permit, to impose an additional requirement on Schedule III (i.e., prior FDA approval) that is not set forth in the statute. DEA's attempt amounts to a violation of the APA both because it exceeds its authority and because, as applied here to the generic version of Marinol, it is arbitrary and capricious.

Deference to an agency's interpretation of its governing statute, Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 801-802, 13 L.Ed.2d 616, 625-627 (1965), does not mean that courts can or should accept a reading of the statute that is contrary to its plain language. Chrysler Corp. v. EPA, et al., 600 F.2d 904, 915-16 (D.C. Cir. 1979). The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations is not the power to make law, but the power to adopt regulations to carry into effect the will of Congress as

expressed by the statute. A regulation which does not do this, but operates to create a rule contrary to the statute, is a mere nullity. <u>Dixon v. United States</u>, 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223, 228 (1965).

Here, DEA's interpretation of Schedule IIIN is out of harmony with the CSA. DEA has attempted to add a requirement that a Schedule III product must be FDA-approved, despite the express language of the CSA that does not mandate such a requirement. Courts have consistently rejected this type of agency action. <u>United States v. Haggar Apparel Co.</u>, 526 U.S. 380, 392 (1999) (explaining that, "[i]n the process of considering a regulation in relation to specific factual situations, a court may conclude the regulation is inconsistent with the statutory language or is an unreasonable implementation of it. In those instances, the regulation will not control"); <u>ASARCO Inc. v. EPA, et al</u>, 578 F.2d 319, 325-29 (D.C. Cir. 1978) (rejecting EPA's regulations interpreting the Clean Air Act where the interpretations are contrary to the Act's language and purpose); <u>Sierra Club v. Leavitt</u>, 355 F.Supp.2d 544, 552-53 (D.D.C. 2005) (deferring to Federal Register for interpretation of regulation at issue; finding that Federal Register furnished conflicting interpretations of the regulation providing "no real guidance in its interpretation"); <u>General Elec. Co. v. Gilbert</u>, 428 U.S. 125 (1976) (declining to follow administrative guidelines where they flatly contradict the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute).

DEA's insistence upon prior FDA approval of the generic version of the FDA-approved product that Plaintiff seeks to import is also a classic case of arbitrary and capricious agency conduct. The C.S.A. exists to protect the public from the diversion of dangerous substances. FDA approval does not render the product Plaintiff seeks to import either more or less susceptible to diversion. Accordingly the defendants have not articulated a satisfactory

explanation for their action nor have they articulated a rational connection between the facts found and their action. See Burlington Truck Lines v. United States, 371 U.S. 156 (1962).

Moreover, the phrase "in an FDA approved product" is ambiguous at best. DEA subscribes to a meaning that requires specific ANDA approval, thus creating a "Catch 22" situation for Plaintiff, which seeks to import its product to obtain that very approval. Furthermore, no such language appears in the regulation. In fact, existing FDA regulations permit Plaintiff to use dronabinol in sesame oil, encapsulated in a soft gelatin capsule in bioequivalency studies in support of an ANDA application. See 21 C.F.R. § 56.103 (noting that pre-approval to conduct bioequivalency studies only required with Investigational New Drugs (21 C.F.R. § 312) part 812 and 813). Because a generic product is merely a copy of an existing product on the market that has already been established to be safe and effective, FDA regulations do not require pre-approval before use in bioequivalency studies. See Affidavit of [REDACTED] attached as Exhibit "A".[8]

Here, Plaintiff notified FDA of its intent to perform bioequivalency studies on its generic Marinol® product and FDA provided recommendations for its protocol. See Letter from FDA attached as Exhibit "C". Based on FDA's recommendation, Plaintiff's consultant prepared a protocol for its bioequivalency studies. Thus, Plaintiff is seeking to import dronabinol in sesame oil, encapsulated in soft gelatin capsules, which is an "FDA approved product" specifically for undertaking bioequivalency studies.

---

[8] During the telephone conference of June 6, 2006 with the Court, Plaintiff's counsel indicated that Plaintiff had received FDA approval of its protocol for its ANDA. To clarify, Plaintiff sought FDA's recommendations for the protocol and FDA provided them, but an actual approval of the protocol was not obtained. The FDA does not require or provide approval for testing protocol for an ANDA. However, the FDA recommendations were used for Plaintiff's protocol. It was then reviewed and approved by an expert independent FDA consultant and former director of bioequivalence studies at FDA retained by Plaintiff who was mistakenly identified as an FDA employee in Plaintiff's Complaint and the Affidavit of [Plaintiff's CEO] attached thereto. An amended affidavit is attached hereto as exhibit "B." Plaintiff will file an amended complaint within the next few days.

Therefore, it is equally as plausible that the phrase "in an FDA approved product" refers not only to a final ANDA approval, but also to FDA approved use in bioequivalency studies. In light of this ambiguity, the Court may look to the Federal Register for guidance in interpreting the regulation. Meyer v. Holley, 537 U.S. 280, 288 (2003) (using commentary in Federal Register in interpreting FHA and related regulations). In this case, the discussion in the January 2, 1999 Federal Register clears up the ambiguity. Indeed, according to the Federal Register, the product listed on Schedule IIIN includes Marinol® and any generic identical formulation that may be approved in the future. Ex. G to Motion, at 2; 64 Fed. Reg. 35928.

DEA acknowledges the language of the Federal Register in its opposition papers, see Opposition at 15, yet it claims that Plaintiff's interpretation is a "selective" and "erroneous" reading of the Federal Register. Significantly, however, DEA does not indicate how Plaintiff's reading is "selective" or "erroneous." On the contrary, the language of the Federal Register could not be clearer – the Schedule III product includes both the existing FDA approved Marinol® and any other generic product that has the identical formulation and may, in the future, receive ANDA approval.

