# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, INC.<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>ALBERTO R. GONZALEZ,<br>Attorney General of the United States, and<br>UNITED STATES DEPARTMENT OF<br>JUSTICE<br>and<br>KAREN P. TANDY, Administrator of the<br>United States Drug Enforcement<br>Administration, and<br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION<br>　　　　Defendants. | CIVIL ACTION NO.<br>1:06CV00966 |

## DECLARATION OF [REDACTED]

I, **[REDACTED]**, making this declaration under penalty of perjury, hereby depose and verify that the following facts are true:

1.　　I am over eighteen years of age and make this Declaration on the basis of personal knowledge.

2.　　I am the Regulatory Affairs Manager for **[REDACTED]**.

3.　　As part of my duties I assisted in preparing a protocol for bioequivalence studies for **[REDACTED's]** development of a generic Marinol product.

4.　　In order to prepare the protocol I contacted the Food and Drug Administration (FDA) and spoke to Dale P. Conner, Pharm. D., the Director of the Division of Bioequivalence at FDA.

5.     I advised Dr. Conner of **[REDACTED's]** plans to perform the bioequivalence studies and sought FDA guidance on the proper methods and procedures to perform them.

6.     On February 14, 2006, I received a letter from Dr. Conner setting forth FDA's recommendations for the protocol regarding dronabinol capsules. A true and correct copy is attached hereto as exhibit "1" to my affidavit.

7.     I forwarded a completed protocol to **[REDACTED]**, an independent consultant on bioequivalence studies and **[REDACTED]** for his review.

8.     On April 24, 2006, **[REDACTED]** forwarded his findings on the protocol. He advised that **[REDACTED]**.

9.     **[REDACTED]** planned to perform the bioequivalence studies as set forth in the protocol recommended by FDA and approved by **[REDACTED]**.

10.    I attest that the foregoing facts are true and correct to the best of my knowledge, information and belief. I am aware that if any of the foregoing is willfully false I am subject to punishment.

Date:  _____        _____/s/_____
                                        **[REDACTED]**

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOE DOE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:06CV00966 |
| | ) | |
| ALBERTO R. GONZALEZ, | ) | |
| in his official capacity as | ) | |
| Attorney General of the United states, and | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE | ) | |
| 950 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C. 20530, | ) | |
| | ) | |
| KAREN P. TANDY, in her official | ) | |
| capacity as Administrator of the | ) | |
| United States Drug Enforcement | ) | |
| Administration, and | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| 2401 Jefferson Davis Highway | ) | |
| Alexandria, VA 22301 | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF [REDACTED]

I, **[REDACTED]**, making this declaration under penalty for perjury, hereby

declare and verify that the following facts are true:

1.    I am over eighteen years of age and make this Declaration on the basis of

personal knowledge.

2.    **[REDACTED]**

3.    I have been actively and continuously engaged in the pharmaceutical products industry since **[REDACTED]**.

4.    As a result of my experience in the pharmaceutical products industry, I am familiar with and have knowledge, skill and experience in the development, manufacturing, and marketing of pharmaceutical drug products, including managing the development and production of pharmaceutical drug products from concept through approval by the United States Food and Drug Administration ("FDA") of an Abbreviated New Drug Application ("ANDA") for marketing approval.

5.    **[REDACTED]**.

6.    **[REDACTED]**.

7.    **[REDACTED]** was created to address a need in the pharmaceutical industry for economically-priced drugs.

8.    **[REDACTED]** has expertise in the development, manufacture, sale, marketing and distribution of pharmaceutical products sold under generic chemical names, including drug products containing controlled substances on Schedules II through V. By way of example, **[REDACTED]** manufactures and distributes **[REDACTED]**, among others.

9.    **[REDACTED]** competes with nearly every manufacturer and distributor of generic drugs.

10.    Currently, **[REDACTED]**.

11.    In order to continue to offer lower-cost alternatives to brand-name pharmaceuticals, in some instances, **[REDACTED]** pursues partnerships or collaborative

2

relationships with other companies. Since its inception, **[REDACTED]** has brought to market over **[REDACTED]** lower cost generic drug products.

12.     Being the first to manufacture and sell a generic drug is essential in the generic pharmaceutical business. As soon as the first generic product is approved and marketed, it will, in my experience, be sold at a drastically reduced price and, in turn, the manufacturer will take a huge portion of the market. Thus, the timing and proper completion of all tasks in a project is critical. Any delay, including a failure to establish and follow proper protocols, may result in a substantial delay in getting the generic product to market.

