## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, INC. <br><br> Plaintiff, <br><br> v. <br><br> ALBERTO R. GONZALES, Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, and KAREN P. TANDY, Administrator of the United States Drug Enforcement Administration <br><br> Defendant. | Civil Action No. <br> 1:06CV00966 |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff ███████████████ ("Plaintiff"), ████████████████████████

████████ is seeking through its motion for preliminary injunction to circumvent established

statutory and regulatory procedures for obtaining authorization to import the controlled substance

dronabinol. Specifically, Plaintiff contends that the Drug Enforcement Administration ("DEA")

has violated the Administrative Procedure Act ("APA") by denying its April 18, 2006 application

to import a particular schedule I controlled substance that Plaintiff misidentified in its

application. Although DEA was required by law to deny that application, Plaintiff seeks a

preliminary injunction from this Court ordering the DEA to permit that importation. Plaintiff's

request for such extraordinary relief is unfounded.

Plaintiff's motion satisfies none of the elements required for a preliminary injunction. Plaintiff is unlikely to succeed on the merits of its claim because the DEA's denial of Plaintiff's application was based on Plaintiff's own failure to comply with applicable regulatory requirements. While that is basis alone to deny the instant motion, Plaintiff also has not demonstrated irreparable injury. Plaintiff speculates that it will suffer millions of dollars in lost economic opportunity if its application is not granted. It is well established in this Circuit, however, that neither economic nor speculative harm constitutes irreparable injury.

Finally, since the requested injunction would contravene the regulatory requirements for the importation of a schedule I controlled substance, that relief is clearly not in the public interest. Rather, the public interest is served by the DEA's faithful application of those requirements. For all these reasons, the instant motion should be denied.

## REGULATORY FRAMEWORK

The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., sets forth a comprehensive framework for the regulation and control of controlled substances. In recognition of certain controlled substances' "useful and medical purpose," Congress has authorized Attorney General to regulate their distribution within a "closed system." The Attorney General has delegated his regulatory under the Act to the Administrator of DEA. 21 U.S.C. § 871(a); 28 C.F.R. § 0.100(b). As part of its statutory responsibilities under the Act, DEA is authorized to "promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. § 821. The Act also provides authority for DEA to "promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his

2

functions under [the Act]." 21 U.S.C. § 871(b). Pursuant to this authority, DEA has issued

extensive regulations implementing the CSA, which are found in 21 C.F.R. Parts 1300-1316.

The applicable rules and regulations vary depending on which of five "schedules," the

controlled substance falls. Schedule I controlled substances have the most stringent regulations

and requirements because they have "no currently accepted medical use in treatment in the

United States," "a lack of accepted safety for use . . . under medical supervision," and "a high

potential for abuse." 21 U.S.C. § 812(b)(1). Controlled substances in schedules II through V

have accepted medical uses and decreasing potential for abuse and physical or psychological

dependence. 21 U.S.C. § 812(b)(2)-(5). The regulations and requirements applicable to such

substances are accordingly not as rigorous as those for schedule I controlled substances.[1]

Among other things, schedule I controlled substances may not be prescribed and dispensed for

medical use; human consumption of these substances is limited to "the confines of a

Government-approved research project." *United States v. Oakland Cannabis Buyers'*

*Cooperative*, 532 U.S. 483, 491 (2001).

<u>Registration and Importation Requirements</u>

The CSA requires anyone who *inter alia* manufactures, distributes, or imports a

controlled substance to obtain, on an annual basis, a registration from the Attorney General. *See*

21 U.S.C. §§ 822(a)(1), 958. Moreover, persons registered with DEA to handle controlled

substances are only authorized to engage in such activities "to the extent authorized by their

registration and in conformity with other provisions of [the CSA]." 21 U.S.C. § 822(b). It is a

---

[1] Only those procedures applicable to schedule I and III controlled substances are
relevant to the issue before this Court.

3

felony violation of the CSA to import any controlled substance except as authorized by the Act –

for example, to import without the proper DEA registration for the particular substance at issue.

*See* 21 U.S.C. § 960; *see also* Declaration of Demetra Ashley ("Ashley Decl.") ¶ 9 (the

registration "specifies not only the Schedule, but the particular controlled substance(s), each

[registrant] is authorized to possess"), attached hereto as Exhibit A.

In deciding whether to grant an application to import a schedule I controlled substance,

DEA must apply the criteria set forth in 21 U.S.C. § 823(a). *See* 21 U.S.C. § 958(a). As stated

in section 823(a), DEA may only grant such a registration if the agency determines that doing so

is consistent with United States obligations under international drug control treaties and

consistent with the public interest (based on six criteria enumerated therein).

In addition to the registration requirement, a separate provision of the CSA sets forth

additional prerequisites for the importation of a schedule I controlled substance. Under 21

U.S.C. § 952(a), a particularized determination must be made with respect to the specific

shipment proposed to be imported. Section 952(a) generally prohibits the importation of

schedule I controlled substances, except under certain circumstances. Where the applicant seeks

to import a schedule I controlled substance for research, the applicant must demonstrate (and

DEA must determine) that such importation is "necessary to provide for the medical, scientific,

or other legitimate needs of the United States" and that the amount of the proposed importation

"is in limited quantities exclusively for scientific, analytical, or research uses." 21 U.S.C. §

952(a)(2)(C).

4

Section 952(a) also provides that the proposed import comply with the import regulations promulgated by DEA. Those regulations provide that no person shall import any schedule I or II controlled substance or any controlled substance that the Administrator has specifically designated "unless and until such person is properly registered under the Act . . . and the Administrator has issued him a permit to do so pursuant to § 1312.13."[2] 21 C.F.R. § 1312.11. A separate import permit is required for each "consignment of controlled substances to be imported." 21 C.F.R. §1312.11(c).

Applications for import permits shall be submitted on DEA Form 357. 21 C.F.R. § 1312.12. Among other things, an application for a import permit must contain the (1) date of execution; (2) the registration number of the importer; and (3) a detailed description of each controlled substance to be imported including the drug name, dosage form, National Drug Code (NDC) number, the Administration Controlled Substance Code Number,[3] and quantity and size of the packages or containers. 21 C.F.R. § 1312.12. The Administrator may issue an import permit authorizing the importation of a controlled substance if (1) the substance is crude opium, poppy straw (or concentrate), or coca leaves and is necessary to provide for medical, scientific, or other legitimate purposes; (2) the substance is necessary to provide for medical and scientific needs or other legitimate needs of the United States during an emergency; (3) the domestic

---

[2]  Section 1312.30 specifically designates "Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product" as requiring an import permit. *See* 21 C.F.R. § 1312.30.

[3]  Controlled substances are assigned an "Administration Controlled Substances Code Number" which is "a unique four-digit number, which appears on Certificates of Registration. Applicants for import and export permits <u>must</u> include the appropriate code number on the application." Ashley Decl. ¶ 10; *see also* 21 C.F.R. § 1308.03(a).

supply of any controlled substance is inadequate for scientific studies; or (4) the importation of the controlled substance is for ballistics or other analytical or scientific purposes. *See* 21 C.F.R. § 1312.13. A permit is not valid after the date specified therein. *See* 21 C.F.R. § 1312.16(b). The Administrator is authorized, however, to cancel a permit at any time for proper cause. *See* 21 C.F.R. § 1312.16(a).

Any applicant denied an import permit may request a hearing within thirty days after the denial of his application. 21 C.F.R. § 1312.44. The Administrator "shall hold such hearing" if requested and provide notice of the date and time of the hearing to the denied applicant at least thirty days before the hearing. 21 C.F.R. § 1312.46. The Administrator has the burden of demonstrating at the hearing that the applicant did not satisfy the requirements for an import permit. 21 C.F.R. § 1312.45. As soon as practicable following the hearing and certification of the record, the Administrator shall issue a final order that sets forth his findings of fact and conclusions of law. 21 C.F.R. § 1312.47.

<u>The Legal Status Under the CSA of THC versus Marinol®</u>

In enacting the CSA, Congress set forth the initial schedules of controlled substances in 21 U.S.C. § 812(c). *See Gettman v. DEA*, 290 F.3d 430, 432 (D.C. Cir. 2002). Under the Act, DEA is responsible for modifications to the schedules and for publishing an updated list of the current schedules on an annual basis. *Id.*; *see also* 21 U.S.C. § 812(c) n.1. The current schedules are published in 21 C.F.R. §§ 1308.11-1308.15. Alongside each listed substance is the "DEA Controlled Substances Code Number," which is used, among other things, for identification purposes on applications for registration. *See* 21 C.F.R. § 1308.11(a).

6

"Tetrahyrdrocannabinols" (THC) is listed in schedule I. 21 C.F.R. § 1308.11(d)(30).

THC is assigned the DEA Controlled Substances Code Number "7370." *Id.* However, one very

specific isomer of THC – *when contained in an FDA-approved product* – is listed in schedule III.