Finally, it should be noted that DEA's own import permit application (Form 357) envisions importation of Schedule IIIN controlled substances for scientific purposes, such as bioequivalency studies in support of an ANDA. See DEA's Form 357, Exs. D and F to Motion. If the only product that could be imported under Schedule IIIN was product that was already ANDA approved, there would be no need to include in the permit application a section requiring the applicant to indicate whether it is using the product for scientific purposes; such scientific studies would obviously be unnecessary because the product was already ANDA approved.

15

In sum, Plaintiff has demonstrated a likelihood of success on the merits of its APA claim. DEA's interpretation of the requirements for importing under Schedule IIIN exceeds its authority under the CSA and is arbitrary and capricious as applied to the generic drug at issue here. Moreover, the words "in an FDA approved product" are ambiguous at best; however, the Federal Register clears up the ambiguity by plainly stating that the product on Schedule IIIN includes both Marinol as well as other identical formulations that may receive FDA approval in the future.

### C.    <u>Plaintiff Is Not Required to Exhaust Administrative Remedies.</u>

DEA concedes that exhaustion of administrative remedies is not required for the Court to exercise jurisdiction in this matter. Opposition, at 17.   In light of this concession, DEA claims "prudential" considerations should require Plaintiff to exhaust administrative remedies.  In so doing, DEA intimates that exhaustion may obviate the need for a judicial decision on the issue because Plaintiff purportedly has the opportunity to apply for a registration to import under Schedule I.  The substantial hurdles associated with obtaining such a registration are discussed in detail above and DEA's silence in identifying those hurdles in its responsive papers speaks volumes.  Simply stated, there is no guarantee that Plaintiff will be issued a Schedule I registration and the process is likely to take a very long time.

Federal courts are vested with a "virtually unflagging obligation" to exercise the jurisdiction given them. <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817-818, 96 S.Ct. 1236, 1246-1247, 47 L.Ed.2d 483 (1976). The court must balance the interest of the individual in retaining prompt access to a federal judicial forum against institutional interests favoring exhaustion. Administrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further. <u>West</u>

v. Bergland, 611 F.2d 710, 715 (8th Cir. 1979), cert. denied, 449 U.S. 821, 101 S.Ct. 79, 66

L.Ed.2d 23 (1980).  Application of this balancing principle is "intensely practical," Bowen v.

City of New York, 476 U.S., at 484, 106 S.Ct., at 2032, citing Mathews v. Eldridge, 424 U.S.

319, 331, n. 11, 96 S.Ct. 893, 901, n. 11, 47 L.Ed.2d 18 (1976), because attention is directed to

both the nature of the claim presented and the characteristics of the particular administrative

procedure provided.

  The DEA does not dispute that there is no prescribed timeframe for either an

administrative hearing by the DEA or a decision by the DEA administrator.  Courts have

consistently held that requiring resort to an administrative remedy may occasion undue prejudice

from an unreasonable or indefinite timeframe for administrative action [9] Even where the

administrative decision-making schedule is otherwise reasonable and definite, a particular

plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his

claim.  Bowen v. City of New York, 476 U.S., at 483, 106 S.Ct., at 2031 (disability-benefit

claimants "would be irreparably injured were the exhaustion requirement now enforced against

them");  Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 773, 67 S.Ct. 1493, 1503,

91 L.Ed. 1796 (1947) ("impending irreparable injury flowing from delay incident to following

the prescribed procedure" may contribute to finding that exhaustion is not required).

Furthermore, the DEA has acknowledged what the result would be in any administrative appeal -

---

  [9] See Gibson v. Berryhill, 411 U.S. 564, 575, n. 14, 93 S.Ct. 1689, 1696, n. 14, 36 L.Ed.2d 488 (1973)
(administrative remedy deemed inadequate "[m]ost often ... because of delay by the agency"); Coit Independence
Joint Venture v. FSLIC, 489 U.S., at 587, 109 S.Ct., at 1376 ("Because the Bank Board's regulations do not place a
reasonable time limit on FSLIC's consideration of claims, Coit cannot be required to exhaust those procedures");
Walker v. Southern R. Co., 385 U.S. 196, 198, 87 S.Ct. 365, 366, 17 L.Ed.2d 294 (1966) (possible delay of 10 years
in administrative proceedings makes exhaustion unnecessary); Smith v. Illinois Bell Telephone Co., 270 U.S. 587,
591-592, 46 S.Ct. 408, 410, 70 L.Ed. 747 (1926) (claimant "is not required indefinitely to await a decision of the
rate-making tribunal before applying to a federal court for equitable relief").

- a confirmation of the denial of Plaintiff's permit application.  Opposition, at 18 ("Through that process, Plaintiff would be informed again" why its application was denied.) .

Here, as discussed above and in Plaintiff's opening brief, each and every day that passes without an import permit imperils Plaintiff's ability to obtain first ANDA approval.  Moreover, as the product continues to sit in **[REDACTED]**, it ages and it becomes more problematic for Plaintiff to ultimately use such product in biostudies.  DEA nowhere disputes that Plaintiff has and continues to suffer such prejudice.  Accordingly, exhaustion of administrative remedies should not be required.

IV.     **CONCLUSION**

For all of the foregoing reasons, in addition to the reasons set forth in Plaintiff's opening brief and supporting affidavits, Plaintiff respectfully requests that its motion for preliminary mandatory injunctive relief be granted.

Respectfully submitted,


/s/
Terence J. Lynam (Bar No. 253872)
Joseph P. Esposito (Bar No. 375507)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4045

Samuel H. Israel
Patrick J. Egan
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103
(215) 299-2886

Attorneys for Plaintiff

Date:  June 9, 2006