13.     **[REDACTED]** expends considerable effort, time and expense identifying opportunities for generic drug development and manufacture, formulating strategies for the development, manufacture, marketing and sale of new generic drugs (from concept through FDA approval to commercialization), developing and maintaining relationships with vendors, suppliers, customers, and other pharmaceutical manufacturers, and manufacturing and marketing its products.

### **[REDACTED] Identifies a Market for Generic Marinol®**

14.     I am aware of and familiar with the brand-name pharmaceutical product known as Marinol®.

15.     The generic chemical formulation of Marinol® is Dronabinol in sesame oil encapsulated in a soft gelatin capsule.

16.     The Active Pharmaceutical Ingredient ("API") of Marinol® is synthetic delta-9-tetrahydrocannabinol or delta-9-THC.

3

17.    Since 1985, Marinol® has been FDA-approved to treat nausea and vomiting in cancer patients who have undergone chemotherapy but have not responded to traditional anti-emetics.  Since 1992, Marinol® has been FDA-approved to treat anorexia associated with severe weight loss in AIDS patients.

18.    Marinol® is available in soft gelatin capsules containing synthetic delta-9-THC in sesame oil in 2.5 mg, 5 mg and 10 mg dosages.

19.    There is currently no generic competition to Marinol® on the market.

20.    Based on my research, current annual sales of Marinol in the United States total $170 million.  The current selling price of  Marinol® is $1,263.31 for a bottle of sixty capsules.

21.    Based on our analysis of the market, if **[REDACTED]** is the first to obtain approval and introduce a lower cost generic version of Marinol®, it will take approximately **[REDACTED]** of the Marinol® market.  **[REDACTED]** plans to sell its generic Marinol® product for a price of **[REDACTED]** of the brand price.  Accordingly, **[REDACTED's]** introduction of the first generic competitor of Marinol® stands to save the public approximately $**[REDACTED]** annually.

### **[REDACTED] Seeks an Agreement with a Soft Gelatin Capsule Manufacturer**

22.    **[REDACTED]** does not currently possess the technology for manufacturing soft gelatin capsules.  Accordingly, **[REDACTED]** was required to partner with a company that possessed such technology in order to formulate a generic Marinol® product

23.    On behalf of **[REDACTED]**, I approached approximately four companies in the United States who possess soft gelatin technology, about the possibility of entering

PH1 860530v1 06/23/06

into a collaboration agreement with **[REDACTED]** to formulate a generic version of Marinol®. Each of the domestic companies that I approached declined to enter into an agreement with **[REDACTED]** to formulate a generic Marinol® product.

24.    Through a third party, I was introduced to **[REDACTED]** a company located in **[REDACTED]**. **[REDACTED]** possesses considerable know-how in soft gelatin capsule ("softgel") technology and is engaged in the business of developing, producing and packaging solid dosage forms for pharmaceutical use.

25.    In 2005, **[REDACTED]**, among others, entered into a Product Development and Manufacturing Agreement (the "Manufacturing Agreement") with respect to development, manufacture and commercialization of a generic formulation of Marinol®.

26.    I executed the Manufacturing Agreement on behalf of **[REDACTED]** and am familiar with its terms.

27.    Through the Manufacturing Agreement, **[REDACTED]** contracted with **[REDACTED]** to develop a custom process for the production and manufacture of Dronabinol in sesame oil encapsulated in a soft gelatin capsule. **[REDACTED]** also contracted with third parties for the raw material supplies, analytical laboratory services and packaging with the goal of obtaining an ANDA.

28.    The ultimate goal of the collaboration with **[REDACTED]** is to submit an Abbreviated New Drug Application ("ANDA") to the FDA for approval as soon as possible and to receive FDA approval for the sale and marketing of a lower cost alternative generic to Marinol® in the United States.

29.     In order to obtain FDA approval of its ANDA, **[REDACTED]** is required to formulate various batches Dronabinol in sesame oil encapsulated in a soft gelatin capsule, bottle the product, run stability studies on the product and conduct various patient studies for the purpose of gathering information to support its ANDA submission to FDA.  Pursuant to the schedule of milestones established in the Manufacturing Agreement, **[REDACTED]** was required to formulate an initial small batch for export to **[REDACTED]** in the United States, pursuant to **[REDACTED's]** Schedule III DEA registration.  Following the receipt of the small batch, **[REDACTED]** was required to formulate three "submission" batches for export to **[REDACTED]** in the United States pursuant to **[REDACTED's]** Schedule III DEA registration.  **[REDACTED]** was then required to bottle the product and send it out for the laboratory and patient testing. **[REDACTED]** believes that it will be able to establish that its generic product is bioequivalent to Marinol®.