Specifically, "Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a

U.S. Food and Drug Administration approved product" is listed in schedule III. 21 C.F.R.

1308.13(g)(1). This FDA-approved product is assigned DEA Controlled Substances Code

Number "7369." *Id.* DEA issued a final order in 1999 which transferred this FDA-approved

drug product from schedule II to schedule III. *See* 64 Fed. Reg. 35928 (1999). As stated in the

final order, "Dronabinol is the United States Adopted Name (USAN) for the (-)- isomer of $\Delta^9$-

(trans)-tetrahyrdocannabinol [$\Delta^9$-(trans)-THC]." Thus, dronabinol is one specific isomer of

THC. Marinol® contains dronabinol in an FDA-approved formulation. *Id.* However, since

dronabinol is a tetrahydrocannabinol, it fits within the schedule I listing of THC when it is other

than in an FDA-approved drug product. *Id.* Accordingly, Since Marinol® is the only FDA-

approved product containing dronabinol (Declaration of Matthew Strait ("Strait Decl.") ¶ 10,

attached hereto as Exhibit B), Marinol® is the only drug containing dronabinol that is not in

schedule I.

**FACTUAL BACKGROUND**

On or about ▬▬▬▬▬▬ Plaintiff ▬▬▬▬▬▬▬ submitted an application for

registration as an importer of three controlled substances on schedule IIIN (nonnarcotic),

including "dronabinol," which Plaintiff identified with DEA Controlled Substances Code

Number "7369." *See* Declaration of Cheryl E. Brown ("Brown Decl.") ¶ 13, attached hereto as

Exhibit C. Code 7369 corresponds to the substance "Dronabinol (synthetic) in sesame oil and

7

encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product." 21 C.F.R. 1308.13(g); *see also* Brown Decl. ¶ 14. On ██████████ DEA issued Plaintiff registration number ████████ for the "dronabinol" identified on Plaintiff's application. Strait Decl. ¶ 14; Declaration of John Robertson ("Robertson Decl.") ¶ 6, attached hereto as Exhibit D; *see also* Brown Decl. ¶ 18 (identifying the specific controlled substances that Plaintiff was registered to handle).

On April 18, 2006, Plaintiff applied for a permit to import 525,000 capsules of its synthetic dronabinol for "biostudy/submission batches for ANDA approval." Strait Decl. ¶ 15. Plaintiff previously had applied for and been granted an import permit to import a significantly smaller quantity of its dronabinol in bulk form. *See* Strait Decl. ¶¶ 15, 16. The large quantity and purpose identified on Plaintiff's April 18, 2006 application "raised a red flag" within the Import/Export Unit ("ODEI") in DEA Headquarters. Strait Decl. ¶ 15. The Chief of ODEI and Chief of the Quota and United Nations Reporting Unit contacted Plaintiff on May 5, 2006 "to obtain more details regarding the application." Strait Decl. ¶ 16. During that conversation, it became clear to these DEA officials that Plaintiff was seeking a permit to import a schedule I controlled substance dronabinol and that Plaintiff's registration to import "schedule III" "dronabinol" was improperly issued and provided no legal authority for the proposed import. *See* Strait Decl. ¶ 16; *see also* Brown Decl. ¶ 19. DEA advised Plaintiff that its April 18, 2006 "application for an import permit was being cancelled" and that the earlier-granted permit to import its product had been issued in error. Strait Decl. ¶ 16. DEA further advised Plaintiff "that dronabinol is a Schedule I controlled substance unless in an FDA-approved product and that ██████ would need to apply for registration as a Schedule I importer." Strait Decl. ¶ 17.

8

Later in that same conversation, DEA officials requested that Plaintiff submit a letter explaining in detail its contemplated plans for its synthetic dronabinol "so that [DEA] could provide specific guidance as to how the Company should be . . . registered for its proposed activities." Strait Decl. ¶ 18.  Plaintiff, although it had agreed to do so, never provided the requested clarification.  Strait Decl. ¶ 21.  Instead Plaintiff's ███████████ contacted a senior attorney in DEA's Office of Chief Counsel and requested that he intervene; Plaintiff insisted that it should be permitted to import its product as a schedule III controlled substance and that DEA's interpretation of its regulations was in error.  Strait Decl. ¶ 23.  More than two weeks after that contact, Plaintiff filed its Complaint and motion for preliminary injunction.

## ARGUMENT

A preliminary injunction "is considered an extraordinary remedy" that should "be granted *only* upon a clear showing of entitlement." *Emily's List v. Federal Election Comm'n*, 362 F. Supp. 2d 43, 51 (D.D.C. 2005); *Arrow Air, Inc. v. United States*, 649 F. Supp. 993, 998 (D.D.C. 1986) (emphasis added); *see also Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) ("A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."); *Association of Flight Attendants-CWA v. Pension Benefit Guar. Corp.*, 372 F. Supp. 2d 91, 98 (D.D.C. 2005) ("A preliminary injunction is an extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party.").  The movant must demonstrate that (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) the threatened injury to plaintiff outweighs the harm to others; and (4) the public interest will be furthered by the injunction. *See Serono Labs., Inc. v. Shalala*,

158 F.3d 1313, 1317-18 (D.C. Cir. 1998). Although courts may balance weakness in one or more of these factors against strong showings in the others, two factors – the likelihood of success on the merits and irreparable harm – must be established. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *District 50, United Mine Workers of Am. v. International Union, United Mine Workers of Am.*, 412 F.2d 165, 167 (D.C. Cir. 1969). Neither has been established here.

Moreover, because Plaintiff seeks an injunction that "would alter, rather than preserve, the status quo . . . [Plaintiff] must meet a higher standard than in the ordinary case by showing 'clearly' that . . . [it] is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997). "A district court should not issue a mandatory preliminary injunction unless the facts and the law clearly favor the moving party." *National Conference on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotations omitted). As they clearly do not here, the Court should deny Plaintiff's motion.

## I.    PLAINTIFF HAS NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Notwithstanding the "fluid nature" of the Court's inquiry, "it is particularly important for [Plaintiff] to demonstrate a substantial likelihood of success on the merits." *Emily's List*, 362 F. Supp. 2d at 51 (internal quotations omitted). The failure to do so "effectively decides the preliminary injunction issue." *Serono Labs.*, 158 F.3d at 1326; *see also Davenport v. Int'l Brotherhood of Teamsters, AFL-CIO*, 166 F.3d 356, 366 (D.C. Cir. 1999) (where "the plaintiffs

10

are not likely to succeed on the merits, it would take a very strong showing with respect to the

other preliminary injunction factors to turn the tide in plaintiff's favor"). Plaintiff's failure to

demonstrate any likelihood of prevailing on its APA claim, therefore, should be dispositive of the

issue before this Court.[4]

Under the APA, agency action is not to be set aside unless it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In

applying this deferential standard, courts recognize that agency action is "entitled to a

presumption of regularity" and Plaintiff therefore faces a heavy burden – not overcome here – in

proving that the DEA violated that standard. *See Citizens to Preserve Overton Park, Inc. v.

Volpe*, 401 U.S. 402, 415-16 (1971). The extent of the Court's review is limited to determining

whether the agency has "articulate[d] a satisfactory explanation for its action including 'a rational

connection between the facts found and the choice made.'" *Motor Vehicle Mfrs Ass'n v. State

Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*,

---

[4] Although Plaintiff's Complaint alleges that Defendants violated the Due Process Clause, Plaintiff's motion fails to address that claim. That claim, in any event, finds no support in law. *See* Compl. ¶¶ 57-59 (alleging that Defendants' "refusal to permit ▇▇▇▇ to import its generic Marinol® product for scientific testing necessary to obtain FDA approval of an ANDA" implicates a Fifth Amendment liberty and property interest). It is well established that to state a claim of deprivation of an occupational liberty, Plaintiff cannot rest on allegations that it is precluded from an aspect of its business. Rather, Plaintiff must allege that it cannot engage in *any* business in its chosen field. *See Connecticut v. Gabbert*, 526 U.S. 286, 291-92 (1999) (noting that cases recognizing some generalized due process right to pursue the business of one's choosing "all deal with a *complete* prohibition of the right to engage in a calling"). At best, Plaintiff's allegations establish that its entry into the generic Marinol® market may be delayed – and not that it has been foreclosed from the generic pharmaceutical market. *See* Affidavit of ▇▇▇▇▇▇▇ ("▇▇▇▇▇▇") ¶ 10 ("Currently, ▇▇▇ manufactures only▇▇▇▇▇. ▇▇▇▇▇"); ▇▇▇▇▇▇ (alleging that because of the "DEA's decision not to issue an import permit," Plaintiff's "project to obtain the first ANDA approval to bring a lower cost alternative to Marinol® to the market has come to a stop").

11

371 U.S. 156, 168 (1962)). In making that determination, the Court must consider whether

> the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to evidence before the agency, or is
> so implausible that it could not be ascribed to a difference in view or the product
> of agency expertise.