**[REDACTED] Obtains a DEA Registration to Import
Schedule III Controlled Substances and a Permit to
Import its First Batch of Generic Marinol® to the United States**

30.     It is my understanding that in order to import controlled substances on Schedule IIIN, DEA regulations require a duly issued DEA registration.  Accordingly, on June 25, 2005, **[REDACTED]** submitted an application to DEA for a registration to import controlled substance listed in Schedule IIIN and IV.  In order to obtain this registration, **[REDACTED]** was required to establish to DEA's satisfaction that it has adequate security and handling procedures in place to ensure that the controlled substances are not illegally diverted.  **[REDACTED]** must also submit to periodic DEA inspections, which it has consistently passed.

6

31.    On December 22, 2005, DEA issued a registration (DEA Registration Number **[REDACTED]**) to **[REDACTED]** to import controlled substances listed on Schedule IIIN (i.e., Dronabinol in sesame oil encapsulated in a soft gelatin capsule).

32.    **[REDACTED]** submitted its Protocol for *In Vivo* Bioequivalence study of Dronabinol in Healthy Human Volunteers under Fasting Conditions to **[REDACTED]** and an expert and consultant in such studies.  On April 26, 2006, **[REDACTED]** received **[REDACTED's]** comments on **[REDACTED's]** protocol, in which he concluded that **[REDACTED].**

33.    On February 28, 2006, **[REDACTED]** submitted an application (DEA Form 357) to import 400 capsules of Dronabinol 2.5 mg, 400 capsules of Dronabinol 5 mg and 400 capsules of Dronabinol 10 mg.  Thereafter, on March 22, 2006, DEA issued Permit No. **[REDACTED]** to **[REDACTED]** to import its generic Marinol® product in the quantities and dosage strengths identified in the February 28, 2006 Form 357.  The DEA permit indicated that "[t]he consignment proposed to be imported is required for legitimate purposes."

34.    On April 18, 2006, **[REDACTED]** filed an application for a permit (Form 357) to import three "submission batches" of its generic Marinol® product. **[REDACTED]** certified on the application that the controlled substances "are imported exclusively for scientific purposes" which was described as "Biostudy/Submission Batches for ANDA Approval."  These batches were manufactured by **[REDACTED]**, paid for by **[REDACTED]** and are stored at **[REDACTED's]** facility in **[REDACTED]** pending DEA's issuance of a permit to **[REDACTED]** to import them to the United States.

**The DEA Denies [REDACTED's] Form 357 Application and Refuses To
Issue a Permit to Import a Second Batch of its Generic Marinol®**

35.    I am advised that on May 5, 2006, representatives of DEA contacted

**[REDACTED]**, **[REDACTED's]** Manager of Controlled Substances and Security.  I am

further advised that the DEA representatives informed **[REDACTED]** that DEA would

not approve **[REDACTED's]** Form 357 and issue a permit to import the three batches of

its generic Marinol®.  The DEA representatives advised **[REDACTED]** that its Form

357 permit was being cancelled.  I am informed that DEA advised **[REDACTED]** that in

order for **[REDACTED]** to import its generic Marinol® product under its registration for

Schedule IIIN controlled substances, the product had to already be FDA approved.  When

**[REDACTED]** pointed out that DEA has already issued a permit to import an earlier

batch under its DEA import registration, the DEA representatives claimed that it had been

a mistake for DEA to issue that permit.

36.    The DEA's decision not to issue an import permit has caused and

continues to cause **[REDACTED]** substantial injury that cannot be adequately

quantified.  **[REDACTED]** cannot obtain FDA approval of its generic Marinol® until

after it imports the three batches and runs the required testing, yet DEA will not allow

**[REDACTED]** to import the product under its Schedule IIIN registration until after it

receives FDA approval.  Each day that passes with the product stored in bulk awaiting

importation increases the risk that FDA will question the results of any testing run on the

batches, thereby delaying FDA's approval of **[REDACTED's]** ANDA.  Moreover,

**[REDACTED's]** project to obtain the first ANDA approval to bring a lower cost

alternative to Marinol® to the market has come to a stop.

8

37.    I attest that the foregoing facts are true and correct to the best of my knowledge, information and belief.  I am aware that if any of the foregoing is willfully false I am subject to punishment.


Date:  _____                    _____/s/_____
                                                          **[REDACTED]**

9

# EXHIBIT C



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville MD 20857

NOV 0 2 2004

# REDACTED

**REDACTED**