*Motor Vehicle Mfrs.*, 463 U.S. at 43. The Court, however, is "not permitted to substitute its

judgment for that of the agency." *Apotex, Inc. v. Food & Drug Admin.*, __ F. Supp. 2d __ , 2006

WL 1030151, at *7 (Apr. 19, 2006, D.D.C.). "[A]s long as the agency decision has some rational

basis, the court is bound to uphold it." *Id.* Applying that standard here, Plaintiff clearly has not

demonstrated a likelihood of success on the merits of its claim.

    **A.**    **The Plain Language of DEA Regulations Governing the Import of Controlled
Substances Required Denial of Plaintiff's Application to Import Its Synthetic
Dronabinol.**

    DEA's denial of Plaintiff's April 18, 2006 import application should be upheld because,

at minimum, that decision was based on a reasonable interpretation of the governing regulations.

*See Carus Chem. Co. v. United States Envt'l Protection Agency*, 395 F.3d 434, 439 (D.C. Cir.

2005) ("An agency is, of course, entitled to 'substantial deference' in its 'interpretation of its own

regulations.'"); *Castlewood Prods. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004) ("[w]e

accord an agency's interpretation of its own regulations a 'high level of deference,' accepting it

'unless it is plainly wrong'"). Indeed, that decision was dictated by the plain language of 21

C.F.R. § 1312.11, which governs the requirements for authorization to import controlled

substances. *See* 21 C.F.R. § 1312.11 (requiring that Plaintiff be both "properly registered under

the Act" and "issued [] a permit . . . for each consignment of controlled substances to be

imported"). Where as here, the language of the regulation is unambiguous, the Court must give it

12

effect. *See Pfizer Inc. v. Heckler*, 735 F.2d 1502, 1509 (D.C. Cir. 1984) (concluding that "[d]eference to agency interpretations is not in order if the rule's meaning is clear on its face"); *see also Roberto v. Department of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning."). Thus, whether based on the language of the relevant regulations or their interpretation by the DEA, the denial of Plaintiff's April 18, 2006 import application clearly was not violative of the APA.

Plaintiff's application sought authorization to import its synthetic version of a naturally occurring compound in the Cannabis plant known as $\Delta^9$-(trans)-tetrahyrdocannabinol [$\Delta^9$-(trans)-THC] for biostudy and – if successful – eventual submission to the FDA for approval.[5] *See* Plaintiff's Motion for Preliminary Injunction ("Pl. Mot.") at 4; *see also* Strait Decl. ¶ 15. That product unquestionably is a schedule I controlled substance, specifically, CSA Drug Code 7370, which includes "tetrahydrocannabinols naturally contained in a plant of the genus Cannabis . . . as well as synthetic equivalents of the substances contained in the cannabis plant, or in the resinous extractives of such plant, and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant." 21 C.F.R. § 1308.11(d)(30) (Tetrahydrocannabinols); *see also* Brown Decl. ¶ 14 ("The drug code for THC, including dronabinol (except for dronabinol products covered under drug code 7369), is 7370."). Plaintiff therefore was required to satisfy both the registration and import

---

[5] The application erroneously identified the DEA Controlled Substances Code Number for Plaintiff's product as 7369 instead of 7370. The former code applies only to "Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule *in a U.S. Food and Drug Administration approved product*." 21 C.F.R. § 1308.13(g) (emphasis added). Plaintiff's application described its product as only "DRONABINOL [] CAPSULES IN SESAME OIL" and therefore that product should have been coded 7370, the code for "synthetic equivalents of the substances contained in the cannabis plant." 21 C.F.R. 1308.11(d)(30).

requirements for a *schedule I controlled substance*. *See* Strait Decl. ¶17. Specifically, Plaintiff was required to obtain a registration and import permit specific to the controlled substance Plaintiff sought to import. *See* Ashley Decl. ¶¶ 8-9; Strait Decl. ¶ 17.

Plaintiff, however, did neither. Instead, Plaintiff obtained a Controlled Substance Registration for schedule III (Dronabinol, Code 7369). *See* Pl. Mot. Ex. C; Brown Decl. ¶ 16. That document registered Plaintiff as an importer of Dronabinol, Code 7369 effective ███████████ ███████ Strait Decl. ¶ 14. Plaintiff's April 18, 2006 import application similarly sought authorization to import Dronabinol, Code 7369, which covers dronabinol *in an FDA-approved product* not dronabinol by itself. *See* Pl. Mot. Ex. F; *see also* Brown Decl. ¶ 14 (discussing Code 7369). As the DEA explained to Plaintiff on May 5, 2006, however, "dronabinol is a Schedule I controlled substance unless in an FDA-approved product and [since Plaintiff's product was not,] ████████ would need to apply for registration as a Schedule I importer."[6] Strait Decl. ¶ 17; *see also* 21 C.F.R. 1308.11(d)(30) (Tetrahydrocannabinols). Since neither Plaintiff's registration nor import application complied with the requirements for the schedule I controlled substance dronabinol, DEA was not authorized under either the CSA or its implementing regulations to issue the permit Plaintiff sought.

---

[6] Plaintiff's claim of a "classic 'Catch 22'" is therefore unfounded. *See* Pl. Mot. at 11 ("The DEA is prohibiting importation of the product because it lacks FDA approval when the importation is for the very purpose of obtaining that approval."). As Plaintiff was advised by DEA, it was required to register as a schedule I importer and obtain an import permit for its specific product. *See* Strait Decl. ¶ 17; *see also* 21 C.F.R. §§ 1301.1, 1312.1. FDA approval was required to the extent Plaintiff sought to import its product under Plaintiff's current registration for Dronabinol, Code 7369. *See* Brown Decl. ¶ 14.

Plaintiff's claim to the contrary is based on an erroneous and selective reading of language in a *Federal Register* notice announcing that DEA had transferred "Marinol®" from schedule II to schedule III.[7] *See* 64 Fed. Reg. 35928 (July 2, 1999). That notice explained that "[w]ith the issuance of this final rule, the Deputy Administrator transfers from schedule II to schedule III of the CSA the drug containing synthetic dronabinol [] in sesame oil and encapsulated in soft gelatin capsules in a product approved by the Food and Drug Administration (FDA)." 64 Fed. Reg. at 35928. Marinol® is the only FDA-approved product consisting of dronabinol in sesame oil and encapsulated in a soft gelatin capsule. Strait Decl. ¶ 10. The Background section of the notice states, however, that "[f]or simplicity within this document, the term "Marinol" will be used hereafter to refer to "Marinol and any other products, which may be approved by FDA in the future, that have the same formulation as Marinol." 64 Fed. Reg. at 35928. Latching onto the phrase "any other products, which may be approved by FDA in the future," Plaintiff contends that its synthetic dronabinol which according to Plaintiff "may be (indeed, is likely to be) approved by the FDA in the future," (Pl. Mot. at 13), is thus among the products transferred to schedule III.

As Plaintiff acknowledges in a footnote, however, the product actually listed on schedule III pursuant to that *Federal Register* notice is "Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule *in a U.S. Food and Drug Administration approved product – 7369*." 21 C.F.R. 1308.13(g) (emphasis added). Because Plaintiff sought to import a substance that was not in an FDA-approved product, that substance was not within that definition

---

[7] The CSA authorizes DEA to "transfer between [] schedules any drug or other substance." 21 U.S.C. § 811; *see also* Ashley Decl. ¶ 11 (discussing transfer process).

and, by denying Plaintiff's application, DEA gave effect to that clear language. *See, e.g., Pfizer,* 735 F.2d at 1509 (refusing to consider Statement referenced in preamble to final regulation "because the language of the regulation itself is clear and unambiguous"); *Barrick Goldstrike Miners, Inc. v. Whitman,* 260 F. Supp. 2d 28, 36 (D.D.C. 2003) (rejecting interpretation based on select portions of preamble to rule where "interpretation would conflict with the plain language of the regulation. In such cases, the regulation must govern.").

Thus, under the deferential standard of review applicable here, DEA's denial of Plaintiff's application clearly neither was arbitrary and capricious nor exceeded its statutory and regulatory authority. To the contrary, DEA properly denied that application as not in compliance with applicable regulations. *See* 21 C.F.R. Pts. 1301, 1312; *see also* Ashley Decl. ¶¶ 9-10; Strait Decl. ¶ 17. Accordingly, *Plaintiff is not likely to succeed on the merits of its APA claim, and its motion for a preliminary injunction should be denied.*

> **B.    Plaintiff Cannot Rely on a Prior Erroneously Issued Permit as a Basis for its Arbitrary and Capricious Claim.**

To bolster its insubstantial merits argument, Plaintiff contends that "[a]s a further example of DEA's arbitrary conduct, it approved ▮▮▮▮▮first permit application but denied the second, and then claimed that the first approval was in error." Pl. Mot. at 13. That application, however, was mistakenly issued because Plaintiff was only registered to import synthetic dronabinol in an approved-FDA product not dronabinol by itself. *See* Strait Decl. ¶ 15; Brown Decl. ¶ 19; Robertson Decl. ¶ 6. It is well established that agencies have the implied authority to rectify their errors. *See, e.g., American Trucking Assoc. v. Frisco Tranp. Co.,* 358 U.S. 133, 145 (1958) ("the presence of authority in administrative officers and tribunals to correct [inadvertent

16

ministerial] errors has long been recognized - probably so well that little discussion has ensued in the reported cases"); *Gun South v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (same); *Kudla v. Modde*, 537 F. Supp. 87, 89 (E.D. Mich. 1982) ("[t]he power of the state to require a license implies the power to revoke a license which has been improperly issued"). Thus, for example, the Supreme Court has held that "erroneous oral and written advice by a Government employee to a benefits claimant" does not "give rise to estoppel against the Government and so entitle the claimant to a monetary payment not otherwise permitted by law." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 415-16 (1990); *see also Automobile Club of Michigan v. Commissioner of Internal Revenue*, 353 U.S. 180, 183 (1957) (holding that "doctrine of equitable estoppel is not a bar to the correction by [an agency] of a mistake of law"). Plaintiff's suggestion therefore that DEA was required to issue a second erroneous import permit because it had done so previously is completely baseless.

### C.    Plaintiff Is Unlikely to Succeed on the Merits of Its Claim Because Plaintiff Failed to Exhaust Its Administrative Remedies.

This Court alternatively should deny Plaintiff's motion because it failed to pursue an administrative appeal of the denial of its application before filing this action. *See* 21 C.F.R. §§ 1312.41 - 1312.47 (discussing procedures for hearings regarding the denial of an application for an import, export or transshipment permit). Although the exhaustion of administrative remedies here is not a condition precedent to this Court's jurisdiction, prudential considerations compel the conclusion that Plaintiff first should have presented its claim in that forum. *See Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247-48 (D.C. Cir. 2004) (comparing and contrasting jurisdictional and non-jurisdictional exhaustion). Non-jurisdictional exhaustion serves three

17

primary functions: "giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, [and] compiling a record adequate for judicial review." *Id.* at 1247. Here, exhaustion might serve a more compelling function – obviating this action altogether. *See Johnson v. District of Columbia*, 368 F. Supp. 2d 30, 38 (D.D.C. 2005) (noting that "exhaustion may further promote judicial efficiency in cases where 'decision by the agency may obviate the need for a judicial decision on the issue'").

Under DEA regulations, an applicant who is denied an import permit may request an administrative hearing, and if requested, "the Administrator shall hold such a hearing." *See* 21 C.F.R. §§ 1312.41, 1312.46. The Administrator has the burden of "proving that the requirements for such permit . . . are not satisfied." 21 C.F.R. § 1312.45 (citations omitted). Following the hearing, a final order setting forth all findings of fact and conclusions of law is issued. 21 C.F.R. § 1312.47. Through that process, Plaintiff would be informed *again*[8] that his April 18, 2006 application was denied because the product Plaintiff sought to import is a schedule I controlled substance that Plaintiff is not registered to handle. *See* Strait Decl. ¶ 17; *see also* 21 C.F.R. § 1312.11 (requiring that importer be "properly registered under the Act" and that "the Administrator has issued him a permit to do so pursuant to § 1312.13"). *Plaintiff, however, has not availed itself of that opportunity.*

Plaintiff has also refused DEA's request to "submit a letter explaining the Company's plans in exact and precise detail so that [DEA] could provide specific guidance as to how the Company should be most appropriately registered for its proposed activities," (Strait Decl. ¶ 18)

---

[8] Plaintiff was advised by DEA officials on May 5, 2006 that "dronabinol is a Schedule I controlled substance unless in an FDA-approved product and that ███████ would need to apply for registration as a Schedule I importer." Strait Decl. ¶ 17.

– as several of Plaintiff's competitors have some time ago. *See* Strait Decl ¶¶ 11-12 (discussing

contacts by and advice given to pharmaceutical companies that approached DEA in 2003-2005

concerning plans to market a generic dronabinol product). Plaintiff instead seeks to circumvent

established regulatory requirements for its proposed plans through a preliminary injunction. This

Court should not sanction that conduct and instead should require that Plaintiff exhaust his

administrative remedies.

## II.     PLAINTIFF HAS NOT MET ITS BURDEN OF DEMONSTRATING IRREPARABLE HARM.

This Court alternatively should deny the instant motion because Plaintiff has not

demonstrated irreparable harm. "[I]rreparable harm to the moving party is 'the basis of

injunctive relief in the federal courts.'" *Almurbati v. Bush*, 366 F. Supp. 2d 72, 77-78 (D.D.C.

2005); *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) ("The *sine qua*

*non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable

injury to the plaintiff."). Thus, a plaintiff's failure to meet its burden of establishing irreparable

harm alone is sufficient to deny preliminary relief. *See CityFed Financial*, 58 F.3d at 747; *see*

*also CWA*, 372 F. Supp. 2d at 98 (noting that "if a party makes no showing of irreparable injury,

the court may deny the motion for injunctive relief without considering the other factors"

(internal quotations omitted)); *Emily's List*, 362 F. Supp. 2d at 52 (noting that "if the movant

makes no showing of irreparable injury, that alone is sufficient for a district court to refuse to

grant preliminary injunctive relief' (internal quotations omitted)). Although the phrase

"irreparable harm does not readily lend itself to definition," courts have developed several "well

known and indisputable" principles for making that determination. *Wisconsin Gas Co. v. FERC*,

758 F.2d 669, 674 (D.C. Cir. 1985). First, the injury must be "both certain and great" and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Emily's List*, 362 F. Supp. 2d at 52 (internal quotations omitted); *Wisconsin Gas Co.*, 758 F.2d at 674 (same). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." *Id.* (internal quotations omitted). Second, economic loss "does not, in and of itself, constitute irreparable harm." *Id.* Third, the plaintiff must substantiate the claim that irreparable harm is "likely" to occur. *Id.* "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." ·*Wisconsin Gas Co.*, 758 F.2d at 674. Finally, the alleged harm must result directly from the action the plaintiff seeks to enjoin. *Id.* Consideration of these guiding principles compels denial of the instant motion.

A.    **Plaintiff's Alleged Economic Injury Does Not Constitute Irreparable Harm.**

Plaintiff contends that in the absence of an injunction, "[Plaintiff] will have to forfeit all of the time, money and effort it has invested over the past year to timely submit its ANDA." Pl. Mot. at 15. A movant, however, "must show that it will suffer harm that is 'more than simply irretrievable.'" *Apotex*, 2006 WL 1030151 at *16. "In this jurisdiction, harm that is 'merely economic' in character is not sufficiently grave under this standard. To successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence." *Apotex*, 2006 WL 1030151 at *16. Plaintiff here has alleged neither.

Plaintiff's own allegations belie any suggestion that the potential loss of its investment in marketing a generic equivalent of Marinol® threatens its existence. *See, e.g.*, Pl. Mot. at 3 ("███████ vies in a highly competitive market with nearly every manufacturer and distributor of ██████████, both foreign and domestic."); Pl. Mot. at 2 ("██████ . . . has successfully developed ███████████████"); ████████████ ("Although ████████████ company, with only ████ employees, █████ competes with nearly every manufacturer and distributor of ████████████"); *see also* ████████████ ("█████ was founded in ██████ and is ████████████ manufacturer in the United States."). Thus, Plaintiff's potential lost investment *is insufficient to justify a preliminary injunction.*

**B.      Plaintiff's Speculations About Being the First to Market a Generic Marinol® are Insufficient to Satisfy the Requirement of Irreparable Harm.**

Although some courts have held that a pharmaceutical company's loss of its statutory entitlement to generic marketing exclusivity attendant with being the first company to receive FDA approval for a generic drug, (Pl. Mot. at 15 (citing cases)), those cases are inapposite. Here, Plaintiff has not alleged that it has any statutory entitlement to exclusivity or even that it has filed an application with the FDA.[9] Rather, Plaintiff seeks an injunction based on its belief that at some point in the future it might be the first manufacturer to submit an Abbreviated New Drug

---

[9] By Plaintiff's own admission, the competition to manufacture and market generic versions of prescription drugs is highly competitive. *See* Pl. Mot. at 3. Indeed, DEA was first contacted by a pharmaceutical concern seeking advice on how to register to research and develop a generic dronabinol in 2003 – two years before Plaintiff's contact with DEA. *See* Strait Decl. ¶ 11. Other such inquiries followed in 2004 and 2005. *See* Strait Decl. ¶ 12. Those companies were advised as Plaintiff was on May 5, 2006, that dronabinol in any formulation other than Marinol® is a schedule I controlled substance. *See* Strait Decl. ¶¶ 11-12, 17. It would be unfair to permit Plaintiff to circumvent the regulatory procedures with which its competitors have been compelled to comply.

Application ("ANDA") for a generic Marinol®. *See, e.g,* Pl. Mot. at 13 ("the generic Marinol®

that ▓▓▓▓ seeks to import has the same formulation as the brand name Marinol® . . . and may

be (indeed, *is likely to be*) approved by the FDA in the future"); ▓▓▓▓▓▓▓▓ ("▓▓▓▓

believes that it will be able to establish that this generic product is bioequivalent to Marinol®.").

Such speculations, however, are clearly not sufficient to establish irreparable harm.[10] *See, e.g.,*

*National Conference on Ministry to Armed Forces*, 278 F. Supp. 2d 37, 52 (D.D.C. 2003)

("Speculative injury does not constitute irreparable injury sufficient to warrant granting a

preliminary injunction."); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 49 (D.D.C. 2001) ("Speculative

harm is not sufficient to constitute irreparable harm."). Plaintiff therefore has not – and indeed,

cannot – satisfy this requirement of a preliminary injunction.[11]

## III.  THE BALANCE OF HARMS AND PUBLIC INTEREST COMPEL DENIAL OF PLAINTIFF'S MOTION

In light of Plaintiff's insufficient showing on the harm and likelihood-of-success factors,

this Court need not consider the remaining factors – balance of harms and public interest. *See*

*CWA*, 372 F. Supp. 2d at 98 (noting that "if a party makes no showing of irreparable injury, the

court may deny the motion for injunctive relief without considering the other factors" (internal

quotations omitted)); *Emily's List*, 362 F. Supp. 2d at 51 (concluding that if plaintiff does not

---

[10] Plaintiff's contention that it is in a classic "Catch 22" does not belie this conclusion. DEA officials advised Plaintiff on May 5, 2006, that it "would need to apply for registration as a Schedule I importer" but to date, Plaintiff has not done so. Strait Decl. ¶ 17. Therefore, its ability to complete its ANDA application, at this point in time, rests solely with Plaintiff.

[11] Since Plaintiff has not demonstrated irreparable harm, Plaintiff's contention that its failure to pursue an administrative appeal should be excused is meritless. *See* Pl. Mot. at 19 (contending that exhaustion should not be required under the circumstances of this case because "[i]f ▓▓▓▓ were to await the conclusion of the administrative process, it could likely lose its position as the first market entrant with a generic product equivalent to Marinol®").

demonstrate a substantial likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor" (internal quotations omitted)). These factors, however, also weigh against granting Plaintiff's motion.

As Plaintiff concedes, (Pl. Mot. at 17), there is a substantial public interest in the lawful application of agencies' statutory and regulatory authority. *See* Pl. Mot. at 17 (citing cases); *see also New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) ("any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"). That interest is not overcome here by Plaintiff's speculation that if it becomes the first company to manufacture generic Marinol®, "the public interest will be served by ready access to a less-expensive generic drug," (Pl. Mot. at 16). *See also Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 347 (D.C. Cir. 1998) ("public's interest in the 'faithful application of the laws' outweighed its interest in immediate access to Mylan's generic product"). An injunction against the DEA's denial of Plaintiff's import application would allow Plaintiff to circumvent the statutory and regulatory procedures for importing a schedule I controlled substance. The public interest clearly is not served by that result. Rather, Plaintiff should bring its generic Marinol® to market through the required regulatory channels . *See* Strait Decl. ¶¶ 17-18.[12]

---

[12]  Other companies that have approached DEA about plans to market a generic dronabinol product in the United States have been advised that "any import of the proposed material would require an import permit for a Schedule I substance" but if "[their] product is approved by the FDA in the future and placed into Schedule III of the CSA, then an import permit for a Schedule III substance would be required." Strait Decl. ¶ 11.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for a preliminary

injunction.

Dated: June 2, 2006                    Respectfully submitted,

                                       PETER D. KEISLER
                                       Assistant Attorney General

                                       KENNETH L. WAINSTEIN
                                       United States Attorney

                                       ARTHUR R. GOLDBERG
                                       Assistant Director, Federal Programs Branch

                                       _____/s/_____
                                       JACQUELINE E. COLEMAN (D.C. Bar No. 459548)
                                       JUDRY L. SUBAR (D.C. Bar No. 347518)
                                       U.S. Department of Justice, Civil Division
                                       Federal Programs Branch
                                       20 Massachusetts Avenue, N.W., Rm 7214
                                       Washington, DC  20530
                                       202-514-3418

                                       **Counsel for Defendants**

24

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JOHN DOE, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. |
|  | ) | 1:06CV00966 |
| ALBERTO R. GONZALES, Attorney General | ) | |
| of the United States, UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE, and KAREN P. | ) | |
| TANDY, Administrator of the United States | ) | |
| Drug Enforcement Administration | ) | |
|  | ) | |
| Defendants. | ) | |

**DECLARATION OF DEMETRA ASHLEY**

I, DEMETRA ASHLEY, declare and state as follows:

1.    I am an employee of the United States Department of Justice, Drug Enforcement Administration (DEA), and have been employed by DEA since 1981. I became a Diversion Investigator in 1987. I was reassigned as a Staff Coordinator in the Office of Diversion Control (OD) in DEA Headquarters in Arlington, Virginia, in December 2004. Since October 2005, I have served as the GS-15 Deputy Section Chief of the Drug and Chemical Evaluation Section (ODE). I make the following statements based upon my personal knowledge, on information provided to me in my official capacity, and on my evaluation of that information.

2.    This declaration is submitted in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction in the above captioned case.

3.    DEA's mission is enforcement of the Controlled Substances Act (CSA), as amended, 21 U.S.C. §§ 801 *et seq.* Many of the narcotics, depressants, stimulants, and

hallucinogenic substances which are manufactured for legitimate medical purposes are subject to abuse. The CSA brings those substances under legal control and refers to them as "controlled substances." *Id.*, § 802(6).

4.    DEA's Office of Diversion Control (OD) in DEA Headquarters directs DEA's world-wide diversion program, including diversion investigations, domestic and international diversion control, registration, voluntary compliance, state assistance, and industry liaison/ support programs. OD's mission is to prevent, detect, and investigate the diversion of pharmaceutical controlled substances and listed chemicals from legitimate channels while ensuring an adequate and uninterrupted supply of pharmaceutical controlled substances and listed chemicals to meet legitimate medical, commercial, and scientific needs.

5.    Under the CSA, all businesses which manufacture or distribute controlled substances, all professionals entitled to dispense, administer, or prescribe them, and all pharmacies that fill such prescriptions must register with DEA. *Id.*, §§ 822, 823. As of November 4, 2005, over 1,200,000 individuals and organizations were registered with DEA. Of these, 1,191,824 were retail level registrants, including practitioners, retail pharmacies, hospitals, and clinics. Over 12,000 were wholesale level registrants, including manufacturers, distributors, researchers, analytical laboratories, importers, exporters, and narcotic treatment programs. Of these, 507, including plaintiff ███████, were manufacturers. Most practitioners must register every three years; manufacturers, distributers, importers, exporters, and researchers must register each year.

6.    To effectively handle this high volume of registrants, DEA has largely standardized, decentralized, and computerized the handling of applications and renewals for

registration. Registrant assistants are available in many of DEA's dozens of domestic field

offices during normal business hours; DEA has also established a national Registration Call

Center and made registration forms and extensive information available on the internet at

www.deadiversion@usdoj.gov. OD, however, provides oversight, policy guidance, and support

to the registration process and to the regulated community.

     7.    The CSA established five Schedules of controlled substances. 21 U.S.C. § 812.

Substances in Schedule I have no currently generally accepted medical use in the United States

and a high potential for abuse. Substances in Schedule II also have a high potential for abuse and

their use may lead to dependence, but do have a currently accepted medical use. Substances in

Schedule III have less potential for abuse than those in Schedules I and II, while their abuse may

lead to moderate or low physical dependence or high psychological independence.

     8.    The registration of an individual practitioner or other retail level registrant

specifies the Schedule(s) within which the individual or concern is authorized to prescribe or

dispense controlled substances. Not all registrants are authorized to prescribe or dispense

controlled substances in all four Schedules from II through V.

     9.    The registration of an individual manufacturer, importer or exporter, or other

wholesale registrant, however, specifies not only the Schedule, but the particular controlled

substance(s), each is authorized to possess.

     10.    Each controlled substance or basic class is assigned an "Administration

Controlled Substances Code Number," a unique four-digit number, which appears on

Certificates of Registration. Applicants for import and export permits must include the

appropriate code number on the application. See 21 C.F.R. § 1308.03(a).

11.    The CSA also established a process by which DEA, in consultation with the Food and Drug Administration (FDA), can add a drug to a Schedule or transfer a drug between Schedules.  21 U.S.C. § 811(a).  Parties can petition DEA to initiate rule-making proceedings to schedule or reschedule substances.  *Id.*  Before initiating such a proceeding, however, DEA must request a scientific and medical evaluation from the FDA.  *Id.*, § 811(b).

12.    The CSA also authorizes DEA to establish national drug production quotas for Schedule I and II controlled substances to ensure that legitimate medical and research needs are satisfied, while minimizing the risk of diversion of controlled substances into illicit channels. *Id.*, § 826.  International treaties also require monitoring the movement of licit controlled substances across the United States' borders.  See *Id.*, § 801(7) (Congressional findings).  DEA issues import and export permits for such movement. *Id.*, §§ 951 ff.

13.    The Drug & Chemical Evaluation Section (ODE) conducts and initiates studies and reviews and appraises the scientific literature to increase and apply scientific knowledge and formulate recommendations to support the scheduling and rescheduling of controlled substances.  ODE also analyzes necessary information from the FDA, the pharmaceutical industry, and other sources to establish annual production and procurement quotas for Schedule I and II controlled substances.

14.    DEA attempts to facilitate ongoing communications with the regulated industry.  Among other outreach efforts, DEA participates in an annual DEA-Pharmaceutical Industry Conference.  The Conference is a forum provided to facilitate cooperation between the industry and DEA and to strengthen lines of communication.  The Conference is a venue for exchange and discussion; topics include interpretation of existing federal regulations, developments

requiring regulatory changes, clarification of DEA policy, and development of initiatives to respond to reports of diversion of controlled substances.

15.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of June, 2006
at Arlington, Virginia

Demetra Ashley
Deputy Chief
Drug Chemical Evaluation Section
Office of Diversion Control
Drug Enforcement Administration

TOTAL P.05

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
JOHN DOE, INC.                                        )
                                                     )
            Plaintiff,                               )
                                                     )        Civil Action No.
      v.                                             )        1:06CV00966
                                                     )
ALBERTO R. GONZALES, Attorney General                )
of the United States, UNITED STATES                  )
DEPARTMENT OF JUSTICE, and KAREN P.                   )
TANDY, Administrator of the United States            )
Drug Enforcement Administration                      )
                                                     )
            Defendants.                              )
                                                     )

## DECLARATION OF MATTHEW STRAIT

I, Matthew Strait, declare and state as follows:

1.      I am an employee of the United States Department of Justice, Drug Enforcement

Administration (DEA). I have been employed by DEA since July 1999 and have held my current

position as a GS-1301 Supervisory Physical Scientist since April 2005.

2.      I currently serve as the Chief of the Quota and United Nations Reporting Unit

(ODEQ) in the Drug and Chemical Evaluation Section (ODE) in the Office of Diversion Control

in DEA Headquarters in Arlington, Virginia. As Chief of ODEQ, I attend meetings with industry

groups and representatives, participate in DEA training and conferences with representatives of

the regulated community, and attempt to facilitate communications with and dissemination of

information to that community, among other functions.

3       I make the following statements based upon my personal knowledge, on

information provided to me in my official capacity, and on my evaluation of that information.

4.    This declaration is submitted in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction in the above captioned case.

5.    When Congress enacted the Controlled Substances Act (CSA), it placed marijuana in Schedule I, where it remains today. The principal psychoactive ingredient in marijuana is tetrahydrocannabinol (THC). THC appears in multiple isomers. Isomers are compounds which have the same molecular formula, that is, the same number of atoms of each element in a molecule, but in which the atoms in each molecule are arranged differently. Different isomers of the same compound can have different physical and/or chemical properties. THC and its isomers are, generally speaking, also classified as Schedule I controlled substances. 21 U.S.C. § 812 Schedule I (c).

6.    Marijuana has been assigned Controlled Substances Code Number 7360. 21 C.F.R. § 1308.11(d)(22).

7.    Tetrahydrocannabinols have been assigned Code Number 7370. Id., § 1308.11(d)(30). The DEA regulation further defines tetrahydrocannabinols:

> Meaning tetrahydrocannabinols naturally contained in a plant of the genus Cannabis (cannabis plant) as well as synthetic equivalents of the substances contained in the cannabis plant, or in the resinous extractives of such plant, and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant...

8.    The FDA has approved a New Drug Application (NDA) for Marinol® for use as an emetic and antinausea drug. Marinol® is the trade name for dronabinol, the synthetic equivalent of one isomer of THC.

9.    Marinol® is in Schedule III. 21 C.F.R. § 1308.13(g)(1). The regulation reads:

2

Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product – 7369.

10.  The FDA has currently approved only one product consisting of synthetic dronabinol in sesame oil and encapsulated in a soft gelatin capsule, Marinol.® The code number 7369 therefore applies only to the commercial product Marinol.®   The code number 7370 therefore applies to all other forms of THC.

11.  In mid-2003, ODE received correspondence from a pharmaceutical company. The incoming correspondence described the firm's plans to market a generic dronabinol product in the United States and asked whether DEA would issue a letter of non-objection permitting the importation of such product. I drafted DEA's response for the signature of the Chief of ODE. ODE advised the firm:

> Tetrahydrocannabinols (THC) and all of its isomers (including the active pharmaceutical ingredient in dronabinol, synthetic delta-9-THC) are classified as Schedule I controlled substances under the Controlled Substances Act (CSA, 21 U.S.C. §812 Schedule I (c)). The Food and Drug Administration (FDA) is responsible for the approval of drug products. When dronabinol is formulated into the FDA-approved product known as Marinol™ it is controlled in Schedule III. Your proposed project would involve the manufacture of a drug product that is not yet approved by the FDA, thus it would be controlled in Schedule I of the CSA. Therefore, at this time, any import of the proposed material would require an import permit for a Schedule I substance. If your drug product is approved by the FDA in the future and placed into Schedule III of the CSA, then an import permit for a Schedule III substance would be required.

12.  ODE provided the same guidance to other concerns which proposed to develop generic dronabinol products on November 21, 2003, June 9, 2004, and December 1, 2005.

13.  I provided the same guidance in response to a question from the audience during a DEA pharmaceutical industry training conference in Atlanta, Georgia, in April 2006.

3

14.    Plaintiff did not contact ODE with respect to its proposed generic dronabinol product. DEA records indicate that ████████████ made application to DEA's Philadelphia Field Division office for registration as an importer of three controlled substances, including dronabinol in bulk form "for product development." After an on-site visit by a Diversion Investigator and review of the security features of ██████ manufacturing facility, a Registration Specialist issued DEA registration ██████████ to ██████ for registration as an importer of Dronabinol, Code # 7369, on ███████████████.

15.    I first learned that DEA's field office had registered ██████████████ to import dronabinol, code number 7369 in early May 2006. ██████ had submitted an application to import 525,000 capsules (175,000 dosage units) of dronabinol. Once the field has issued registration as an importer, specific requests are submitted to the Import/Export Unit (ODEI) in DEA Headquarters. This application, unlike ██████ first, sought to import finished product in capsule form, rather than bulk dronabinol for product development. When ODEI received the application, the large quantity and use of the material to be imported raised a red flag.

16.    The Chief of ODEI, Stephen M. ("Mark") Via, contacted me to discuss the matter. We decided to contact the firm to obtain more details regarding the application. I immediately placed a telephone call to ██████████████ management. During a telephone call on May 5, 2006, Mr. Via informed the ██████ representative that its application for an import permit was being cancelled. The representative protested that his company had previously been permitted to import amounts of dronabinol; Mr. Via explained that it had been a mistake for DEA to issue the previous registration. Michael Morley of my staff and I also participated in that conversation.

4

17.    Mr. Via, Mr. Morley, and I all explained to the ▓▓▓ representative that dronabinol is a Schedule I controlled substance unless in an FDA-approved product and that ▓▓▓ would need to apply for registration as a Schedule I importer.

18.    During that conversation, Mr. Via and I asked ▓▓▓ to submit a letter explaining the Company's plans in exact and precise detail so that we could provide specific guidance as to how the Company should be most appropriately registered for its proposed activities. It was not clear to us, for example, whether it intended to manufacture generic dronabinol in the United States or simply to import gel capsules and package them in the United States under its own company name.

19.    It was also not clear whether ▓▓▓ intended simply to conduct bioequivalence studies in this country or whether it proposed to conduct research using human subjects. When a company seeks to market a drug in the United States which the FDA has not previously approved, it must submit a New Drug Application (NDA) containing scientific data demonstrating its safety and effectiveness. To obtain DEA registration to conduct human clinical trials using a Schedule I substance, an applicant must submit a detailed research protocol, which DEA forwards to the FDA. The FDA determines whether the applicant is qualified and competent and whether the research protocol is meritorious. See 21 C.F.R. § 1301.32. As we understood it, however, ▓▓▓ proposed only to manufacture a generic drug, which only requires submission of an Abbreviated New Drug Application (ANDA). The ANDA must demonstrate, among other things, that the generic version is the bioequivalent of the NDA-approved version of the product. In other words, the generic drug must deliver the same amount of the active ingredient at the

5

same rate and extent to the body as the innovator drug. See 21 U.S.C. § 355(j). It was therefore not clear to us why ▮▮▮▮ proposed to conduct human clinical trials.

20.     Finally, we wanted to know why ▮▮▮▮ Company sought to import such a large quantity of finished capsules. Were all 175,000 dosage units needed for bioequivalence testing, or was ▮▮▮▮ Company attempting to establish a domestic inventory for sale in anticipation of FDA approval and DEA rescheduling?

21.     The ▮▮▮▮ representative agreed to provide written clarification of ▮▮▮▮ plans. I intended to provide regulatory guidance in a written response, as ODE had done in response to the requests of other manufacturers.

22.     Mr. Via and I, however, never received the requested clarification.

23.     Instead, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ placed a telephone call to Brian Bayly, a Senior Attorney in DEA's Office of Chief Counsel who had previously helped settle an unrelated legal matter. ▮▮▮▮ followed up with a May 9, 2006, letter to "Dear Brian," in which he asked Mr. Bayly to intervene on his behalf with ODE and insisted that ▮▮▮▮ should be permitted to import dronabinol under Schedule III and that ODE's interpretation was in error. A copy is attached as Declaration Exhibit 1. A copy of ▮▮▮▮ ▮▮▮▮ May 10, 2006, letter to Mr. Bayly is also attached as Declaration Exhibit 2.

25.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Executed this 2ᵈ day of June, 2006
at Arlington, Virginia

Matthew Strait
Chief, Quota and U.N. Reporting Unit
Office of Diversion Control
Drug Enforcement Administration

6

# EXHIBIT 1

Date:  May 9, 2006

Mr. Brian Bayley
United States Department of Justice
Drug Enforcement Administration
2401 Jefferson Davis Highway
Alexandria, VA  22301

Dear Brian:

Per our phone discussion yesterday, the following is a sequence of events for which I
am requesting your intervention.

- On ████████, ████ submitted an application for registration under
  controlled substances act of 1970 for a Schedule IIIN and IV for controlled
  substances.  Included was the drug code number CSA 7369, which is assigned
  to Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin
  capsule.

- On July 6, 2005, representatives of ████████ ( ████████,
  ████ ) met with Ann Carter and John Robertson at the DEA Office in
  Philadelphia.  The purpose of this meeting was to inform the local office of our
  plans for the manufacture and/or marketing of new controlled substance finished
  goods.  ████ recalls specifically discussing Dronabinol soft gel capsules
  2.5mg, 5mg and 10mg finished goods and asking if there would be any issues.
  ████ further recalls Mr. Robertson of DEA stating that while the DEA lists
  the soft gel capsules as a CIII, we would need to advise the DEA each time we
  imported it.  He advised that DEA treated this drug similarly to drugs that have
  quotas assigned in that post approval by FDA of our Abbreviated New Drug
  Application (ANDA) we would need to constantly show we had customer orders
  for the capsules being imported.

- The Drug Enforcement Agency's Import/Export Unit did issue an import permit
  DEA registration certificate ████████.

- On ████████ applied for a permit to import controlled
  substances for domestic and/or scientific purposes (form 357) for 400 capsules
  Dronabinol 2.5 mg capsules in sesame oil, 400 capsules 5 mg in sesame oil and
  400 capsules 10 mg in sesame oil.  The Drug Enforcement Administration issued

Telephone: ████████ • ████████ • Fax: ████████ • ████████

4

a permit ███████████████████████ with an expiration date of ███████████ allowing these quantities to be imported from Switzerland. This Dronobinal was imported and received by ██████ in Philadelphia on April 24, 2006.

- On April 18, 2006, ████████ made an application for a permit to import controlled substances for domestic and/or scientific purposes (form 357) for 175,000 capsules of each Dronabinal dosage form listed above for the stated purpose of packaging the biostudy batch and submission batches for ANDA approval. These capsules are prepared and awaiting our instructions. These are sensitive materials that need to be packaged quickly. Any delay will be viewed by FDA negatively.

- On May 5, 2006, Stephen Via, Acting Chief of ODEI along with Matt Strait and Michael Morley from ODEI contacted ██████████ to inform him that the import permit application of April 18, 2006 was being cancelled. ████████ was informed that 21 CFR 1308 .13 (g) requires Dronabinol to be an FDA approved product. ████████████ was further informed that Dronabinol would need to be imported as Schedule I controlled substance and not an IIIN. ████████ stated to Mr Via that the DEA ODEI did issue permit no.███████████ to bring in samples of 400 capsules of each dosage for Dronabinol. Mr. Via stated that it had been a mistake for the DEA to issue that permit.

It is difficult to understand why Dronobinol, a formulated processed product in sesame oil and encapsulated in a soft gelatin capsule, could be reclassified to a schedule I drug per 21 CFR 1308.11 (d) following the issuing of an import permit by the DEA. ████████ has in the past imported unapproved generic versions of approved FDA products for research and development purposes. In these instances, ████████ has committed in writing that they would not market or distribute the unapproved product and has taken measures to prevent diversion of such unapproved products.

████████ wishes to point out that 21 CFR, Section 1308.13 (g) (1) is used to define a CIIIN drug and the FDA approval refers to there being a product on the U.S. Market in the particular dosage form. In order to get generic drug approval from FDA ████████ is seeking to import an unapproved generic version of the approved FDA branded product, Marinol (the reference listed drug). In order for ████████ to obtain approval to market its Dronabinol in the US, it must package and bottle the drug at its facilities, conduct stability tests and show bioequivalence with the reference listed drug, Marinol in biostudies. Then it must assemble information from this testing and submit an ANDA. The drug product in its packaged and bottled form needs to available for inspection by FDA at ████████ premises.
We believe that FDA approval has no relevance to whether or not a drug is a schedule or what schedule it should be. Diversion is what drives these designations.

████████ would be prepared to provide whatever documentation is necessary to convince the DEA that ████████ has adequate safeguards in place against diversion of the

# EXHIBIT 2



Date: May 10, 2006

Via facsimile

Mr. Brian Bayley, Esq.
United States Department of Justice
Drug Enforcement Administration
2401 Jefferson Davis Highway
Alexandria, VA  22301

Dear Brian:

Following up on my conversation, DEA should note that paragraph 8 of the
Application for Permit to Import Controlled Substances for Domestic and/or
Scientific Purposes requires the applicant to indicate whether the controlled
substances will be used only for scientific purposes and, if so, to so certify. Thus,
the Form itself contemplates the importation of unapproved drugs for scientific
purposes, such as for conducting tests to obtain FDA approval for a generic
version. In other words, the DEA Form is consistent with an interpretation of
Schedule 3N as referring to unapproved Dronabinol.

I apologize for not including this in my letter yesterday.

Kind Regards,

Douglas C.
Throckmorton, M.D.
Acting Deputy Director,
Center for Drug Evaluation
and Research, F.D.A.

Matt—
E-6249-3
Susan
E-6235
97193

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE, INC.<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO R. GONZALES, Attorney General<br>of the United States, UNITED STATES<br>DEPARTMENT OF JUSTICE, and KAREN P.<br>TANDY, Administrator of the United States<br>Drug Enforcement Administration<br><br>Defendant. | Civil Action No.<br>1:06CV00966 |

### DECLARATION OF CHERYL E. BROWN

I, Cheryl E. Brown, declare and state as follows:

1.    I am employed by the United States Department of Justice, Drug Enforcement Administration (DEA), as the Supervisory Diversion Investigator for Diversion Group #1 in DEA's Philadelphia Field Division Office. I make the following statements based upon my personal knowledge, on information provided to me in my official capacity, and on my evaluation of that information.

2.    As the supervisor of Philadelphia Diversion Group #1, I direct the activities of ten Diversion Investigators, one Registration Technician, and one Investigative Assistant assigned to this group. Diversion Investigators conduct investigative activities related to drugs classified as controlled substances and chemicals classified as List 1 and List 2 chemicals pursuant to various federal laws. Diversion Investigators are responsible for dealing with the Drug Enforcement

Administration's registrant population and ensuring that those registrants are in compliance with the federal regulations in Title 21, Code of Federal Regulations, Section 1300 to the End. The Diversion Investigation Unit in Philadelphia covers most of the eastern half of the Commonwealth of Pennsylvania and all of the State of Delaware. Philadelphia Registration Technicians are responsible for processing registration applications for all of Pennsylvania and Delaware.

3.    This declaration is submitted in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction in the above captioned case.

<u>July 5, 2005, Meeting with</u> ███

4. .    In June 2005, representatives of ████████████████ (hereafter "████") asked to meet with Ann Carter, the Diversion Program Manager for the Philadelphia Field Division. Because they had not identified any purpose for the meeting, her staff asked them to do so. They replied that they wanted a general discussion of security issues.

5.    As the Diversion Program Manager, Ms. Carter would not normally participate in a staff-level consultation about an application for registration or an import permit. We expected the meeting to focus on preexisting regulatory issues. My Diversion Group has worked with, and conducted investigations, of ████ on issues unrelated to this litigation for several years. I was therefore asked to attend the meeting. Because the Diversion Investigator who was then primarily responsible for ████ issues was not available, I asked his office mate, D/I Robertson, to sit in on the meeting.

6.    DEA Program Manager Ann Carter, DEA Diversion Investigator John Robertson, and I met with ████ officials ██████████, ██████████, and ████████ on July 5, 2005. We expected to discuss issues pertaining to ████ existing DEA registrations and

2

████ business practices. The meeting began with a discussion of security issues relating to the fact that ████ now has two manufacturing sites ██████████ and would be transporting controlled substances between those sites.

7. The ████ representatives then stated that they intended to market new products. This did not surprise me. ████████████████ ████████████████████████████████ I had been told by ████████████ that they were reviewing the patents held by the ████████ and considering issuing new products based on them. We had had a number of preliminary discussions about such potential products, which had not always been followed by applications for registration or import permits.

8. During the meeting, ████ officials also informed us of their desire to import dronabinol. I thought that we were again having a preliminary discussion. We had not known beforehand that this issue would be discussed at the meeting and we had not researched any issues that might arise surrounding this product.

9. I associated dronabinol with Marinol® (a Schedule III controlled substance) and said that I did not understand why they wanted to import a finished product under a manufacturer registration. The ████ representatives did not inform me that they were trying to develop a generic version of Marinol®. Instead, they started talking about manufacturing facilities in ████ and other locations which would be supplying them with other products. I told them that DEA's coincident activities rule allowed a manufacturer registration to re-distribute only those products on which it had conducted a manufacturing activity, such as dosage form manufacturing, bottle packaging, bottle labeling, etc. Therefore, if they imported, received, or

3

purchased finished products under a manufacturing registration, they would not be able to

distribute the finished products unless their company actually did something to the product. At

that point, the conversation went back to other issues.

      10.    We did remind the ███████ representatives during the meeting that our local office

in Philadelphia had no authority to approve or disapprove requests by registrants to import or

export shipments of any controlled substances, as such requests are reviewed and approved by a

DEA Headquarters unit.

      11.    If the ███████ representatives had told me explicitly that they intended to develop

a generic version of Marinol® which they would be submitting to FDA for approval, that would

have prompted me to do additional research to confirm that the dronabinol which ███████

intended to import complied with the description of dronabinol products covered by Drug Code

7369. However, they did not. I therefore assumed during our meeting that ███████ intended to

import an approved Schedule III substance.

      12.    After that meeting, I do not remember having any further discussions with

███████ officials regarding ███████ desire to import dronabinol.

      ███████ <u>Registration Application</u>.

      13.    My office subsequently received ███████ application to register

as an importer of controlled substances. The application sought registration to import three

controlled substances, one of which was dronabinol. ███████ application stated that it sought

to import dronabinol under drug code 7369. Products covered by drug code 7369 are products

approved by the U.S. Food and Drug Administration containing dronabinol in a specific

formulation.

.4.

14.   Drug code 7369 is the drug code for "Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product." See 21 C.F.R. § 1308.13(g). Dronabinol is the United States name for the (-)- isomer of Δ9-(trans)-tetrahydrocannabinol (hereinafter "Δ9-(trans)-THC"), which is believed to be the major psychoactive component of cannabis (marijuana). See 64 FR 35928 (July 2, 1999). Tetrahydrocannabinols (hereinafter "THC") and any material, compound, mixture, or preparation containing THC or any of its isomers, including Δ9-(trans)-THC, are Schedule I controlled substances. See 21 CFR § 1308.11(d)(30). The drug code for THC, including dronabinol (except for dronabinol products covered under drug code 7369), is 7370. Dronabinol, unless it is a synthetic dronabinol in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved product, is a schedule I controlled substance.

15.   My office therefore interpreted the application's use of Drug Code 7369 to mean that ▓▓▓▓ sought to register as a manufacturer of the Schedule III controlled substance 7369.

16.   ▓▓▓▓ had submitted an attachment to its application containing a brief phrase to the effect that it sought to import dronabinol for "product development." Our office did not realize the significance that ▓▓▓ attached to this addendum, but granted the registration on the assumption that ▓▓▓ sought registration to manufacture the substance described on the application itself.

17.   As explained above, I am familiar with ▓▓▓▓ other DEA registrations. At the time of our July 6, 2005, meeting ▓▓▓ was already registered to handle two controlled substances that are, like dronabinol, placed in more than one schedule of the Controlled

5

Substances Act, depending on the form in which the substance exists.   This is described, both by DEA and the pharmaceutical industry, as "split registrations."

    18.   Specifically, ██████ is registered to handle difenoxin, a Schedule I controlled substance, 21 C.F.R. § 1308.11(b)(20), in order to manufacture a Schedule V controlled substance, 21 C.F.R. § 1308.15(c)(4), made from difenoxin. Also, ██████ is registered to handle bulk dextropropoxyphene (non-dosage forms), a Schedule II controlled substance. 21 C.F.R. 1308.12(c)(5), in order to manufacture a Schedule IV controlled substance, 21 C.F.R. § 1308.14(b)(2), made from bulk dextropropoxyphene. ██████ officials should therefore be familiar with the concept of split registration and the need to obtain separate registrations for the raw compound and the finished pharmaceutical product.

    19.   In May 2006, I became aware that DEA's Import/Export Unit had refused to grant ██████ importation application because the product it sought to import was a Schedule I controlled substance (drug code 7370) and not a Schedule III controlled substance (drug code 7369).  If I had been aware that the product which ██████ sought to import was not an FDA approved formulation of dronabinol, and therefore did not meet the definition of a Schedule III controlled substance, my office would not have granted ██████ application for registration to import this drug code nor would it have had the authority from my agency to grant such approval.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

        Executed this 2nd day of June 2006 in Philadelphia, Pennsylvania.

                                            Cheryl E. Brown
                                            Supervisory Diversion Investigator

EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE. INC.

        Plaintiff,

        v.

ALBERTO R. GONZALES, Attorney General
of the United States, UNITED STATES
DEPARTMENT OF JUSTICE, and KAREN P.
TANDY, Administrator of the United States
Drug Enforcement Administration

        Defendant.

Civil Action No.
1:06CV00966

## DECLARATION OF JOHN ROBERTSON

I, John W. Robertson, declare and state as follows:

1.    I am employed by the United States Department of Justice, Drug Enforcement

Administration (DEA), as a Diversion Investigator (D/I) and am currently assigned to DEA's

Philadelphia Field Division, where I am responsible for addressing the problem of diversion of

controlled substances and regulated chemicals from the legitimate channels in which they are

manufactured, distributed, and dispensed. I am also responsible for assisting the pharmaceutical

and chemical industries in complying with the Controlled Substances Act and its implemented

regulations, as well as other pertinent laws, international treaties and conventions. I make the

following statements based upon my personal knowledge, on information provided to me in my

official capacity, and on my evaluation of that information.

2.    *This declaration is submitted in support of Defendants' Opposition to Plaintiff's*

Motion for Preliminary Injunction in the above captioned case.

3. ████████████████ (hereinafter "█████") submitted to the Philadelphia Field Division, DEA, an application, dated ████████ to register as an importer of controlled substances. The application sought registration to import three controlled substances, one of which was dronabinol. ██████ application stated that it sought to import dronabinol under drug code 7369.

4. On September 27, 2005, D/I Michelle McGregor and I met with █████ officials ████████ and ████████ to discuss █████ application to register with DEA to import dronabinol. ██████ and ██████ indicated that █████ intended to import Schedule III non-narcotic dronabinol; the documents they presented to D/I McGregor and me stated, under the heading, "Import Registration Information: Material: Dronabinol, Schedule 3, Code #7369."

5. ████████ and ██████ also told us that they intended to import bulk dronabinol to be manufactured into soft gelatin capsules  At the time of this meeting, however, I was unaware that dronabinol, except when in an U.S. Food and Drug Administration (hereinafter "FDA") approved product as described in 21 C.F.R. § 1308.13(g), is a Schedule I controlled substance. During the meeting on September 27, 2005, there was no discussion about whether ██████ intended to import an FDA approved product, or whether dronabinol, in the form that ██████ desired to import it, was a Schedule I or Schedule III controlled substance.

6. On December 20, 2005 D/I Michelle McGregor recommended approval of ██████ application to register to import dronabinol as a Schedule III controlled substance.

7. On ████████████ DEA Registration Specialist Maria Mendoza approved

2

███ application to import dronabinol with what is now known by me to be the erroneous

drug code 7369, since the product ███ desires to import is not approved by the FDA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _2_ day of June, 2006 in Philadelphia, Pennsylvania.

John W. Robertson
Diversion Investigator

3

CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2006, I caused a copy of the foregoing Defendants'

Opposition to Plaintiff's Motion for a Preliminary Injunction to be filed through the United

States District Court for the District of Columbia's ECF system.


_____/s/_____
Jacqueline Coleman